1   Samuel J. Strauss, WSBA #46971
    TURKE & STRAUSS LLP
2   936 North 34th Street, Suite 300
    Seattle, Washington 98103-8869
3   Telephone: (608) 237-1774
    Facsimile: (608) 259-9114
4   Email: sam@turkestrauss.com

5   [Additional Counsel Appear on Signature Page]

6

7              IN THE UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF WASHINGTON
8

9   MONTE SWENSON, WILBUR PACE,
    NOAH PACE, CHRISTOPHER PACE,
    LOUISE LARGE-GURIN, and                    NO.
10  ELIZABETH KANTOR, individually
    and on behalf of all others similarly      **CLASS ACTION COMPLAINT**
11  situated,

12              Plaintiffs,

13       v.

14  VOYA RETIREMENT INSURANCE
    & ANNUITY COMPANY, VOYA
15  FINANCIAL, INC., LINCOLN LIFE &
    ANNUITY COMPANY OF NEW
    YORK, LINCOLN NATIONAL LIFE
16  INSURANCE COMPANY, AND
    LINCOLN NATIONAL CORP.,
17

18              Defendants.

19

20

CLASS ACTION COMPLAINT
CASE NO. 2:14-CV-48

I.     INTRODUCTION ................................................................... 1

II.    PARTIES ............................................................................... 10

       A.    Defendants and their Affiliation............................... 10

       B.    The Plaintiff Policyholders ...................................... 12

III.   JURISDICTION AND VENUE............................................. 13

IV.    FACTS ................................................................................. 14

       A.    General Background Allegations .............................. 14

             1.    Voya's Relationship with Lincoln ................. 14

             2.    Voya's Troubled History ............................... 19

             3.    Lincoln's Troubled Financial Status Leads to Acceptance of TARP Funds............................. 25

             4.    The Captive Reinsurance Scheme ................. 26

                   a.    *Accurate Reporting of Surplus and RBC under NAIC SAP is required* ........................... 27

                   b.    *Two main ways insurance companies are measured for ability to meet long-term obligations: surplus and risk-based capital* ...................... 33

                         i.    Surplus as a means of solvency ..................... 33

                         ii.   RBC as a measure of ability to meet future obligations...................................... 36

                   c.    *Transactions with affiliates can manipulate surplus and RBC*....................................... 40

d.    *The Danger of Financial Alchemy through Transactions with Affiliates Worsens through the Use of Wholly-Owned Captives* ........................................................... 46

e.    *Rules Prohibiting Financial Alchemy through Affiliated Transactions* ................................... 56

f.    *Captives and Offshore Affiliates Help Companies Break the Rules* ........................................... 60

g.    *Affiliated Transactions Help Hide Liabilities* ............. 61

B.    Defendants' Captive Insurance Scheme ............................................ 65

     1.    Voya's Captive Reinsurance Scheme ..................................... 66

     2.    Lincoln's Captive Reinsurance Scheme ............................... 75

C.    Defendants Move Policyholders to the End of the Line, Putting Investors Ahead of Them to Receive Excessive Stockholder Dividends ........................................................ 85

     A.    Voya's Payment of Dividends to Voya Financial ................. 85

     B.    Lincoln National Life's Payment of Dividends to Lincoln National Corp. ........................................................ 88

D.    Defendants' COI Increase ................................................ 92

     1.    Lincoln and Voya's Special Relationship Regarding the Life Policies at Issue ...................................................... 92

     2.    Overview of Life Policies at Issue ....................................... 97

     3.    Lincoln Sends Annual Reports Indicating the Voya Policies Are Adequately Funded and Minimal Fees Are Charged ... 100

     4.    Defendants Implement Drastic COI Increases to Generate Cash and Cause Lapse ........................................................ 102

5.      Defendants Misrepresent the True Reasons Behind the COI Increase ................................................................. 103

E.      Universal Policies at Issue ............................................................ 107

A.      Plaintiff Monte Swenson ...................................................... 107

B.      Plaintiff Wilbur Pace.............................................................. 109

C.      Plaintiffs Noah and Christopher Pace.................................. 110

D.      Plaintiff Louise Large-Gurin ................................................ 113

E.      Plaintiff Elizabeth Kantor .................................................... 115

F.      Class Members....................................................................... 117

F.      Defendants' Publicly Filed Financial Statements Demonstrate that the Defendants Justifications to Raise COI Rates Are Untrue ...... 118

V.      RICO ALLEGATIONS ............................................................................. 125

A.      Standing, Injury, and Proximate Cause............................................ 125

B.      The Alleged Association-in-Fact RICO Enterprise ....................... 128

1.      Purpose of the RICO Enterprise ........................................... 130

2.      Relationships Among Separate and Distinct Associates ..... 131

3.      Continuous Existence............................................................. 135

4.      Interstate Commerce .............................................................. 136

C.      Pattern of Racketeering Activity....................................................... 136

D.      Predicate Acts.................................................................................... 137

VI.    CLASS ALLEGATIONS ........................................................................ 142

VII.    COUNTS ........................................................................................... 148

COUNT ONE VIOLATION OF THE RACKETEER INFLUENCED
AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. SECTION
1962(c) .................................................................................................. 148

COUNT TWO VIOLATION OF THE RACKETEER INFLUENCED
AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C.
SECTION 1962(d) .................................................................................. 149

COUNT THREE BREACH OF CONTRACT ........................................ 150

COUNT FOUR UNJUST ENRICHMENT ............................................ 153

COUNT FIVE CONVERSION ............................................................... 155

COUNT SIX FRAUD ............................................................................. 156

COUNT SEVEN VIOLATION OF THE CONNECTICUT UNFAIR
TRADE PRACTICES ACT ..................................................................... 158

COUNT EIGHT VIOLATION OF NEW YORK DECEPTIVE ACTS &
PRACTICES ACT ................................................................................... 163

COUNT NINE VIOLATION OF MISSOURI MERCHANDISING
PRACTICES ACT ................................................................................... 168

COUNT TEN VIOLATION OF THE NORTH CAROLINA UNFAIR
AND DECEPTIVE TRADE PRACTICES ACT ..................................... 173

COUNT ELEVEN VIOLATION OF THE PENNSYLVANIA UNFAIR
TRADE PRACTICES AND CONSUMER PROTECTION LAW ......... 178

COUNT TWELVE VIOLATION OF WASHINGTON CONSUMER
PROTECTION ACT ............................................................................... 183

VII.    PRAYER FOR RELIEF ....................................................................... 188

IX.    JURY DEMAND........................................................................................ 188

1    Plaintiffs Monte Swenson, Wilbur Pace, Noah Pace, Christopher Pace, and

2    Louise Large-Gurin, individually and on behalf of a class and/or subclasses of all

3    those similarly situated, bring this action against Voya Retirement Insurance &

4    Annuity Company, Voya Financial, Inc., Lincoln Life & Annuity Company of New

5    York, Lincoln National Life Insurance Company, and Lincoln National Corp., and

6    allege based upon the investigation of counsel and upon information and belief as

7    follows:

8                                    **I.  INTRODUCTION**

9        1.1    Defendants Lincoln National Life Insurance Company ("Lincoln

10   National Life") and Lincoln Life & Annuity Company of New York ("Lincoln

11   NY") and Voya Retirement Insurance & Annuity Company ("Voya") are for-profit

12   life insurers.  Each insurance company operates within a holding company system

13   consisting of other for profit insurance companies with a common parent entity

14   (Defendant Lincoln National Corp. for Lincoln National Life and Lincoln NY, and

15   Defendant Voya Financial Inc. for Voya).

16       1.2    Beginning in October 1998, Lincoln NY serves as an administrative

17   agent for former Aetna universal life policies now owned by Voya Retirement

18   Insurance & Annuity Company. Lincoln NY reinsures and administers several

19

20

CLASS ACTION COMPLAINT - 1
CASE NO. 2:14-CV-00235-RMP

1  blocks of universal life and variable universal life insurance policies originally

2  issued by Aetna Life Insurance and Annuity Company ("Aetna").[1]

3      1.3    The reinsurance agreement between Aetna and Lincoln was amended

4  in March 2007 to name Aetna's successor, ING (rebranded presently as Voya) as a

5  party to the arrangement.

6      1.4    Because the Defendant insurance companies are for-profit, and

7  because they hold large amounts of assets, they are under great pressure to pay

8  dividends to satisfy their shareholders.

9      1.5    Indeed, Voya's ultimate parent company, Voya Financial, is a holding

10 company whose principal asset is the stock of its insurance company subsidiaries.

11 Voya Financial relies on dividends, returns of capital, and interest income on

12 intercompany indebtedness from its insurance company subsidiaries, including

13 Voya, to meet its obligations to pay dividends to shareholders, repurchase its

14 securities and pay corporate expenses, and to pay interest and principal on

15 outstanding debt obligations.

16     1.6    Likewise, Lincoln National Corp. is a holding company that depends

17 primarily on the ability of its subsidiaries, including Lincoln National and Lincoln

18

19

20

---

[1] *Another Major Carrier Raising Cost of Insurance Charges*, ITM TWENTYFIRST (May 10, 2016), https://blog.itm21st.com/2016/05/10/another-major-carrier-raising-cost-of-insurance-charges/).

CLASS ACTION COMPLAINT - 2
CASE NO. 2:14-CV-00235-RMP

1    NY, to pay dividends or to advance or repay funds to Lincoln National Corp. to

2    meet its obligations to pay dividends to shareholders, repurchase its securities and

3    pay corporate expenses, and to pay interest and principal on outstanding debt

4    obligations.

5        1.7    Prior to the financial crisis in 2008, both the Voya Defendants and

6    Lincoln Defendants aggressively sold insurance and annuity products, including

7    products guaranteeing minimum returns to their policyholders.  These products

8    provided a significant cash inflow to the insurance company subsidiaries

9    companies who then paid large dividends to their parent companies.  In fact,

10   between 2006 and through 2008, Lincoln National Life paid over $1.8 billion in

11   dividends while Voya (formerly ING) paid over $376 million in dividends to its

12   parent.

13       1.8    The products the Voya Defendants and Lincoln Defendants were

14   selling, however, also generated liabilities, particularly on these guaranteed

15   obligations, and in order to meet these obligations and make a profit, Defendants

16   needed investments yielding a higher rate of return than those products.

17       1.9    To generate those returns, the Lincoln Defendants and Voya

18   Defendants both began to bet heavily on mortgage-backed securities, investing as

19   much as 20% or more of their assets into what turned out to be an illiquid and

20   overvalued investments.  In March 2007, ING (Voya) required Lincoln to enter

CLASS ACTION COMPLAINT - 3
CASE NO. 2:14-CV-00235-RMP

1   into a trust arrangement whereby Voya would serve as beneficiary over a variety

2   of assets, including mortgage-backed securities and government bonds.

3       1.10   The   financial   crisis,   however,   turned   the   Lincoln   and   Voya

4   Defendants'   strategy   on   its   head   and   revealed   the   insidious   nature   of   the

5   "investments" in mortgage-backed securities Defendants had made to back their

6   products.   As a consequence, both the Lincoln and Voya Defendants' insurance

7   companies became severely financially distressed.

8       1.11   Indeed, by 2009 Lincoln National Corp. required a nearly $1 billion

9   dollar bailout from the United States Treasury Department, and sought to raise

10  another $1.1 billion dollars by issuing debt and new common stock, to try and save

11  its insurance operations, including Lincoln National Life.

12      1.12   Likewise, Voya Financial's former Dutch parent, ING Group N.V.,

13  required a $14 billion bailout from the Dutch government, who ordered ING Group

14  N.V. to divest itself of its troubled United States subsidiary insurance companies

15  because of their distressed financial condition.

16      1.13   After the financial crisis in 2008, and in their strained financial

17  condition, both the Lincoln Defendants and Voya Defendants had a choice: admit

18  to financial distress, try to rebuild their capital assets, and forgo or substantially

19  restrict their ability to pay dividends to shareholders, or engage in a scheme to

20

CLASS ACTION COMPLAINT - 4
CASE NO. 2:14-CV-00235-RMP

1  conceal from the public their true financial condition so they could continue doing

2  business as usual and paying extraordinary dividends to their shareholders.

3      1.14   Both the Lincoln and Voya Defendants opted for the latter choice, and

4  both devised a scheme to conceal their true financial condition by moving billions

5  of dollars of liabilities for policyholder claims off their balance sheets by using

6  wholly-owned captive reinsurance transactions.  These captive reinsurers have

7  been called "financial alchemy" by New York's former Superintendent of

8  Financial Services, Benjamin M. Lawsky, because in reality, the liabilities remain

9  with the insurer, since the wholly-owned captive reinsurance companies (unlike

10  traditional reinsurance with third-party reinsurers) are incapable of satisfying the

11  assumed obligations.  The finances of these captives are hidden from consumers,

12  the public, and even most regulators, and both the Lincoln and Voya Defendants

13  used this lack of transparency to unload billions of dollars of insurance liabilities

14  off of their balance sheets.

15      1.15   Thus, for more than ten years, Lincoln National Life and Lincoln NY,

16  under the direction of both company's ultimate parent, Lincoln National Corp., put

17  investors and executives ahead of their own policyholders.  In doing so, Lincoln

18  National Corp. moved $10.7 billion of liabilities, *à la* Enron, from its insurance

19  subsidiaries' balance sheets to its wholly-owned "captives" and other affiliates in

20  transactions that the Lincoln Defendants misrepresented as complying with NAIC

1  Statutory Accounting Procedures when in fact they did not.  Using the illusory

2  "surplus" created by this scheme, Lincoln National Corp. caused Lincoln National

3  Life and Lincoln NY to pay more than $7.6 billion in "extraordinary stockholder

4  dividends."

5      1.16   Voya, at the direction of its parent company, Voya Financial, has also

6  engaged in the same scheme.  Voya moved more than $13 billion of liabilities to

7  wholly-owned "captives" and other affiliates in transactions that it misrepresented

8  as complying with NAIC Statutory Accounting Procedures when in fact they did

9  not, thereby creating a false "surplus" and enabling Voya alone to pay over $1.7

10  billion in stockholder dividends.

11      1.17   The use of captive reinsurance departs from Statutory Accounting

12  Principles issued by the National Association of Insurance Commissioners

13  (referred to as "NAIC SAP") and adopted by every state, including those few states

14  allowing the use of captive reinsurance. Nonetheless, even though insurers are

15  required to disclose all departures from NAIC SAP and the impact these departures

16  have on either surplus or risk-based capital ("RBC"), neither the Lincoln insurance

17  subsidiaries nor the Voya insurance subsidiaries reported the effect of these

18  departures from NAIC SAP in their Annual Statements.

19      1.18   As a direct consequence, the Annual Statements of both Lincoln

20  National Corp.'s insurance subsidiaries and the Voya Financial's insurance

1    subsidiaries present a materially inaccurate and misleading picture of their finances

2    and ability to both meet their obligations to policyholders and continue to pay the

3    extraordinary dividends to their parent companies.

4        1.19    Moreover, these captive reinsurance transactions did not actually

5    transfer the underlying risk associated with these liabilities outside of the holding

6    systems of which they are part. The Lincoln insurance subsidiaries and the Voya

7    insurance subsidiaries remain responsible for meeting these insurance obligations

8    as they come due and needed to generate cash to meet the billions of dollars of

9    insurance liabilities associated with policies they had issued.

10        1.20    Importantly, this included a need for cash to cover the billions of

11    dollars of insurance obligations for universal life policies issued by Voya and

12    reinsured and administered by Lincoln National and Lincoln NY.

13        1.21    Thus, the finances of both the Voya Defendants and Lincoln

14    Defendants are linked because of: (1) the inability of Voya to meet its significant

15    insurance obligations, including $1.8 billion in obligations for policies reinsured

16    by Lincoln; and likewise, (2) the inability of Lincoln National or Lincoln NY to

17    meet their significant insurance obligations, including $1.8 billion in reinsurance

18    obligations for policies issued by Voya.

19        1.22    Neither the Lincoln nor Voya Defendants had the assets necessary to

20    cover their liabilities, including the Voya policies (with guaranteed minimum rates

CLASS ACTION COMPLAINT - 7
CASE NO. 2:14-CV-00235-RMP

of return) reinsured and administered by Lincoln, particularly because between 2008 and 2016 Defendant Lincoln National paid $5.51 billion in dividends to shareholders and Voya paid $1.35 billion to its shareholders.

1.23   To keep the scheme going, the Lincoln and Voya Defendants conspired with each other to generate more cash, or even cause policyholders to lapse or surrender their policies so they could erase the liabilities, by hitting policyholders like Plaintiffs and putative Class members with exorbitant charges that Defendants falsely told policyholders were based on Cost of Insurance ("COI") increases.

1.24   Thus, on June 1, 2016, Lincoln NY suddenly increased the COI charged to large blocks of former Aetna (now Voya) universal life insurance policyholders; in some cases, by as much as 55%.[2] According to the COI increase letter sent to Plaintiffs and Class members, Lincoln, who "act[s] as administrative agent for Voya," had decided to increase the COI on their policies.[3]

1.25   Indeed, in 2016, through mailers, agent communications, and a myriad of other mediums, Lincoln NY began representing to Voya policyholders like Plaintiffs and putative Class members that their monthly payments would be

---

[2] *See* Summary of Changes, Cost of Insurance Rates Effective June 1, 2016, LINCOLN FINANCIAL GROUP, p. 1, attached hereto as Exhibit 1.
[3] *See, e.g.*, May 31, 2016 Letter from Lincoln NY to Plaintiff W. Pace Re: Important Notification, attached hereto as Exhibit 2.

CLASS ACTION COMPLAINT - 8
CASE NO. 2:14-CV-00235-RMP

1   dramatically increasing because the COI had increased as a the result of "lower

2   investment income and elevated costs."

3       1.26   This statement was undoubtedly false. According to their financial

4   statements, the investment performance and cost associated with administering the

5   life insurance business at Lincoln, Lincoln NY, and Voya has remained stable. In

6   fact, for more than a decade, Defendants have represented to insurance examiners,

7   policyholders, rating agencies, and shareholders the exact opposite of what they

8   told Plaintiffs and the putative Class to justify paying extraordinary dividends and

9   encourage investment by both policyholders and shareholders.

10      1.27   In reality, the dramatic increases in monthly payments that Defendants

11  levied on Plaintiffs and putative Class members are not due to legitimate COI

12  increases but are the direct consequence of the Lincoln Defendants' and Voya

13  Defendants' scheme to continue taking cash out of their insurance company

14  subsidiaries while masking their troubled financial condition from the public.

15      1.28   The improper increases are not permitted under the terms of Plaintiffs'

16  and the putative Class members' policies.  These charges do not result because of

17  an increase in the COI but rather are a result of a conspiracy on the part of

18  Defendants to address past practices of funneling billions of dollars out of their

19  insurance subsidiaries despite their financial distress by raiding policyholder

20

accounts and improperly charging insureds who have dutifully paid premiums to Defendants for years, often decades.

1.29   Plaintiffs seek a return of these improper charges and legal remedies available under RICO, the common law, and other statutory provisions.

## II.  PARTIES

**A.    Defendants and Their Affiliation**

2.1     Lincoln National Corporation ("Lincoln National Corp.") is a holding company, which operates multiple insurance and investment management businesses through subsidiary companies.  Lincoln National Corp. is incorporated under the laws of Indiana with its principal place of business at 150 North Radnor-Chester Road, Radnor, Pennsylvania 19087.

2.2     Lincoln National Life Insurance Company ("Lincoln National Life") is an insurance company incorporated under the laws of Indiana and with its principal place of business at 1300 South Clinton Street, Fort Wayne, Indiana 46802.  All outstanding shares of Lincoln National Life are owned by Lincoln National Corp.

2.3     Lincoln Life & Annuity Company of New York ("Lincoln NY") is a New York life insurance company, incorporated under the laws of New York and with its principal place of business at 120 Madison Street, Suite 1700, Syracuse,

New York 13202.  All outstanding shares of Lincoln NY are owned by Lincoln National Life.

2.4    All outstanding shares of Lincoln National Life and Lincoln NY are owned by Lincoln National Life and Lincoln NY's common parent company, Lincoln National Corporation ("Lincoln National Corp.").[4] (Lincoln National Life, Lincoln NY, and Lincoln National Corp. will be collectively referred to as "Lincoln".)

2.5    Voya Financial, Inc. ("Voya Financial") is a holding company incorporated under the laws of Delaware and with its principal place of business at 230 Park Avenue, New York, NY 10169. Voya Financial was until known as ING U.S., Inc. until 2014 when it changed its name to Voya Financial, Inc.

2.6    Voya Retirement Insurance & Annuity Company ("Voya") is a for-profit life insurance company incorporated under the laws of Connecticut that, upon information and belief has its principal place of business is One Orange Way, Windsor, Connecticut, 06095.  All outstanding shares of Voya are owned by Voya Financial.  (Voya and Voya Financial will be collectively referred to as "the Voya Defendants".)

---

[4] *See, e.g.*, <u>Annual Statement for Year 2015 of the Lincoln National Life Insurance Company</u> at 19.11.

CLASS ACTION COMPLAINT - 11
CASE NO. 2:14-CV-00235-RMP

**B.    The Plaintiff Policyholders**

2.7    Plaintiffs are purchasers of Universal Life policies from Aetna, now owned by Voya and reinsured and administered by Lincoln.

2.8    Plaintiff Monte Swenson is an adult resident of Colbert, Washington. Plaintiff Swenson purchased an Aetna universal life insurance policy in 1988. Beginning October 1, 1998, Lincoln NY began administering the policy on behalf of Aetna, which was subsequently acquired by Voya Financial.

2.9    Plaintiff Wilbur Pace ("W. Pace") is an adult resident of Eufaula, Alabama.  Plaintiff W. Pace purchased an Aetna universal life insurance policy when he resided in Florida on December 15, 1986.  Beginning October 1, 1998, Lincoln NY began administering the policy on behalf of Aetna, which was subsequently acquired by Voya Financial.

2.10    Plaintiff Noah Pace ("N. Pace") is an adult resident of Ayden, North Carolina.  Plaintiff N. Pace purchased an Aetna universal life insurance policy in 1987.  Plaintiff Christopher Pace ("C. Pace"), also an adult resident of Ayden, North Carolina, is listed as the owner and payor of the policy.  Beginning October 1, 1998, Lincoln NY began administering the policy on behalf of Aetna, which was subsequently acquired by Voya Financial.

2.11    Plaintiff Louise Large-Gurin is an adult resident of Raymore, Missouri.  Plaintiff Large-Gurin purchased an Aetna universal life insurance policy

in 1989.  Beginning October 1, 1998, Lincoln NY began administering the policy on behalf of Aetna, which was subsequently acquired by Voya Financial.

2.12   Plaintiff Elizabeth Kantor is an adult resident of Shelton, Connecticut. Plaintiff Kantor purchased an Aetna universal life insurance policy in 1992. Beginning October 1, 1998, Lincoln NY began administering the policy on behalf of Aetna, which was subsequently acquired by Voya Financial.

### III.  JURISDICTION AND VENUE

3.1    This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c) and jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1332(d), the Class Action Fairness Act ("CAFA"), and § 1367.

3.2    This Court has personal jurisdiction over the Defendants pursuant to 18 U.S.C. §§ 1965(a), (b) and (d).  The Defendants reside in, are found in, or have agents in and transacts affairs in the State of Washington.

3.3    This Court has also has personal jurisdiction over all Defendants due to their purposeful availment via continuous transactions, contact, acts, and omissions with Plaintiff Swenson that gave rise to his claim within this district. Additionally, all Defendants purposefully avail themselves of the privilege of doing business in Washington and within this district, including but not limited to, by soliciting business in Washington, by advertising or promoting their services

CLASS ACTION COMPLAINT - 13
CASE NO. 2:14-CV-00235-RMP

(including flexible premium adjustable life insurance and universal life insurance policies) to residents of Washington, and by providing services in Washington to Washington residents.

3.4    Venue is proper in this District pursuant to 18 U.S.C. §§ 1965(a) and (b), as Defendants reside in, are found in, have agents in, and transact affairs in Washington.

3.5    Venue in this District is alternatively appropriate under 28 U.S.C. § 1391, because Defendant corporations are deemed to reside in any judicial district in which they are subject to personal jurisdiction, and because a substantial part of the events or omissions giving rise to the claim—such as communications and payments to the Defendants—occurred in this District.

## IV.  FACTS

**A.    General Background Allegations**

1.    <u>Voya's Relationship with Lincoln</u>

4.1    To understand Voya's and Lincoln's relationship with each other, one must start with another insurance company, Aetna Life Insurance Company ("Aetna"), as the policies that are the subject of this lawsuit originated with Aetna.

4.2    Aetna was a multiple-line insurer whose products including life insurance and annuities.

4.3    In the late 1990's, Aetna made the decision to get out of the life and

1  annuity business to focus on selling health insurance and began selling parts of its

2  business.

3      4.4    Specifically in 1998, Aetna "sold" its domestic individual life

4  insurance business to Lincoln National Corp. for $1 billion in cash. The transaction

5  was generally in the form of an indemnity reinsurance arrangement, under which

6  Lincoln National Life and Lincoln NY assumed from Aetna certain policyholder

7  liabilities and obligations, although Aetna remained directly liable to policyholders.

8  Also, certain Aetna employees became Lincoln National Corp. employees, and

9  Lincoln had access to Aetna's sales distribution channels, as a result of the

10 transaction.

11     4.5    Plaintiffs' and Class members' policies were part of the block of

12 insurance that Lincoln reinsured as part of this sale.

13     4.6    In addition to serving as a reinsurer for Plaintiffs' and the Class

14 members' policies, Aetna and Lincoln entered into an administrative services

15 agreement effective in 1998, through which Lincoln was paid by Aetna to provide

16 certain administrative services on behalf of Aetna.[5]   Thereafter, Lincoln became

17

18
_____

19 [5] *See* Coinsurance Agreement between Aetna Life Insurance and Annuity Company and The Lincoln National Life Insurance Company (Oct. 13, 1998), Voya Financial, Inc. Form S-1/A p. 1541 (Jan. 23, 2013),

20 http://d1lge852tjjqow.cloudfront.net/CIK-0001535929/c51a388f-03bf-4c44-a508-4acda8f90a5b.pdf.

CLASS ACTION COMPLAINT - 15
CASE NO. 2:14-CV-00235-RMP

1    the administrative agent of Aetna's policies and became the sole line of

2    communication regarding Plaintiffs' and Class members' policies.

3        4.7    Thus, from 1998 onward, Lincoln collected all premiums and paid all

4    claims as well as the expense of administering the policies, and all correspondence,

5    annual statements, and policyholder inquiries were handled by Lincoln, on behalf

6    of Aetna.

7        4.8    Despite being the reinsurer, the coinsurance agreement between

8    Lincoln and Aetna allowed Lincoln to reinsure the liabilities, and does not limit it

9    in doing so.  In fact, Lincoln could even use its own captives, if it so chooses.[6]

10        4.9    In 2000, ING acquired Aetna Financial Services for $7.7 billion.[7]

11        4.10    When ING acquired Aetna in 2000, it also acquired the result of the

12    1998 sale of Aetna's life business to Lincoln, namely the reinsurance transactions

13    into which Lincoln had entered with Aetna, and related transactions and

14    agreements.

15        4.11    On May 1, 2002, letters were sent to Aetna policyholders informing

16    them that Aetna had "changed its name to ING Life Insurance and Annuity

17    Company."  This letter guaranteed to policyholders that the policy would continue

18    to be insured by ING in accordance with the policy terms.  Additionally, it stated

19

20    _____

[6] *Id.* at 1559.
[7] *Id.*

CLASS ACTION COMPLAINT - 16
CASE NO. 2:14-CV-00235-RMP

that Lincoln National Life would continue to act as administrative agent for the policy, in accordance with an agreement between Lincoln National Life and ING.

4.12   In 2013, ING Group decided to sells its shares of ING U.S. through an initial public offering so that ING U.S. could "becom[e] an independent, standalone, U.S.-based company."  As part of this rebranding effort, ING U.S. was renamed "Voya Financial."[8]

4.13   On September 14, 2015, letters were sent to policyholders informing them that ING had "changed its name to Voya Retirement Insurance and Annuity Company effective September 1, 2014."  This letter guaranteed to policyholders that their "contracts" would continue to be insured by Voya in accordance with the contracts' terms.  Additionally, it stated that Lincoln Life & Annuity Company of New York would "continue to service" the contracts.

4.14   Importantly, although policyholders purchased an Aetna (now Voya) policy, Lincoln and Voya have blurred the distinction between their independent companies.  Policyholders pay their premiums to Lincoln, all communication regarding the policy comes from Lincoln, and to inquire about their policy, policyholders must call Lincoln's customer service or access their policy through

---

[8] *ING U.S. to rebrand as Voya Financial*, ING, https://www.ing.com/Newsroom/All-news/Features/Feature/ING-U.S.-to-rebrand-as-Voya-Financial.htm (last visited Jan. 31, 2017).

CLASS ACTION COMPLAINT - 17
CASE NO. 2:14-CV-00235-RMP

1  Lincoln's website. Moreover, in correspondence to policyholders, Lincoln has

2  even referred to the Voya policyholders as "valued customer[s] of Lincoln

3  Financial"[9] and "valuable Lincoln Life policy owner[s]."[10]

4      4.15   Upon information and belief, Voya compensates Lincoln for its

5  administration of the Plaintiffs' and Class members' policies.

6      4.16   Likewise, Voya compensates Lincoln for reinsuring the same policies.

7      4.17   In its 2015 Annual Report, Voya Financial states that Lincoln National

8  Life established a trust to secure its obligations under the reinsurance transaction.

9  Moreover, "[o]f the reinsurance recoverable on the Consolidated Balance Sheets,

10  $1.8 billion and $1.9 billion as of December 31, 2015 and 2014, respectively, is

11  related to the reinsurance recoverable from the subsidiary of Lincoln under this

12  reinsurance agreement."[11]

13      4.18   In fact, Voya (then ING) and Lincoln entered into this trust agreement

14  in March 2007.[12]  This agreement requires Lincoln to place "102% of the amount

15

16  _____

17  [9] *See* December 14, 2015 Letter from Lincoln NY to Monte Swenson, attached
    hereto as Exhibit 3.

18  [10] *See* January 22, 2015 Letter from Lincoln NY to Monte Swenson, attached hereto
    as Exhibit 4.

19  [11] Voya Financial, Inc., Annual Report, p. 144 (2015),
    http://s1.q4cdn.com/733568831/files/doc_financials/2015/annual/138420_006_w
    eb_clean.pdf.

20  [12] Grantor Trust Agreement between Lincoln NY and ING (Mar. 19, 2007), Voya
    Financial, Inc. Form S-1/A, p. 1654 (Jan. 23, 2013),

CLASS ACTION COMPLAINT - 18
CASE NO. 2:14-CV-00235-RMP

needed to fund all of the Reinsured Liabilities" into the trust with ING named as beneficiary.[13]

4.19    This trust has portfolio investment goals that rely extremely heavily on government bonds and mortgage-backed securities.[14]

4.20    Within less than a year, the Great Recession would expose mortgage-backed securities as "troubled" or toxic assets, sending stock prices plummeting. Meanwhile, interest rates impacting the government bonds and other investments held in the Lincoln-Voya trust would be slashed dramatically over the next decade and continuing at record low levels up to the filing of this action.

### 2.    Voya's Troubled History

4.21    Since at least 2008 and likely long before that date, the Voya U.S. insurance subsidiaries performed poorly due to both continuing issues with meeting guarantees they made to policyholders as well as above-average investment losses, largely from illiquid mortgage-backed securities.

4.22    Indeed, Moody's Investors Service repeatedly downgraded the credit rating of Voya and Voya's U.S. insurance business.[15]

_____

http://d1lge852tjjqow.cloudfront.net/CIK-0001535929/c51a388f-03bf-4c44-a508-4acda8f90a5b.pdf.

[13] *Id.* at 1670.

[14] *Id.* at 1678.

[15] *See, e.g.*, Global Credit Research, *Rating Action: Moody's downgrades ING's ratings*, MOODY'S INVESTORS SERVICE (Oct. 21, 2008), https://www.moodys.com/research/Moodys-downgrades-INGs-ratings--

CLASS ACTION COMPLAINT - 19
CASE NO. 2:14-CV-00235-RMP

4.23   As reflected in these Moody's rating actions, one reason for these financial problems is that Voya had, both prior to and after 2007, aggressively marketed insurance products having high guaranteed interest rates and/or no-lapse guarantees.

4.24   At the same time, the Voya Defendants, as well as Voya Financial's other subsidiaries, invested heavily in risky mortgage-backed securities (both collateralized mortgage obligations ("CMO") and real estate mortgage investment conduits ("REMIC")) having no agency backing or guarantees.

4.25   Voya Financial's subsidiary, Security Life's of Denver's Annual

---

PR_165323 ("The deterioration in ING US's credit profile has been driven by higher realized and unrealized investment losses in its sizable portfolio of subprime and Alt-A residential mortgage-backed securities and commercial mortgage-backed securities, which continue to remain largely illiquid and whose market valuations are depressed."); Global Credit Research, *Announcement: Moody's affirms ING insurance ratings; outlook changed to negative*, MOODY'S INVESTORS SERVICES (Dec. 13, 2010), https://www.moodys.com/research/Moodys-affirms-ING-insurance-ratings-outlook-changed-to-negative--PR_211157 ("[A] negative outlook is now appropriate because - although core earnings have shown recent signs of improvement -- ING US's net income remains weak, due to both continuing legacy variable annuity issues, as well as above-average investment losses, largely from structured securities."); Global Credit Research, *Rating Action: Moody's downgrades credit ratings of ING's US insurance subsidiaries (IFS to A3)*, MOODY'S INVESTORS SERVICE (Dec. 7, 2011), https://www.moodys.com/research/Moodys-downgrades-credit-ratings-of-INGs-US-insurance-subsidiaries-IFS--PR_232808, ("Commenting on the downgrade, Moody's said that the reserve charge is sizable relative to ING US's earnings and capital and weakens the US operation's stand-alone credit quality.").

CLASS ACTION COMPLAINT - 20
CASE NO. 2:14-CV-00235-RMP

1  Statements show that its investment in "other" CMOs and REMICs (that is, those

2  having no agency backing or guarantees) grew to over $4.6 billion by 2008, which

3  represented over 20.8% of its invested assets and over 320% of reported surplus.

4  As of 2011, Security Life still had an investment of over $2.9 billion in these types

5  of mortgage-backed securities, which represented over 18.9% of its invested assets

6  and over 190% of reported surplus.

7      4.26  Likewise,   Voya   Financial's   subsidiary,   ReliaStar's   Annual

8  Statements show that its investment in "other" CMOs and REMICs grew to over

9  $3.1 billion by 2008, which represented over 17% of its invested assets and over

10  150% of reported surplus.  As of 2011, ReliaStar still had an investment of over

11  $1.2 billion in these types of mortgage-backed securities, which represented over

12  7% of its invested assets and over 61% of reported surplus.

13      4.27  ING USA's (now Voya Financial) Annual Statements show that its

14  investment in "other" CMOs and REMICs grew to over $5.2 billion by 2008, which

15  represented over 22% of its invested assets and over 280% of reported surplus.  As

16  of 2011, ING USA still reported an investment of over $2.6 billion in these types

17  of mortgage-backed securities, which represented over 9.3% of its invested assets

18  and over 117% of reported surplus.

19      4.28  ING Life and Annuity's (now Voya) Annual Statements show that its

20  investment in "other" CMOs and REMICs grew to over $3.58 billion by 2008,

1    which represented over 18% of its invested assets and over 235% of reported

2    surplus.  As of 2011, ING Life and Annuity still had an investment of over $1.3

3    billion in these types of mortgage-backed securities, which represented over 6.1%

4    of its invested assets and over 72% of reported surplus.

5        4.29   Upon information and belief, the Voya Defendants invested heavily

6    in mortgage-backed securities betting that this growing portfolio of risky CMOs

7    and REMICs would generate returns that would match or exceed the returns that

8    they guaranteed to policyholders and enable them to continue to pay dividends.

9        4.30   This risky investment strategy was an abject failure.  Indeed, by the

10   onset of the housing and mortgage crisis in the United States in 2007, it became

11   obvious that the returns Voya Financial and its insurance subsidiaries anticipated

12   earning from their investment strategy would never materialize and, compounding

13   the problem, the market prices for these mortgage-backed securities plummeted.

14       4.31   Even worse, the prolonged period of low interest rates after the 2007

15   housing crisis, that continues to this day, meant that Voya Financial and its

16   insurance subsidiaries were, upon information and belief, unable to make

17   investments that generated returns equal to or higher than the returns they

18   guaranteed to policyholders.

19       4.32   Nonetheless, Voya Financial and its insurance subsidiaries continue

20   to over-value their respective investments in CMOs and REMICs in their Annual

CLASS ACTION COMPLAINT - 22
CASE NO. 2:14-CV-00235-RMP

Statements.  Instead, each of these companies largely utilize the historical book cost as the value of these assets on their respective Annual Statements and use that historical book cost value as the offset against liabilities when reporting surplus in their Annual Statements.

4.33   Another reason for Voya's financial problems is that its shareholder/parent, Voya Financial, regularly caused them to distribute to Voya Financial tens of millions of dollars each year to in the form of dividends and capital distributions.

4.34   Upon information and belief, Voya Financial directed its insurance subsidiaries to make these dividends or return of capital payments in order to further the accounting schemes discussed herein, and to help prop-up the finances of its then-ultimate parent, ING Group, whose financial condition had deteriorated to the point that the Dutch government had to rescue them at the end of 2008 by providing them with approximately $13.5 billion "to strengthen its capital position."[16]

4.35   As part of that rescue package, ING Group and the Dutch government reached an agreement in January of 2009 for an Illiquid Assets Back-up Facility

---

[16] *Transactions with Dutch State*, ING (March 31, 2014), https://web.archive.org/web/20140408000022/http://www.ing.com/Investor-relations/Transactions-with-Dutch-State.htm.

CLASS ACTION COMPLAINT - 23
CASE NO. 2:14-CV-00235-RMP

1  ("IABF").  According to ING Group, under the IABF, "a full risk transfer to the

2  Dutch State will be realized on 80% of ING's EUR 27.7 billion portfolio of Alt-A

3  RMBS at ING Direct USA and ING Insurance Americas. The Dutch State therefore

4  will participate in 80% of any results of the portfolio. This risk transfer will take

5  place at a discount of 10% of par value. ING will remain the legal owner of 100%

6  of the securities and will remain exposed to 20% of any results on the portfolio."[17]

7      4.36   The Dutch government also required ING Group to fully divest itself

8  of its poorly performing U.S. insurance subsidiaries.

9      4.37   Unable to find a buyer of its U.S. insurance subsidiaries, however,

10  ING Group decided to sells its shares of ING U.S. through an initial public offering.

11      3.    Lincoln's Troubled Financial Status Leads To Acceptance of
          TARP Funds

12      4.38   Interestingly, in June of 2009, Lincoln National Corp. accepted funds

13  from the government's Troubled Asset Relief Program ("TARP").[18]   Lincoln

14  received preliminary approval to receive up to $2.5 billion from the government,

15

16

_____

17  [17] *ING update on results and measures to reduce risk and costs*, ING (Jan. 26,
2009),     https://web.archive.org/web/20130517113615/http://www.ing.com/Our-
18  Company/Press-room/Press-release-archive/PressRelease/ING-update-on-results-
and-measures-to-reduce-risk-and-costs.htm.

19  [18] "Lincoln Financial accepts TARP money," HARTFORD BUSINESS (June 15,
2009),
20  http://www.hartfordbusiness.com/article/20090615/NEWS01/306159937/lincoln-
financial-accepts-tarp-money.

CLASS ACTION COMPLAINT - 24
CASE NO. 2:14-CV-00235-RMP

but accepted $950 million.[19]  Aside from the government funds, at the same time, Lincoln announced it would raise another $600 million through a common stock offering and another $500 million through a senior debt offering.[20]  About $1 billion of this new cash was contributed to Lincoln National Life Insurance Co., while the remaining funds were held at the holding company for "general corporate purposes, including the repayment of short-term debt."[21]

4.39  However, TARP funds were meant to encourage lending to middle America.  Instead, "Lincoln used TARP to finance 'expansion' of its annuities and life insurance sales."[22]  According to Lincoln officials, it could use each TARP dollar to finance "roughly 20 times that amount" in new insurance and annuity sales.[23]

4.40  In order to obtain TARP funds, Lincoln bought a tiny Indiana savings bank and become a thrift holding company so it could legally qualify for funds.  TARP rules allowed the buyer to add its vast insurance assets to the bank's small

---

[19] *Id.*
[20] *Id.*
[21] *Id.*
[22] Joseph N. DiStefano, *Lincoln National to pay back $1 billion US bailout*, PHILLY.COM (June 14, 2010 9:01 AM EDT), http://www.philly.com/philly/blogs/inq-phillydeals/Lincoln_National_to_pay_back_1_billion_US_bailout.html (quoting Special Inspector General Neil Barofsky).
[23] *Id.*

CLASS ACTION COMPLAINT - 25
CASE NO. 2:14-CV-00235-RMP

1  loan portfolio and magnify its TARP request.  As a result, Lincoln was able to

2  obtain $950 million in TARP funds (and in fact received approval for up to $2.5

3  billion in TARP funding), though its small bank would have been able to obtain, at

4  most, $350,000—*if* it would have qualified for funding at all.[24]

5      4.41   However, Lincoln supposedly had a "strong financial position" and

6  was "viable without TARP funds."[25]

7      4.     The Captive Reinsurance Scheme

8      4.42   Despite their financial troubles, both Voya and Lincoln were able to

9  pay massive amounts of dividends by using captive reinsurance to move liabilities

10  off their books.

11      4.43   The Defendants devised a scheme by which they were able to conceal

12  their true financial condition.  This involved moving billions of dollars of liabilities

13  for policyholder claims off of their balance sheets by using wholly-owned captive

14  reinsurance transactions, although these captive companies are incapable of

15  satisfying their assumed obligations.

16

17

18  ───────────────

19  [24] *Additional Insight on Use of Troubled Asset Relief Program Funds*, SIGTARP (Dec. 10, 2009),
   https://www.sigtarp.gov/Audit%20Reports/Additional_Insight_on_Use_of_Troub
20  led_Asset_Relief_Program_Funds.pdf.
   [25] DiStefano, *supra* note 24.

CLASS ACTION COMPLAINT - 26
CASE NO. 2:14-CV-00235-RMP

a.    *Accurate reporting of surplus and RBC under NAIC SAP is required.*

4.44    The NAIC is the U.S. standard-setting and regulatory support organization created and governed by the chief insurance regulators from the 50 states, the District of Columbia, and five U.S. territories.  One of NAIC's goals is to "[p]rotect the public interest" and to "[p]romote the reliability, solvency and financial solidity of insurance institutions."[26]

4.45    The insurance company Defendants, like every other insurance company in the United States, are required each year to prepare and file a sworn Annual Statement based on the convention blank form adopted by the NAIC.

4.46    The Annual Statement is a detailed statement of an insurance company's finances that must be prepared in accordance with the NAIC Annual Statement Instructions and NAIC Accounting Practices and Procedures Manual.

4.47    The NAIC Accounting Practices and Procedures ("AP&P") Manual provides the Rules of Statutory Accounting for Insurance Companies, referred to as SAP.

4.48    All fifty states require the adoption of the AP&P Manual and the Annual Statement Instructions.

4.49    Statutory accounting rests on principles unique to insurance company

---

[26] "About the NAIC," NAIC, http://www.naic.org/index_about.htm (last visited Jan. 23, 2017).

CLASS ACTION COMPLAINT - 27
CASE NO. 2:14-CV-00235-RMP

1    accounting of conservatism, consistency and recognition.  *See* SAP Preamble.

2        4.50    These fundamentals of statutory accounting differ from other financial

3    accounting methods because the focus is on solvency for the protection of

4    policyholders and annuity holders.  This is because insurance contracts, especially

5    annuities, involve a promise to pay which extends years (often decades) into the

6    future.

7        4.51    To protect policyholders, the applicable statutory accounting

8    principles promote conservativism: "Conservative valuation procedures provide

9    protection to policyholders against adverse fluctuations in financial condition or

10    operating results.  Statutory accounting should be reasonably conservative over the

11    span of economic cycles and in recognition of the primary responsibility to regulate

12    for financial solvency."  AP&P Manual, ¶ 30.  This emphasis—determining an

13    insurer's ability to satisfy obligations years in the future—is much different than

14    other financial accounting methods, such as Generally Accepted Accounting

15    Principles ("GAAP").

16        4.52    The NAIC SAP "provide[s] examiners and analysts with uniform

17    accounting rules against which companies' financial statements can be evaluated,"

18    to provide "more complete disclosures and more comparable financial statements,"

19    and so that surplus and RBC "will be reported more consistently…."  SAP

20    Preamble, ¶ 14.

1    4.53   To that end, Connecticut (Defendant Voya's state of domicile) and

2    New York (Defendant Lincoln NY's state of domicile) and all other states, require

3    all Annual Statements conform to the annual statement instructions and manuals

4    promulgated by NAIC.

5    4.54   Therefore, every year Defendants are required to prepare and file a

6    sworn Annual Statement, based on the convention blank form adopted by NAIC,

7    that accurately reports its financial condition with the Connecticut Insurance

8    Department and the New York Department of Financial Services.

9    4.55   An Annual Statement is a detailed statement of an insurance

10   company's finances.  It must be prepared according to SAP, to the extent they are

11   not in conflict with applicable state statutes or regulations.  Quarterly Statements,

12   which contain less detail than the Annual Statement, are also prepared using the

13   same accounting methodology.

14   4.56   While states can either (1) prescribe certain accounting practices in

15   their state laws, regulations, or general rules that may differ from NAIC SAP, or

16   (2) permit account practices that differ from NAIC SAP, ***both the deviation and its***

17   ***financial effect must be disclosed specifically in an insurance company's Annual***

18   ***Statement***.  SAP No. 1.  While "[s]tatutory requirements vary from state to state

19   … to the extent that they exist it is the objective of NAIC statutory accounting

20   principles to provide the standard against which the expectations will be measured

CLASS ACTION COMPLAINT - 29
CASE NO. 2:14-CV-00235-RMP

1    and disclosed if material." Statement of Concepts, ¶ 26.

2        4.57   Thus, if an insurer's use of a state accounting practice that departs

3    from NAIC SAP affects surplus or RBC, it must disclose both the accounting

4    practice and explain the financial impact to the insurance company in Note 1 of the

5    Annual Statement:

> [I]f a reporting entity employs accounting practices that depart from the NAIC accounting practices and procedures, disclosure of the following information about those accounting practices that affect statutory surplus or risk-based capital shall be made at the date each financial statement is presented:
>
> (a) A description of the accounting practice;
>
> (b) A statement that the accounting practice differs from NAIC statutory accounting practices and procedures;
>
> (c) The monetary effect on net income and statutory surplus of using an accounting practice which differs from NAIC statutory accounting practices and procedures;
>
> (d) If the insurance enterprise's risk-based capital would have triggered a regulatory event had it not used a prescribed or permitted practice, that fact should be disclosed in the financial statements.
>
> These disclosures shall be disclosed in Note 1 as illustrated in Appendix A-205. Additionally, a reference to Note 1 shall be included in the individual notes to financial statements impacted by the prescribed or permitted practices as applicable.

17   SAP No. 1.

18       4.58   Essential to the principles of statutory accounting and inherent in all

19   of its requirements is the requirement of **_adequate disclosure_**:

> Statutory reporting applies to all insurers authorized to do business in the United States and its territories, and

*requires sufficient information to meet the statutory objectives.* However, statutory reporting as contained in this guide is not intended to preempt state legislative and regulatory authority. The SSAP financial statements include the balance sheet and related summary of operations, changes in capital and surplus, and cash flow statements. Because these basic financial statements cannot be expected to provide all the information necessary to evaluate an entity's short-term and long-term stability, *management must supplement the financial statements with sufficient disclosures* (*e.g.*, notes to the financial statements, management's discussion and analysis, and supplementary schedules and exhibits) to assist financial statement users in evaluating the information provided.

SAP Preamble: Objectives of Statutory Financial Reporting (emphasis added).

4.59   Thus, it is essential that insurance companies fully and accurately disclose the nature of their financial transactions, as the ability to protect the company's policyholders and annuity holders rests squarely on accurate reporting.

4.60   Accurate Annual Statement reporting is critically important, because the Annual Statement is made available to the public so that consumers, agents, ratings agencies and others can develop an assessment of the company's financial strength and ability to pay future claims as they come due.

4.61   An insurance company's Annual Statement, statutory surplus and risk-based capital ratios are also key variables that influence the financial strength rating assigned by A.M. Best, a rating agency that historically focuses on the insurance industry, as well as other rating agencies.

CLASS ACTION COMPLAINT - 31
CASE NO. 2:14-CV-00235-RMP

1      4.62   For example, A.M. Best issues financial strength ratings that provide

2  an opinion of an insurer's financial strength and ability to meet its ongoing

3  obligations to policyholders and annuity holders.  The financial strength rating is

4  based on the surplus, RBC ratio and other data the insurance company reports in

5  its Annual Statement "since it is "the foundation for policyholder security."[27]

6      4.63   As A.M. Best explains on its website, a financial strength rating is

7  important because insurance agents and professionals depend on it "to assess the

8  creditworthiness of an insurer's operations, to evaluate prospective reinsurance

9  accounts, to compare company performance and financial condition," and a "rating

10  can influence an agent's selection of plans to market."  Moreover, "[a] rating also

11  is an important factor in the consumer's decision-making process to purchase

12  insurance," and it "can provide consumers with the information necessary for an

13  educated buying decision."[28]

14          b.    *Two main ways insurance companies are measured for ability*
                  *to meet long term obligations:  surplus and risk-based capital*

15      4.64   There are two main metrics by which consumers and the public

16  determine whether an insurance company is adequately capitalized to meet future

---

19  [27] "Understanding BCAR for U.S. and Canadian Life/Health Insurers," A.M.
    BEST METHODOLOGY, Criteria – Life/Health, p. 1 (April 11, 2016),
    http://www3.ambest.com/ambv/ratingmethodology/OpenPDF.aspx?rc=190754.

20  [28] A.M. BEST METHODOLOGY, Criteria – Insurance (May 2, 2012) (available:
    http://www.ambest.com/ratings/guide.asp).

CLASS ACTION COMPLAINT - 32
CASE NO. 2:14-CV-00235-RMP

1  policy holding obligations:  surplus and risk-based capital ("RBC") ratio.

2  (i)    Surplus as a measure of solvency.

3  4.65    Solvency of an insurance company is critical to policyholders.  It
4  "ensure[s] that the policyholder, contract holder and other legal obligations are met
5  when they come due and *that the companies maintain capital and surplus at all*
6  *times and in such forms as required by statute to provide an adequate margin of*
7  *safety*."  SAP Preamble, ¶ 27 (emphasis added).

8  4.66    A consumer's ability to assess an insurance company's ability "to
9  provide an adequate margin of safety" if the life insurance company accurately
10  discloses its financial condition.  As the NAIC observed, "the cornerstone of
11  solvency measurement is financial reporting."  *Id*.

12  4.67    Surplus is derived by comparing the company's admitted assets to all
13  of its liabilities, including its current and projected future obligations to
14  policyholders and annuity holders.

15  4.68    Admitted assets are assets of the insurer available for the satisfaction
16  of its obligations to its policyholders.  Assets that cannot be readily liquidated due
17  to encumbrances or other third party interests cannot be reported as *admitted assets*.
18  AP&P Manual, at SAP No. 4.

19  4.69    A contingent letter of credit ("LOC") is an example of an asset that
20  *cannot* be an admitted asset.

1    4.70   In addition, even though an insurer may be part of a holding company

2    system, the surplus (and solvency) of each insurance company is determined solely

3    by that company's finances independent of the finances of any other affiliated

4    company within the holding company system.

5    4.71   The following example of a simplified balance sheet demonstrates

6    how surplus is calculated:

| Admitted Assets | | Liabilities | |
|---|---|---|---|
| Bonds | $13 Billion | All Reserves | $14 Billion |
| Stock | $ 1 Billion | Expenses Due | $2 Billion |
| Cash | $ 1 Billion | Debt | $ 0 |
| All Other | $2 Billion | | |
| **Total Admitted Assets** | **$17 Billion** | **Total Liabilities** | **$16 Billion** |
| | | | |
| | **Surplus = $1 Billion** | | |

12    4.72   If a life insurance company's statutory surplus falls below the

13    minimum legal levels, or if the company operates at an annual loss, it is not

14    permitted to pay dividends to shareholders and may not be able to continue

15    operations.

16    4.73   Management of every U.S.-based life insurer swears, under penalty of

17    perjury, that the financial condition of their company, as reported in the Annual

18    Statements, is completely true.  That means that assets must be valued truthfully,

19    and liabilities calculated in accordance with the law, specifically SAP.

20    4.74   State laws and SAP requirements create a framework by which an

CLASS ACTION COMPLAINT - 34
CASE NO. 2:14-CV-00235-RMP

1  insurer's financial condition is externally reported to, among others, consumers.

2      4.75  For a life insurer, liabilities are almost entirely promises made to

3  policyholders—such as death benefits—and those promises are most often very

4  long-term commitments.  The nature of insurance business requires that insurance

5  company management engage actuaries to calculate the total commitments

6  associated with a company's annuities and life policies for the Annual Statement.

7  To calculate the present value of all those future promises, actuaries must consider

8  future contingent events that would trigger claims the company must pay.

9      4.76  The projected amount due under life insurance policies is a relatively

10  predicable figure because the calculation is relatively simple, involving far fewer

11  unknowns than property and casualty risks, which would include such events as

12  hurricanes and fires.

13      4.77  The actuary performs mathematical calculations to determine, in his

14  judgment, the present value of future liability, which is the liability figure used on

15  a life insurer's balance sheet.  If the value of the admitted assets exceeds that

16  liability figure, the company can show surplus.  If, however, admitted assets are

17  insufficient to cover the liability figure, the company suffers from a deficit and the

18  state regulator must take action to protect policyholders by, for example, putting

19  the company in receivership.

20      4.78  Accurate reporting of both assets and liabilities is essential to

1  measuring solvency through surplus.  It is essential to accurately represent to

2  consumers the true financial condition of the company.

3          (ii)     RBC as a measure of ability to meet future obligations.

4      4.79   RBC is another measure of insurance company solvency, and is one

5  of the most important factors examined in determining an insurance company's

6  ability to meet future obligations.

7      4.80   RBC limits the amount of risk a company can take.  It requires a

8  company with a higher amount of risk to hold a higher amount of capital.  Capital

9  provides a cushion to a company against insolvency.  Stated another way, RBC is

10  a ratio that measures a company's ability to meet its future obligations.  All things

11  being equal, a company with a higher RBC ratio is more capable of meeting its

12  future obligations than a company with a lower RBC ratio.

13      4.81   In order to assure policyholders that their benefits will be available

14  when they are needed, the NAIC began regulating insurer capital through the Risk-

15  Based Capital Model Act ("the RBC Model Act").

16      4.82   The RBC Model Act provides a method of measuring the minimum

17  capital necessary for an insurer to support its overall business operations when

18  considering its size and risk profile.

19      4.83   Under the RBC Model Act, insurance companies calculate and self-

20  report their total adjusted capital (in general, the amount by which a company's

1   assets exceed liabilities) and an RBC figure which reflects the riskiness of the

2   company's activities.  Although the insurance company reports the results of those

3   calculations on its Annual Statement, the calculations themselves are not part of

4   the Annual Statement.

5       4.84   RBC is intended to be a ***minimum*** capital standard and not necessarily

6   the full amount of capital that an insurer would want to hold to meet its safety and

7   competitive objectives.  It is one of the tools used to assess the ability of insurance

8   companies to meet its risk obligations both now and in the future.

9       4.85   Before RBC was created, fixed capital standards were a primary tool

10  used to monitor insurance companies' financial solvency.   Under fixed capital

11  standards, insurers were required to hold the same minimum amount of capital,

12  regardless of the riskiness of the company's activities.  Capital requirements varied

13  by state, ranging from $500,000 to $6 million, and were dependent upon the state

14  and the lines of business the insurance carrier wrote.  Companies were required to

15  meet minimum capital and surplus requirements to be licensed and to write

16  business in the state.  As insurance companies changed and grew, it became clear

17  that the fixed capital standards were no longer effective in providing a sufficient

18  cushion for many insurers.

19      4.86   Following a string of large company insolvencies in the late 1980s and

20  1990s, the NAIC implemented its RBC regime, intending it to be an early warning

1  system that alerted regulators to potential insolvencies.

2      4.87   The RBC regime's intent was to provide a capital adequacy standard

3  directly related to risk that (a) provided a safety net for insurers, (b) was uniform

4  among the states, and (c) provided regulatory authority for timely action.

5      4.88   The NAIC RBC regime has two main components: (1) the risk-based

6  capital formula, that established a hypothetical *minimum* capital level that is

7  compared to a company's actual capital level, and (2) a risk-based capital model

8  law that gives state insurance regulators authority to take specific actions based on

9  the level of impairment if an insurer's RBC drops below the minimum threshold.

10      4.89   Under the RBC system, regulators have statutory authority to take

11  preventive and corrective measures, which vary depending on the capital

12  deficiency indicated by the RBC result.  These preventive and corrective measures

13  are intended to enable, and even require, regulatory intervention that will correct

14  problems before insolvencies become inevitable, thereby minimizing the number

15  and adverse impact of insolvencies.

16      4.90   On their Annual Statements, insurance companies must report two

17  RBC-related numbers: (1) Total Adjusted Capital, and (2) their Authorized Control

18  Level Capital.

19      4.91   Frequently, the comparison between a company's Total Adjusted

20  Capital and the Authorized Control Level Capital is expressed as a ratio—the RBC

Ratio.  The ratio is:

$$\frac{\textit{Total Adjusted Capital}}{\textit{Capital Reserved In Accordance Pursuant to RBC Model Act}}$$

4.92    When the NAIC RBC system is tripped, one of two things happens: (1) a company must take action to increase its capital as compared to its risk (meaning increase its surplus), or (2) regulators can exercise their statutory authority and intervene in the business affairs of the insurer.  If a company's financial reporting is accurate, reported RBC alerts regulators to undercapitalized companies, giving them sufficient time to act and minimize overall costs associated with insolvency.

4.93    The RBC ratio is for use by potential consumers in evaluating the likelihood of a future insolvency of an insurer given its capital, surplus and risk. Indeed, RBC is a significant factor in the financial strength ratings insurance companies receive and that consumers rely on in deciding whether to purchase a product or at what price.

4.94    If RBC is misstated, a company not only improperly avoids regulatory intervention, but it also misleads ratings agencies and consumers about its financial stability and adequate capitalization.

c.    *Transactions with affiliates can manipulate surplus and RBC*

4.95    "An 'affiliate' . . . is a [company] that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common

1  control with, the [company] specified." Insurance Holding Company System

2  Regulatory Act §1A.

3      4.96  Historically, some companies have used affiliated entities to hide their

4  distressed financial condition, *à la* Enron. Accounting machinations and off-

5  balance sheet liability transfers are easily executed when the company that assumes

6  liabilities is wholly owned or affiliated with the ceding company, and has every

7  incentive to act for a common benefit, rather than its own benefit.

8      4.97  Surplus and RBC are good predictors of an insurer's solvency only if

9  all the company's transactions regarding the transfer of liabilities, assets, and risk

10  are legitimate and arm's-length. When, however, such transactions are not arm's-

11  length, surplus and RBC can be easily manipulated.

12      4.98  Obviously, some affiliated transactions achieve meaningful purposes,

13  for example, consolidating certain lines of business into an affiliate that specializes

14  in that line. Affiliated transactions, however, can also be used for nefarious

15  purposes, such as shuffling liabilities between entities, artificially "transferring"

16  risk, inflating valueless assets, or merely generating phantom assets.

17      4.99  Insurance companies legitimately use reinsurance, coinsurance, and

18  modified coinsurance transactions to spread risk to third-party companies that are

19  solvent and capable of meeting policyholder to meet current and future obligations.

20  This allows insurance companies to obtain surplus relief, as well as improve their

1  RBC ratios.

2       4.100 When an insurer "cedes" risks of a block of life insurance policies or

3  annuities through a bona fide reinsurance transaction, the assuming company is

4  obliged by the governing reinsurance contract—a "treaty"—to set up reserve

5  liabilities for that block.  Once ceded, the ceding company can drop those liabilities

6  from its own financial statements because the assuming company becomes

7  responsible for paying those liabilities.

8       4.101 By way of example, assume that Company A originally sold 100

9  insurance policies to customers (policyholders), each with a death benefit of

10 $100,000.  Although extremely unlikely, the worst-case scenario for the insurer is

11 that all 100 policyholders suddenly die the very next day.  Doing the math, a

12 $100,000 death benefit multiplied by 100 policies equals a $10 million liability.

13 However, it is highly unlikely that all 100 policyholders will die after just one day.

14 Applying mathematical tables, formulas, and the "Law of Large Numbers,"

15 actuaries can predict with accuracy what proportion of insureds, within a given

16 class of insureds, will die.  Accordingly, Company A is not required to hold

17 reserves equal to a policy's ultimate death benefit.  However, between the policy's

18 issue date and the policyholder's death, the insurance company is expected to

19 collect premiums and earn interest on those funds which will, over time, equal more

20 than the $100,000 benefit.  For this reason, the initial reserve liability for a very

CLASS ACTION COMPLAINT - 41
CASE NO. 2:14-CV-00235-RMP

1    young, healthy, non-smoker will be much lower than it would be for an elderly

2    smoker.  This assessment, keyed to the present value of the obligation, is done

3    through annual cash flow testing and reserve calculations.

4        4.102 In insurance parlance, the total needed to fulfill all contractual

5    obligations (in this example $10 million) is referred to as the "Gross In-Force"—

6    the sum of all ultimate death benefit payments.  Because it is extremely likely that

7    the deaths will be staggered across many ensuing years, the insurance company

8    only needs to hold in reserve the present value of that ultimate $10 million.  For

9    this example, assume that the actuarially required immediate reserve liability is $1

10   million for the entire block.

11       4.103 When Company A cedes this block of policies to Company B in a

12   reinsurance transaction, Company A drops the present value amount of $1 million

13   from its liabilities and Company B sets up the $1 million liability on its books.

14   Company B is essentially backing Company A, and must pay Company A $100,000

15   for each death claim as it is made. The terminology used to describe Company A's

16   reduction of the $1 million liability is a "reserve credit."  In other words, because

17   Company B is now "on the hook" to pay the claims as they come due, Company A

18   is allowed to reduce its reserve liability (called a "reserve credit") by $1 million.

19   In this way, Company A reduces its liabilities by $1 million and Company B adds

20   $1 million to its liabilities.

4.104 Because this is a business transaction between two independent companies, Company B will not acquire the reserve liabilities without sufficient payment; therefore, Company A must also send sufficient assets to cover the reserve liabilities.  In an arm's-length transaction, those assets are cash or cash-equivalents that are commensurate to cover the assuming company's obligations.

4.105 RBC assumes that all reinsurance agreements are reached at arm's-length with reinsurers financially capable of performing the ceded reinsurance obligations; therefore, the RBC formulas do not account for reinsurance *quality*. As a result, reinsurance with a highly solvent third-party reinsurer and reinsurance with an undercapitalized wholly owned captive shell company are treated the same.

4.106 Coinsurance or modified coinsurance similarly spreads risk. However, the assets for the block of business that is coinsured stay on the balance sheet of the ceding company for surplus calculation purposes, but are considered transferred to the assuming company for RBC purposes.  In other words, the ceding company's RBC is calculated as if the company had transferred that block of business off its books.

4.107 Historically, insurance companies reinsure or coinsure their risks with highly capitalized and independent—non-affiliated—companies.  Legitimate reinsurers are used for their strong financial support and their valuable expertise and advice.  A knowledgeable, well-capitalized, and honest reinsurer helps a

company spread its risks and shares knowledge of good underwriting practices and economic expectations.  The independent reinsurer has its own set of experienced executives, actuaries, and other experts that help the ceding company achieve shared goals.  With well-capitalized and independent reinsurers, the valid purpose for reinsuring or coinsuring risks is achieved.

4.108 In arm's-length transactions between unaffiliated entities, both companies are independently incentivized to ensure that liabilities transferred mirror liabilities assumed, and that the transferred assets are real and sufficient to cover the assumed liabilities.

4.109 In fact, for the ceding company to take a reserve credit, the reinsurance agreements must transfer risk from the ceding entity to the reinsurer.  SAP 61R, ¶ 17.

4.110 When insurance companies engage in reinsurance, coinsurance, and modified coinsurance transactions with affiliated entities, the companies can manipulate their balance sheets or risk profiles.  Such transactions can foist large liabilities or risky assets onto an affiliated entity that is not subject to the strict capital and surplus requirements imposed on life insurance companies for the policyholders' benefit.

4.111 Such transactions between affiliates, especially shell entities, often have no valid economic purpose.  Indeed, pretending to transfer risk to an affiliate

or captive is similar to a husband handing off a debt he owes a bank to his wife, purportedly to improve the family's financial condition.  It simply does nothing.

4.112 These types of sham liability transfers have recently become prevalent in the life insurance industry: insurance companies create, and enter into transactions with, wholly owned captive subsidiaries whose finances are secret and free from regulatory scrutiny.  These entities provide a vehicle for financial alchemy that serves to mask a ceding company's dire financial condition, or even insolvency.

4.113 Because the financial statements of captive companies generally unavailable to the public, rating agencies, or regulators outside of their state of domicile, it is easy for a company to shift its future obligations into reinsurers that do not appear on the insurer's balance sheet.  And many of these moves are, sadly, made with the blessing of state regulators, who in some cases even waive accounting rules or approve excessive dividends.[29]

d.    *The Danger of Financial Alchemy through Transactions with Affiliates Worsens through the Use of Wholly Owned Captives*

4.114 A legitimate captive insurance company can be a very specific kind of

---

[29] *See* COI Rate Risk: an analysis of the cause and effect, p.7 CAMBRIDGE GUARANTEE GROUP (Dec. 2016); Mary Williams Walsh, *Why Some Life Insurance Premiums Are Skyrocketing*, THE NEW YORK TIMES (Aug. 13, 2016), https://www.nytimes.com/2016/08/14/business/why-some-life-insurance-premiums-are-skyrocketing.html?_r=1.

CLASS ACTION COMPLAINT - 45
CASE NO. 2:14-CV-00235-RMP

1    risk financing wherein a non-insurance company, such as Exxon, creates an

2    insurance subsidiary for which it is the sole policyholder.  The captive insurer is a

3    regulated entity designed to provide a form of self-insurance.  Through a captive

4    reinsurer, a company creates a self-insurance vehicle and tax deductions because it

5    can write off the premiums.  Companies typically form captives when they are

6    either so large that they have more resources than the insurers who would be

7    covering their risk, or when it is simply less expensive to start and run one's own

8    insurance company than it is to pay the market value for certain kinds of insurance.

9        4.115 A captive insurer is "an insurance or reinsurance entity created and

10   owned, directly or indirectly, by one or more industrial, commercial or financial

11   entities, other than an insurance or reinsurance group entity, the purpose of which

12   is to provide insurance or reinsurance cover for risks of the entity or entities to

13   which it belongs, or for entities connected to those entities and only a small part if

14   any of its risk exposure is related to providing insurance or reinsurance to other

15   parties."[30]

16       4.116 Nevertheless, insurance companies have begun to create "captive"

17   reinsurance subsidiaries primarily to hide liabilities, thereby falsely inflating RBC.

18

19   [30] *Guidance Paper on the Regulation and Supervision of Captive Insurers*,
     International Association of Insurance Supervisors (Oct. 2008),

20   http://www.iaisweb.org/file/34118/17-guidance-paper-no-36-on-regulation-and-
     supervision-of-captive-insurers.

CLASS ACTION COMPLAINT - 46
CASE NO. 2:14-CV-00235-RMP

4.117 Arguably, the impetus for captive reinsurance subsidiaries was the NAIC's Regulation XXX reserving methodology. The XXX reserving methodology is the product of the NAIC's March 1999 adoption of the revised Valuation of Life Insurance Policies Model Regulation.

4.118 Becoming effective in January 2000, Regulation XXX significantly increased the U.S. statutory reserve requirements for term life insurance writers.

4.119 Regulation XXX was a response to life insurer's attempt to drive down reserves by creating products that had excessively late-duration guaranteed premiums. Regulation XXX was intended to foreclose this practice, which was generally regarded as a loophole exploitation. Regulation XXX addressed this practice by necessitating that each level of a premium be calculated separately in order to ensure sufficient reserve requirements.

4.120 The insurance industry pushed back against increased reserves requirements imposed by Regulation XXX. Insurance companies alleged that the reserve requirements were overly stringent and, in response, began pursuing workarounds.

4.121 Ultimately, companies began to evade the increased reserve requirements by using captive reinsurers. More specifically, many companies began ceding their policy liabilities to offshore or out-of-state reinsurers where local statutory reserving requirements were less onerous, such as allowing the use

1   of U.S. GAAP rather than SAP.

2       4.122 Universal life ("UL") policies with secondary guarantees are subject

3   to Regulation AXXX (also known as Actuarial Guideline 38).  Reserves under

4   AXXX demonstrate a similar "hump-backed" pattern as XXX with longer tails

5   since universal life typically has a longer average policy life than term life products.

6   The reinsurance market for the AXXX reserve is very limited and most insurers

7   retain the risk.

8       4.123 To address the looming capital needs associated with XXX and

9   AXXX reserves, many for-profit life insurance companies turned to so called

10   "alternate capital-funding solutions," among which securitization is considered the

11   more elegant solution.

12       4.124 Securitization is the process of repackaging certain assets or cash

13   flows for sale in the capital markets as debt securities that pay periodic coupons as

14   well as the eventual repayment of principal.  Investors buying these securities will

15   assume the risks inherent in the underlying cash flow.

16       4.125 A common and well-known type of securitization in the asset world is

17   a mortgage-backed security, where the cash flows from a pool of mortgages that

18   are sold as debt.  Insurance securitizations follow a very similar process, except

19   that the cash flows are derived from liabilities instead of assets, and the risks are

20   related to insurance risks such as mortality and lapse rates instead of prepayment.

1    4.126 A simple hypothetical illuminates how these securitizations function

2  in practice: Suppose a block of term insurance reserves under XXX is being

3  securitized.  Similar concepts would apply to UL reserves under AXXX as well.

4  The original company is either a direct writer or a reinsurer looking to finance its

5  mounting XXX reserve.  The company typically would set up a captive reinsurer

6  and cede off its block of term policies under a coinsurance treaty.  Many companies

7  choose to set up captives either offshore or in states that offer favorable regulatory

8  accounting treatment, such as allowing the use of GAAP reserves for the captive's

9  regulatory reporting.  A holding company may be set up as the parent to the captive

10 reinsurer.  Many prefer this type of holding company structure, since the original

11 company does not directly own the captive reinsurer, and it is less likely that the

12 original company will need to reflect the captive reinsurer on its statutory financial

13 statement.

14    4.127 Special Purpose Vehicles ("SPVs") are often used in securitization.

15 An SPV is set up to serve a specific purpose, such as raising capital and servicing

16 investors in a securitization.  It performs little or no other activities.  The investors

17 have claims to assets only in the SPV and have no recourse to the original company.

18 Similarly, the creditors of the original company have no claims to any assets in the

19 SPV.  The equity holder of the SPV is often the original company, an affiliate or

20 an investment bank, and controls the SPV's activities, including the issuing of debt

or equity securities, as well as selling notes to the investors.  The SPV pays the financial guarantor a premium to compensate for the risks the guarantor assumes.

4.128 For years, insurance companies created these captive entities in off-shore countries, such as Barbados and Bermuda.  Because the offshore captives are not subject to U.S. regulation, they provide a means to hide balance sheet and RBC problems from United States regulators.

4.129 In the last decade, several states, including Arizona, Vermont, and South Carolina, encouraged the formation of the "special purpose financial captives" ("SPFCs")—a specific type of SVP—in their states, hoping to spur a cottage industry that would generate fee revenues and create jobs.  Such state programs feature confidentiality protections that, despite the required transparency of the ceding company's financial condition, shield the SPFCs' financial condition from the view of consumers (and even from other state regulators that would be unwilling to offer SPFCs the same degree of secrecy).

4.130 Vermont, for example, cloaks domestic SPFCs in secrecy, only permitting its Commissioner of the Department of Financial Regulation to disclose captive formation and financial information under two circumstances: (1) in response to a subpoena if certain specific requirements are met, VT. STAT. ANN. tit. 8, § 6002(c)(3)(A), or (2) to a public officer with insurance regulation responsibilities in another state, provided that: "(i)  such public official shall agree

1  in writing to maintain the confidentiality of such information; and (ii) the laws of

2  the state in which such public official serves require such information to be and to

3  remain confidential." *Id*. at § 6002(c)(3)(B).

4      4.131 The same strict confidentiality restrictions apply to examinations and

5  investigations by the commissioner into a captive insurance company's financial

6  condition:

> All examination reports, preliminary examination reports or results, working papers, recorded information, documents and copies thereof produced by, obtained by or disclosed to the commissioner or any other person in the course of an examination made under this section are confidential and are not subject to subpoena and may not be made public by the commissioner or an employee or agent of the commissioner without the written consent of the company, except to the extent provided in this subsection. Nothing in this subsection shall prevent the commissioner from using such information in furtherance of the commissioner's regulatory authority under this title. ***The commissioner may, in the commissioner's discretion, grant access to such information to public officers having jurisdiction over the regulation of insurance in any other state or country, or to law enforcement officers of this state or any other state or agency of the federal government at any time, so long as such officers receiving the information agree in writing to hold it in a manner consistent with this section.***

18  *Id*. at § 6008(c) (emphasis added). These confidentiality restrictions are expressly

19  applicable to Vermont SPFCs. *Id*. at § 6048(a).

20      4.132 In short, Vermont and certain other states now allow insurance

1   companies to create U.S. subsidiaries whose balance sheets are secret.

2      4.133 Simply stated, insurance companies can shuttle financial statement

3   problems onto captive SPFCs, and away from regulation and public scrutiny.

4      4.134 For this reason, many people consider captive SPFCs the "black hole"

5   of insurance company financial analysis.

6      4.135 As captives have become more prevalent, the NAIC has begun to

7   examine and advise the insurance industry on their potential abuse.  In fact, the

8   NAIC has expressly stated that these entities should not be used to manipulate

9   company finances: "Commercial insurer-owned captives and [SPFCs] ***should not***

10  ***be used to avoid statutory accounting***."[31]

11     4.136 The NAIC White Paper also stated that conditional LOCs, which

12  cannot be admitted assets pursuant to SAP, were not appropriate means for

13  capitalizing captive SPFCs:

14         The transactions involving conditional LOCs or parental

15  _____

16  [31] *Captives and Special Purpose Vehicles: An NAIC White Paper*, NAIC (July
    2013) (hereinafter "NAIC White Paper"), at 3 (emphasis added); *see also id.* at 20

17  ("the general opinion of the Subgroup was that it is inappropriate for captives and
    [SPFCs] to be used as a means to avoid statutory accounting"); 23 (recognizing "a

18  consensus view that captives and special purpose vehicles should not be used by
    commercial insurers to avoid statutory accounting prescribed by states"); 30 ("The

19  practice of using a different entity or different structure outside of the commercial
    insurer to engage in a particular activity because of a perception that the regulatory
    framework does not accurately account for such activity should be discouraged.

20  The Subgroup held a consensus view that captives and [SPFCs] should not be used
    by commercial insurers to avoid statutory accounting prescribed by the states.").

CLASS ACTION COMPLAINT - 52
CASE NO. 2:14-CV-00235-RMP

guarantees effectively permit assets to support reinsurance recoverables, either as collateral or as capital, in forms that are otherwise inconsistent with requirements under Model #785 and Model #786 or other financial solvency requirements applicable to U.S.-domiciled commercial assuming insurers. The Subgroup held a consensus view that these types of transactions may not be consistent with the NAIC credit for reinsurance requirements.

NAIC White Paper, at 23.

4.137 The draft White Paper was more blunt:

The transactions involving conditional LOCs or parental guarantees effectively permit assets to support reinsurance recoverables, either as collateral or as capital, in forms that are otherwise inconsistent with requirements under the credit for reinsurance models or other financial solvency requirements applicable to U.S.-domiciled commercial assuming insurers. The subgroup held a consensus view that these types of transactions were not consistent with the NAIC credit for reinsurance requirements. ***It is not financially sound to provide credit for reinsurance when the assuming insurer's solvency depends on a parental guaranty, while the parent's surplus that supports that guaranty includes credit for the very reinsurance whose performance depends on the guaranty. Similar bootstrapping problems arise if reinsurance is directly secured by an LOC, or is indirectly secured when an LOC is used to capitalize the assuming insurer, and the ceding insurer itself, or one of its affiliates, is the LOC applicant, which becomes liable to reimburse the bank if the LOC is drawn.***

Draft White Paper (setting out Maine comments), at 18 (emphasis added).

4.138 The New York Department of Financial Services has also warned

1  about the use of captive reinsurers by the life insurance industry, stating "[s]hadow

2  insurance could potentially put the stability of the broader financial system at

3  greater risk."[32]

4      4.139 In short, otherwise regulated commercial insurers, such as

5  Defendants, cannot do through an SPFC what it is prohibited from doing by SAP.

6  Liabilities originating with, and retained by, the ceding insurer cannot be granted

7  favorable treatment merely by reporting that those liabilities are on the books of an

8  affiliated captive.  *See, e.g.*, NAIC White Paper, at 28 ("allowing a captive or

9  [SPFC] to account for LOCs or parental guarantees as assets [is] something not

10  permitted in the current statutory accounting framework.").  Likewise, risky assets

11  that would normally affect a company's RBC ratio cannot simply be transferred to

12  a wholly owned captive entity to make the insurance company look financially

13  stable when it is not.

14      4.140 As alleged with particularity below, and precisely as feared by the

15  NAIC, Lincoln National Corp., Lincoln National Life, Lincoln NY, Voya

16  Financial, and Voya have used SPFCs and other affiliated entities to facilitate a

17  fraudulent scheme to avoid statutory accounting rules and principles to make

18  Defendants appear financially stable, inflate statutory surplus, and magically

19

20  [32] Benjamin M. Lawsky, *Shining a Light on Shadow Insurance*, p. 1 (June 2013), http://www.dfs.ny.gov/reportpub/shadow_insurance_report_2013.pdf.

CLASS ACTION COMPLAINT - 54
CASE NO. 2:14-CV-00235-RMP

1  improve their RBC ratios.  As shown below, Defendants, during the Class Period,

2  used the "black box" confidentiality afforded by Vermont, South Carolina,

3  Missouri, Arizona, Barbados, and Bermuda to evade SAP principles, to misstate its

4  true surplus, and mask its troubled financial condition to regulators, rating

5  agencies, and ultimately, its life insurance customers.

6          e.      *Rules Prohibiting Financial Alchemy through Affiliated*
                   *Transactions*
7
           4.141 Because the risk that insurance companies will alter their balance

8
   sheet through affiliate transactions is so grave, the NAIC drafted the Model

9
   Holding Company Act, adopted in all 50 states, to govern such transactions.  The

10
   Act's primary objective is to ensure that insurance companies' transactions with

11
   affiliates are "fair and reasonable," and done at "arm's-length."

12
           4.142 Those requirements, mainly contained in SAP 25, prohibit companies

13
   from recording non-arm's-length or non-economic transactions with affiliates in

14
   such a way that they seem to "create" assets, falsely inflate assets, or mask

15
   liabilities.

16
           4.143 SAP No. 25 governs accounting for transactions with affiliates and

17
   other related parties.  SAP No. 25 in pertinent part provides:

18
                   [1] Related party transactions are subject to abuse
19                 because reporting entities may be induced to enter
                   transactions that may not reflect economic realities or
20                 may not be fair and reasonable to the reporting entity or
                   its policyholders. As such, related party transactions

CLASS ACTION COMPLAINT - 55
CASE NO. 2:14-CV-00235-RMP

require specialized accounting rules and increased regulatory scrutiny. This statement establishes statutory accounting principles and disclosure requirements for related party transactions.

\*\*\*

[9] Loans or advances by a reporting entity to all other related parties shall be evaluated by management and nonadmitted if they do not constitute arm's length transactions as defined in paragraph 12.

\*\*\*

[12] An arm's-length transaction is defined as a transaction in which willing parties, each being reasonably aware of all relevant facts and neither under compulsion to buy, sell, or loan, would be willing to participate. A transaction between related parties involving the exchange of assets or liabilities shall be designated as either an economic transaction or non-economic transaction. An economic transaction is defined as an arm's-length transaction which results in the transfer of the risks and rewards of ownership and represents a consummated act thereof, i.e., "permanence." The appearance of permanence is also an important criterion in assessing the economic substance of a transaction. In order for a transaction to have economic substance and thus warrant revenue (loss) recognition, it must appear unlikely to be reversed. If subsequent events or transactions reverse the effect of an earlier transaction prior to the issuance of the financial statements, the reversal shall be considered in determining whether economic substance existed in the case of the original transaction.

\*\*\*

An economic transaction must represent a bona fide business purpose demonstrable in measurable terms. *A transaction which results in the mere inflation of surplus without any other demonstrable and measurable betterment is not an economic transaction. The statutory accounting shall follow the substance, not the form of the transaction.*

***

[13] In determining whether there has been a transfer of the risks and rewards of ownership in the transfer of assets or liabilities between related parties, the following – and any other relevant facts and circumstances related to the transaction – shall be considered:

[a] Whether the seller has a continuing involvement in the transaction or in the financial interest transferred, such as through the exercise of managerial authority to a degree usually associated with ownership;

***

[15] A non-economic transaction is defined as any transaction that does not meet the criteria of an economic transaction. Similar to the situation described in paragraph 13, ***transfers of assets from a parent reporting entity to a subsidiary, controlled or affiliated entity shall be treated as a non-economic transactions at the parent reporting level because the parent has continuing indirect involvement in the assets***.

***

[16] When accounting for a specific transaction, reporting entities shall use the following valuation method:

[a] Economic transactions between related parties shall be recorded at fair value at the date of the transaction. To the extent that the related parties are affiliates under common control, the controlling reporting entity shall defer the effects of such transactions that result in gains or increases in surplus (*see* paragraph 13);

[b] Non-economic transactions between reporting entities, which meet the definitions of related parties above, shall be recorded at the lower of existing book values or fair values at the date of the transaction;

[c] Non-economic transactions between a reporting entity and an entity that has no significant ongoing operations other than to hold assets that are primarily for the direct or indirect benefit or use of the reporting entity or its affiliates, shall be recorded at the fair value at the

CLASS ACTION COMPLAINT - 57
CASE NO. 2:14-CV-00235-RMP

date of the transaction; however, to the extent that the transaction results in a gain, that gain shall be deferred until such time as permanence can be verified;

[d] ***Transactions which are designed to avoid statutory accounting practices shall be reported as if the reporting entity continued to own the assets or to be obligated for a liability directly instead of through a subsidiary***.

SAP 25, ¶¶ 1, 9, 12, 13, 15 & 16 (emphasis added).

4.144 The Code of Connecticut also addresses transactions with affiliates and prohibits self-interested transactions with affiliates:

(a) Transactions within an insurance holding company system to which an insurance company subject to registration under section 38a-135 is a party shall be subject to the following requirements: (1) The terms shall be fair and reasonable; (2) charges or fees for services performed shall be reasonable; (3) expenses incurred and payment received shall be allocated to the insurance company in conformity with customary insurance accounting practices consistently applied; (4) the books, accounts and records of each party shall be so maintained as to clearly and accurately disclose the precise nature and details of the transactions, including such accounting information as is necessary to support the reasonableness of the charges or fees to the respective parties; (5) the insurance company's surplus shall be reasonable in relation to such company's outstanding liabilities and adequate to its financial needs; and (6) agreements for cost-sharing services and management shall include such provisions as may be required by regulations adopted by the commissioner.

Conn. Gen. Stat. § 38a-136.

4.145 Utilizing similar language, the Indiana Code and New York Insurance

CLASS ACTION COMPLAINT - 58
CASE NO. 2:14-CV-00235-RMP

Laws similarly prohibit such transactions.  *See* Ind. Code § 27-1-23-4; N.Y. Ins. Las § 1505.

f.    *Captives and Offshore Affiliates Help Companies Break the Rules*

4.146 While SAP 25 clearly prohibits the use of affiliated transactions to manipulate a company's financial picture and give the appearance of stability and strength, it still relies on insurance companies to accurately disclose and report their financials.

4.147 Companies that are motivated to cheat have found a perfect vehicle for financial alchemy in domestic and offshore captive subsidiaries and affiliates. Because the captives' finances are largely secret and not subject to the same regulations, parent insurance companies can, and do, hide liabilities through affiliated transactions.

4.148 Life insurance companies are now using captive SPFCs to misuse reinsurance and coinsurance as methods of masking their troubled financial condition.

4.149 They do this by causing their affiliates to enter into what appears to be reinsurance transactions, but that are in reality simply means of shuffling the insurance company's worst liabilities and assets off its books.  In reality, however, liabilities are not transferred because they never left the holding company system or the insurance company where it started.

CLASS ACTION COMPLAINT - 59
CASE NO. 2:14-CV-00235-RMP

4.150 "About 80% of total 2015 reinsured XXX/AXXX reserves went to captives, rather than to third-party reinsurers, improving regulatory capital ratios, *even though no risk has left the house*," according to Moody's Investors Services Vice President-Senior Credit Officer, Laura Bazer.[33]

### g.   *Affiliated Transactions Help Hide Liabilities*

4.151 Moody's Investors Service recently noted "little information exists on the underlying financing arrangements themselves.  (Re)insurers are not required to provide details on the financing providers or diagrams describing the transactions and fund flows, among other things, which makes assessing the risks associated with the financings, including counterparty risk, challenging."[34]

4.152 A company that wishes to disguise its troubled financial condition can hide some of its liabilities through affiliated transactions, allowing it to report positive surplus and favorable RBC ratios.

4.153 By creating captive reinsurers and offshore affiliated entities, life insurers can enter into imbalanced economic, non-arm's-length transactions in which the ceding company can "cede" more liabilities than the assuming company

---

[33] Global Credit Research, *Announcement: Moody's: New Regulatory Disclosures Show Sizable XXX/AXXX Captive Exposures*, MOODY'S INVESTORS SERVICES (Dec. 21, 2016), https://www.moodys.com/research/Moodys-New-Regulatory-Disclosures-Show-Sizable-XXXAXXX-Captive-Exposures--PR_359957?WT.mc_id=AM~RmluYW56ZW4ubmV0X1JTQl9SYXRpbmdzX05ld3NfTm9fVHJhbnNsYXRpb25z~20161221_PR_359957 (emphasis added).
[34] *Id.*

1    reports it "assumes," or the ceding company can "send" significant liabilities, while

2    sending insufficient assets to back these liabilities.

3        4.154 Because surplus is a component of the insurance company's RBC ratio

4    (it is part of the numerator in the RBC ratio calculation), artificially inflating

5    surplus also artificially inflates RBC.

6        4.155 In a normal arm's-length reinsurance transaction, an independent

7    reinsurance company would not assume liabilities without also receiving real assets

8    commensurate to back those liabilities.    Because life insurance involves such

9    predictable risk factors, as compared to other forms of insurance, it is likely that

10   the actuary working for the ceding company will independently derive a number

11   that reasonably tracks the number derived by the assuming company's actuary.

12       4.156 If the ceding actuary arrives at $2 billion, for example, the assuming

13   actuary should be in the same ballpark, substantially "mirroring" his counterpart.

14   Because different and independent executives and actuaries are involved in arm's-

15   length reinsurance transactions, there is no great concern if the liability to asset

16   ratio is minimally different because it simply reflects the subtle differences in each

17   companies' management and actuarial approach.    Such a transaction could, for

18   example, look like this:

19

20

1

Reserve Liabilities Should "*Mirror*"

2

3

| Ceding Company Calculates Reserves at $2,000,000,000 | → | Assuming Company Calculates Reserves at $2,000,100,000 |

4

5

6      4.157 When, however, the ceding company chooses to "cede" the $2 billion

7  to an affiliated company (or wholly owned captive), no independent actuarial

8  calculations occur.    Because the ceding parent and assuming captive share

9  management and actuaries, the amount ceded and the amount assumed should be

10 *comparable*.

11      4.158 If the terms of the transaction can be concealed, however, there is a

12 powerful incentive for the assuming affiliated company to set its reserves much

13 lower.  Such a transaction could, for example, look like this:

14

Reserve Liabilities Don't "*Mirror*"

15

16

| Ceding Company Calculates Reserves at $2,000,000,000 | → | Assuming Company Calculates Reserves at $1,400,000,000 |

17

18

19      4.159 In this example, the difference is neither subtle nor reasonable.  The

20 two parties are not independent; instead, the same management is intentionally

creating the disparity, which gives the appearance that $600 million in surplus for

1    the ceding company resulted from the reinsurance deal.  Such manufacturing of

2    phony surplus can be accomplished only because the captive does not file public

3    financial statements revealing the lack of mirroring.

4        4.160 The Model Holding Company Act expressly prohibits this sort of

5    "reserve discounting" scheme.  In the insurance industry it is called "window

6    dressing."  The Act mandates that when a ceding company transacts with an

7    affiliate, the deal terms must be fair and reasonable; one party cannot benefit to the

8    other party's detriment.  If such transactions were permitted, no regulator, rating

9    agency, or life insurance purchaser could possibly know the true condition of the

10   ceding insurer.

11       4.161 Through such affiliated reinsurance transactions, insurers generate

12   false surplus by sending significant liabilities and likewise decreasing reserves, all

13   the while sending far fewer assets than necessary to establish the assuming

14   company reserves.  Because the reinsurer is often an offshore entity or wholly

15   owned domestic captive without regulated finances, the acquiring entity has no

16   corresponding obligation to certify that its reserves meet statutorily mandated

17   levels, or are adequate to cover the transferred liabilities.  In short, the offshore

18   affiliate or wholly owned captive is not subject to the same reserve scrutiny by

19   regulators.

20       4.162 By transferring reserve liabilities off a company's books, and onto an

CLASS ACTION COMPLAINT - 63
CASE NO. 2:14-CV-00235-RMP

affiliate's books, through sham or non-arm's-length "reinsurance" transactions, the "ceding" company is able to significantly reduce the reserves it is required to hold to pay future claims, thereby improving the company's risk profile in the process. This, of course, allows the company's surplus and capital picture to appear much healthier than it actually is, permitting stockholder dividend payouts while, at the same time, lulling policyholders into a false sense of security.

4.163 This practice is unfortunately becoming far too prevalent in the life insurance industry, regardless of the injury it has on policyholders. Moody's Investors Services found "At year-end 2015, captive XXX/AXXX reserve credit taken by Moody's rated universe of life insurers was $155 billion, after adjusting for double counted transactions that occur in the normal course of business." Furthermore, "in 2015, the life insurance industry said 50% of its grandfathered captive XXX/AXXX reserves were 'economic,' implying 50% were excess or redundant. These redundant reserves were financed with 'soft' assets, like letters of credit."[35]

---

[35] Global Credit Research, *Announcement: Moody's: New Regulatory Disclosures Show Sizable XXX/AXXX Captive Exposures*, MOODY'S INVESTORS SERVICES (Dec. 21, 2016), https://www.moodys.com/research/Moodys-New-Regulatory-Disclosures-Show-Sizable-XXXAXXX-Captive-Exposures--PR_359957?WT.mc_id=AM~RmluYW56ZW4ubmV0X1JTQl9SYXRpbmdzX05ld3NfTm9fVHJhbnNsYXRpb25z~20161221_PR_359957.

CLASS ACTION COMPLAINT - 64
CASE NO. 2:14-CV-00235-RMP

**B.    Defendants' Captive Insurance Scheme**

4.164 Not only are Lincoln and Voya using each other to reinsure blocks of life insurance policies, both utilize a number of wholly-owned captive reinsurance companies to further their reinsurance scheme.

1.    Voya's Captive Reinsurance Scheme

4.165 Following the NAIC's adoption of Regulation XXX and AXXX, Defendants were required to increase their policy reserve liabilities to levels much higher than in previous years.  As discussed above, the entire purpose of Regulation XXX and AXXX was to inject more conservatism into the reserving methodologies to better protect policyholders.

4.166 Choosing to disregard NAIC's concerns for policyholders, Voya began, as early as 2000, engaging in a series of "captive reinsurance" schemes to sidestep these higher reserve requirements imposed by following Regulation XXX, AXXX, and NAIC Statutory Accounting Procedures (NAIC SAP), and enabling them to set aside far less reserve liabilities to cover future claims.

4.167 By 2015, Voya's captive reinsurance portfolio had expanded to include domestic captives in Arizona and Missouri, two states infamous for allowing loosely-regulated captives with zero transparency.  When Voya "ceded"

1    liabilities to its own captives, they took "reserve credits" in 2015 of $1.06 billion.[36]

2    In simplified terms, Voya *reduced* its reported policy liabilities by $1.06 billion,

3    thereby reducing the amount of assets it needed to hold to match the policy

4    liabilities.

5        4.168 To be allowed to recognize that $1.06 billion reserve credit, traditional

6    standards of statutory accounting require Voya to send to its affiliated reinsurers

7    assets commensurate with the policy liabilities ceded.  However, Voya chose to

8    form captives in Arizona, Missouri, and Bermuda to take advantage of what Voya

9    would describe as regulatory arbitrage.  Under these jurisdictions, the insurance

10   regulators allow certain types of captives to operate much more loosely than life

11   insurers.  Specifically, these captives have extremely low capital requirements and

12   are permitted to carry certain "investments" as admitted assets that do not qualify

13   under the standard accounting definition of assets; much less carry any

14   value.  Pursuant to SAP No. 4, any form of investment that is ***contingent*** in any

15   way upon anything cannot be classified as an admitted asset.  Under the laws of

16   Arizona and Missouri, contingent letters of credit, parental guarantees and other

17   types of contingent investments may be approved by the regulators as admitted

18

19   _____
     [36] In comparison, Moody's Investors Service recognized that on August 23, 2013,
     Voya (then known as ING) had taken $15 billion in reserve credit.  *The Captive*
20   *Triangle: Where Life Insurers' Reserve and Capital Requirements Disappear*,
     MOODY'S INVESTORS SERVICE, Appendix III (Aug. 23, 2013).

CLASS ACTION COMPLAINT - 66
CASE NO. 2:14-CV-00235-RMP

assets for *captive reinsurers domiciled in their states*. However, no regular life insurer in the United States is permitted to allow such contingent investments as admitted assets. Importantly, even Arizona and Missouri do not permit its *non-captive traditional insurers* to do so. Despite Arizona's and Missouri's lax captive laws, NAIC's SAP 97 specifically prohibits a parent company—such as Voya—from receiving on its books any benefit recognized from such a transaction within its subsidiary.

4.169 Specifically, for collateral, Voya captives use a combination of funds withheld and held in a segregated account at Voya, assets held in a reserve credit trust, and LOCs. In 2013, the "assets" of Voya (still known as "ING") captives were comprised of $7.1 billion in funds withheld, $4.6 billion in trust agreements, and $4.4 billion in LOCs.[37]

4.170 Below are portions of Schedule Y – Part 2 excerpted from the 2015 Voya Retirement Insurance and Annuity Company's sworn statutory annual statement. Schedule Y – Part 2 compiles into one schedule all material transactions between the insurance companies and their affiliates. This schedule is found not in Key Pages, but buried after the reinsurance supplemental schedules. However, it is an obscure—but especially helpful—tool in attempting to grasp the magnitude

---

[37]MOODY'S, *supra* note 38, at Appendix III.

CLASS ACTION COMPLAINT - 67
CASE NO. 2:14-CV-00235-RMP

of the companies' excessive interdependence with respect to reinsurance (column

13) and dividends (column 4).

ANNUAL STATEMENT FOR THE YEAR 2015 OF THE Voya Retirement Insurance and Annuity Company

**SCHEDULE Y**

**PART 2 - SUMMARY OF INSURER'S TRANSACTIONS WITH ANY AFFILIATES**

| 1 | 2 | 3 | 4 | 5 | 12 | 13 |
|---|---|---|---|---|---|---|
| NAIC Company Code | ID Number | Names of Insurers and Parent, Subsidiaries or Affiliates | Shareholder Dividends | Capital Contributions | Totals | Reinsurance Recoverable/ (Payable) on Losses and/or Reserve Credit Taken/(Liability) |
| 86509 | 71-0294708 | Voya Retirement Insurance and Annuity Company | (206,000,000) | 0 | (206,000,000) | 1,063,268,625 |
| 80942 | 41-0991508 | Voya Insurance and Annuity Company | (394,000,000) | (98,000,000) | (492,000,000) | 6,693,124,149 |
| 66109 | 35-0838945 | Midwestern United Life Insurance Company | 0 | 0 | 0 | 38,139 |
| 67105 | 41-0451140 | ReliaStar Life Insurance Company | (474,000,000) | 8,196,000 | (465,804,000) | 1,320,658,142 |
| 61360 | 53-0242530 | ReliaStar Life Insurance Company of New York | 0 | 0 | 0 | 1,015,100,327 |
| 68713 | 84-0499703 | Security Life of Denver Insurance Company | (111,000,000) | (126,933,577) | (237,933,577) | 3,444,073,738 |
| 13583 | 26-3355951 | Roaring River, LLC | 0 | (5,000,000) | (5,000,000) | (289,120,785) |
| 14007 | 27-2278894 | Roaring River II, LLC | 0 | (3,196,000) | (3,196,000) | (41,902,223) |
| | 45-4771241 | Roaring River III Holding, LLC | 0 | (18,119,441) | (18,119,441) | 0 |
| 14416 | 80-0795318 | Roaring River III, LLC | 0 | (9,032,393) | (9,032,393) | 0 |
| 15365 | 80-0955075 | Roaring River IV, LLC | 0 | 12,122,240 | 12,122,240 | (1,161,579,209) |
| | 46-3607309 | Roaring River IV Holding, LLC | 0 | 11,963,171 | 11,963,171 | 0 |
| 15364 | 46-1051195 | Langhorne I, LLC | 0 | 0 | 0 | (60,637,422) |
| 15321 | 98-0138339 | Security Life of Denver International Limited | 0 | 0 | 0 | (11,983,023,481) |
| | 52-1222820 | Voya Financial , Inc. | 111,000,000 | 130,000,000 | 241,000,000 | 0 |
| | 06-1375177 | Voya Financial Partners | (115,000,000) | 0 | (115,000,000) | 0 |
| | 02-0488491 | Voya Holdings | 1,189,000,000 | 98,000,000 | 1,287,000,000 | 0 |
| 9999999 Control Totals | | | 0 | 0 | 0 | 0 |

4.171 Note that the totals in the bottom row always equal zero because for

every payable *to* an affiliate is a corresponding receivable *from* that affiliate. As

you scan down column 13, note that positive numbers represent reinsurance

recoverables, like receivables, and (negative) numbers represent reinsurance

payables. Clearly, this group of Voya life insurance companies (the first six

companies listed in column 3) are dangerously dependent on one captive in

particular, Security Life of Denver International Limited ("SLDIL"), in the amount

of nearly $12 billion. For example, Security Life of Denver Insurance Company,

a Colorado-domiciled life insurer, reported total surplus on December 31, 2015 of

CLASS ACTION COMPLAINT - 68
CASE NO. 2:14-CV-00235-RMP

1   only $855 million, but was dependent on reinsurance recoverables from SLDIL in

2   the amount of $3.6 billion—which is just a fraction of the SLDIL total reinsurance

3   payables equally $11.9 billion.  In other words, the regulated life insurer in

4   Colorado has a receivable from one affiliated captive that is more than *four times*

5   its total surplus.

6   4.172 Despite improperly taking reserve credit for ceding policy liabilities

7   to its captives and substantially underfunding its reserves as a result, Voya failed

8   to properly disclose such substantial departures from NAIC SAP in Note 1 of its

9   Financial Statements.

10   4.173 Even if Voya had properly accounted for its reinsurance with its

11   captives, the enormous volume and dollar amount by which the transactions with

12   its affiliates grew make no sense and simply reflect the fact that Voya's motives

13   and true business model have shifted to one of placing investors ahead of its own

14   customers.

15   4.174 Moody's Investor Service prepared a Special Comment report dated

16   August 23, 2013, entitled *The Captive Triangle: Where Life Insurers' Reserve and*

17   *Capital Requirements Disappear*,[38] which included specific references to Voya

18   Financial (then known as ING), by and through Voya (formerly ING Life Insurance

19

20

---

[38] MOODY'S, *supra* note 38, at 1.

CLASS ACTION COMPLAINT - 69
CASE NO. 2:14-CV-00235-RMP

1    Annuity Company).  In the opening paragraph of that report, Moody's states "a

2    growing reliance on captives places incremental negative pressure on the industry."

3         4.175 Specific reference to the Voya life insurance companies is made in

4    Appendix III of the Moody's report.  That table reports that the Voya companies

5    had taken reserve credits on their life business of approximately $15 billion from

6    their *unauthorized* general account affiliates. To see the mix of which captives were

7    involved, the December 31, 2012 sworn annual statement of Voya Retirement

8    Insurance and Annuity shows that these captives are domiciled across South

9    Carolina, Missouri and the Cayman Islands.[39]

10        4.176 The Department of Treasury Office of Financial Research ("OFR")

11   would later report its concerns about the Voya companies and other for-profit life

12   insurers' use of "off-balance sheet captives."[40]

13        4.177 The OFR found the following regarding the assets of two of Voya's

14   captive reinsurers—Roaring River IV LLC and Security Life of Denver

15   International:

16

---

17   [39] SLDIL was domiciled in the Cayman Islands during the time of this report, but
     is now domiciled in Arizona—a state known for its lax laws regarding captive
18   reinsurance companies.

     [40] Jill Cetina, Arthur Fliegelman, Jonathan Glicoes & Ruth Leung, *Mind the Gaps:*
19   *What Do New Disclosures Tell Us About Life Insurers' Use of Off-Balance-Sheet*
     *Captives?*, OFFICE OF FINANCIAL RESEARCH, Brief Series 16-02 (Mar. 17, 2016),
20   https://www.financialresearch.gov/briefs/files/OFRbr_2016-02_Captive-
     Insurers.pdf.

CLASS ACTION COMPLAINT - 70
CASE NO. 2:14-CV-00235-RMP

| Ceding Insurer | Captive Reinsurer | Part 1: Statutory Reserve Credit Taken | Asset Composition | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Part 2: Reserve Credit Taken | Supporting Assets | Cash | NAIC 1 | NAIC 2 | NAIC 3 | NAIC 4+ | Evergreen LOC | Other LOC | Other |
| Security Life of Denver Insurance Co. | Roaring River IV LLC | 1,083 | 1,083 | 1,057 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 100.0% |
| | Sec Life of Denver Intl Ltd. | 3,555 | 3,555 | 3,851 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 52.4% | 47.6% |
| Subtotal | | 4,638 | 4,638 | 4,908 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 41.1% | 58.9% |

Appendix Figure A-1.  Note that the Asset Composition percentages are all under the far right two columns as "Other LOC" and just plain "Other."  The Other LOC heading means these LOCs are not "Evergreen," meaning they are not guaranteed to be renewed.  These do not comply with NAIC standards requiring the Evergreen provision.  Without the Evergreen clause, the NAIC's concern is that if the captive begins to approach a "hazardous financial condition," the LOC issuer might unilaterally exit their support.  The remaining contingents of "assets" are made not of cash, hard assets, nor obligations rated by the NAIC, but are mysteriously and shockingly labeled as "Other."

4.178 It is difficult to explain the sheer magnitude of Voya's "reinsurance" abuse.  The "reinsurance" transactions are imprudent and have no legitimate business purpose.  Importantly, life insurance industry insiders are well aware of the fact that the value of a prudent life insurer's portfolio of reinsurers is dependent on the *quality, independence,* and *capital* of those reinsurers.  In its "reinsurance" transactions with wholly-owned Arizona and Missouri captives, Voya has wasted

1  precious policyholder funds, receiving literally nothing of real value in return;

2  merely the *real* cost of an *unreal* ruse.

3      4.179 What Voya has done is simply illogical; an insurance company cannot

4  receive any balance sheet benefit by transferring policy liabilities to its wholly-

5  owned subsidiary as shown by the below graphic.  Because Voya has merely

6  shoved its liabilities downward into its captives, the liabilities, in fact, go nowhere.

7  In reinsurance parlance, *no risk has been transferred*.  It is very well documented

8  in reinsurance texts, accounting guidelines, and even major white-collar criminal

9  investigations and convictions that total absence of true risk transfer renders a

10 "reinsurance transaction" a sham.

11     4.180 All 50 states incorporated the NAIC Model Holding Company Act

12 into their insurance statutes.  Specific to these affiliated transactions, those statutes

13 require, as previously stated, the following:

14          (a) Transactions within an insurance holding company
            system to which an insurance company subject to
15          registration under section 38a-135 is a party shall be
            subject to the following requirements: (1) The terms
16          shall be fair and reasonable; (2) charges or fees for
            services performed shall be reasonable; (3) expenses
17          incurred and payment received shall be allocated to the
            insurance company in conformity with customary
18          insurance accounting practices consistently applied; (4)
            the books, accounts and records of each party shall be so
19          maintained as to clearly and accurately disclose the
            precise nature and details of the transactions, including
20          such accounting information as is necessary to support

the reasonableness of the charges or fees to the respective parties; (5) the insurance company's surplus shall be reasonable in relation to such company's outstanding liabilities and adequate to its financial needs; and (6) agreements for cost-sharing services and management shall include such provisions as may be required by regulations adopted by the commissioner.

Conn. Gen. Stat. § 38a-136; *see also* Ind. Code § 27-1-23-4; N.Y. Ins. Las § 1505.

4.181 The manner in which Voya effected and reported its transactions with its captives failed to comply with *all* of the following standards:

- Transferring policy liabilities to wholly-owned subsidiaries does not qualify as "risk transfer" sufficient to support the related reserve credits;
- Transferring policy liabilities to wholly-owned subsidiaries without transferring commensurate admitted assets cannot qualify as "fair and reasonable;"
- Because the captives (both onshore and offshore) do not file statements with the NAIC and do not even make financial statements available to the public, none of the material transactions with the captives comply with the requirement that "the books, accounts and records shall be so maintained as to clearly and accurately disclose the nature and details of the transactions…;"
- Because Voya does not transfer admitted assets commensurate with the policy liabilities, the transactions are deemed "window dressing." If such lopsided transactions were permitted, no one would ever be able to determine the insurer's true financial condition;
- Because Voya has not actually shed the policy liabilities, it is, in essence, reinsuring itself, a circular transaction;
- Although it can't be determined without access to discovery if Voya is actually "discounting" its policy liabilities in the captive jurisdiction, it has been reported that some life insurers have discounted the reserves both offshore and onshore; and
- Voya has failed to disclose in its Note 1 of the Notes to Financial Statements the fact that Voya has received, on its own balance sheet, very

CLASS ACTION COMPLAINT - 73
CASE NO. 2:14-CV-00235-RMP

1

2

material benefits from sham transactions that are being booked at the captives' level.

4.182 Yet, even though Voya took hundreds-of-millions–of-dollars of reinsurance credit for numerous captive reinsurance transactions, and even though Voya knew that these transactions departed from NAIC SAP, Voya falsely reported that these transactions did ***not*** depart from NAIC SAP and in fact followed NAIC SAP in Note 1 of its sworn Annual Statements.

4.183 This scheme had a simple and common purpose: to give Voya the false appearance of strong surplus and RBC and overall financial strength.

2.    Lincoln's Captive Reinsurance Scheme

4.184 Much like the reinsurance scheme Voya had concocted to elude the higher reserve requirement imposed by Regulation XXX and AXXX, Lincoln National Life began, as early as 2003, engaging in the same captive reinsurance transactions.  The schemes began relatively small with a total of reserve credits for reinsurance transferred to captives at year-end 2004 in the amount of $372 Million. The schemes snowballed into a monstrous swirl of circular promises that, in 2015, totaled more than $10.7 billion.



4.185 In 2003, Lincoln National Life was using only "Offshore" captives: a Barbados captive reinsurer named Lincoln National Reinsurance Company (Barbados) Limited. By 2015, Lincoln National Life's captive reinsurance portfolio had expanded to include domestic captives in Vermont and South Carolina, two states infamous for allowing loosely-regulated captives with zero transparency. When Lincoln National Life "ceded" these liabilities to its own captives, they took "reserve credits" in 2015 of $10.7 billion.[41] In simplified terms, Lincoln National Life *reduced* its reported policy liabilities by $10.7 billion, thereby reducing the amount of assets it needed to hold to match the policy liabilities.

---

[41] In comparison, Moody's Investors Service recognized that on August 23, 2013, Lincoln National Life had taken $6.9 billion in reserve credit. MOODY'S, *supra* note 38, at Appendix III.

CLASS ACTION COMPLAINT - 75
CASE NO. 2:14-CV-00235-RMP

1
2
3
4
5
6
7
8
9



10    4.186 To be allowed to recognize that $10.7 billion reserve credit, traditional

11 standards of statutory accounting require Lincoln National Life to send to its

12 affiliated reinsurers assets commensurate with the policy liabilities

13 ceded.  However, Lincoln National Life chose to form captives in Vermont, South

14 Carolina, and Barbados to take advantage of what Lincoln National Life would

15 describe as regulatory arbitrage.  Under these jurisdictions, the insurance regulators

16 allow certain types of captives to operate much more loosely than life insurers.

17 Particularly, these captives have extremely low capital requirements and are

18 permitted to carry certain "investments" as admitted assets that do not qualify under

19 the standard accounting definition of assets; much less carry any value.  Pursuant

20 to SAP No. 4, any form of investment that is *contingent* in any way upon anything

1    cannot be classified as an admitted asset.  Under the laws of Vermont and South

2    Carolina, contingent letters of credit, parental guarantees and other types of

3    contingent investments may be approved by the regulators as admitted assets for

4    *captive reinsurers domiciled in their states*.  However, no regular life insurer in the

5    United States is permitted to allow such contingent investments as admitted assets.

6    Importantly, even Vermont and South Carolina do not permit its *non-captive*

7    *traditional insurers* to do so.  Despite Vermont's and South Carolina's lax captive

8    laws, NAIC's SAP 97 specifically prohibits a parent company—such as Lincoln

9    National Life—from receiving on its books any benefit recognized from such a

10   transaction within its subsidiary.

11        4.187 Specifically, for collateral, Lincoln National Life captives use a

12   combination of funds withheld and held in a segregated account at Lincoln National

13   Life, assets held in a reserve credit trust, and LOCs.[42]   In 2013, the "assets" of

14   Lincoln National Life captives were comprised of $4.9 billion in funds withheld,

15   $1.2 billion in trust agreements, and $2.6 billion in LOCs.[43]   The LOCs used are

16   typically irrevocable and of relatively long duration (12-20 years).  These LOCs

17

18   _____

19   [42] M Financial Group, *The Use of Captives in the Life Insurance Industry*, BCG
     COMPANIES, p. 8 (July 2013),
     http://www.bcgco.com/NewsResources/Update/BCG_M%20White%20Paper_Ca
20   ptives_July%202013.pdf.
     [43] MOODY'S, *supra* note 38, at Appendix III.

     CLASS ACTION COMPLAINT - 77
     CASE NO. 2:14-CV-00235-RMP

may contain limited conditions that specify that other sources of funds available to the captive must be used prior to a draw occurring on the LOC.[44]

4.188 Below are portions of Schedule Y – Part 2, excerpted from 2015 Annual Statement of The Lincoln National Life Insurance Company. Just as above, the positive numbers in column 13 represent reinsurance recoverables, and negative numbers are reinsurance payables. Clearly Lincoln NY and Lincoln National Life are dangerously dependent on their captive reinsurers. Specifically, they are dependent on Lincoln Reinsurance Company of Vermont ("LRCV") I; LRCV III; and LRCV IV for over $3.5 billion.

Annual Statement for the year 2015 of the **The Lincoln National Life Insurance Company**

### SCHEDULE Y

PART 2 - SUMMARY OF INSURER'S TRANSACTIONS WITH ANY AFFILIATES

| 1 NAIC Company Code | 2 ID Number | 3 Names of Insurers and Parent, Subsidiaries or Affiliates | 4 Shareholder Dividends | 5 Capital Contributions | 12 Totals | 13 Reinsurance Recoverable/ (Payable) on Losses and/or Reserve Credit Taken/ (Liability) |
|---|---|---|---|---|---|---|
| **Affiliated Transactions** | | | | | | |
| 62057 | 22-0832760 | Lincoln Life & Annuity Company of New York | | | (32,531,598) | 114,711,828 |
| 13693 | 27-0219307 | Lincoln Reinsurance Company of Vermont I | | | 18,825,530 | (1,465,416,250) |
| 13920 | 27-2826427 | Lincoln Reinsurance Company of Vermont II | | (388,459) | (388,459) | |
| 14116 | 45-2493225 | Lincoln Reinsurance Company of Vermont III | | | (13,455,160) | (2,003,116,629) |
| 14147 | 45-3071138 | Lincoln Reinsurance Company of Vermont IV | (20,000,000) | | 10,024,836 | (1,095,041,439) |
| 15336 | 46-3277007 | Lincoln Reinsurance Company of Vermont V | | 56,450,819 | 48,153,292 | (698,859,174) |
| 15854 | 47-4846438 | Lincoln Reinsurance Company of Vermont VI | | 10,000,000 | 20,947,328 | (337,944,089) |
| | 20-4073176 | Lincoln Investment Solutions, Inc | (33,000,000) | | (33,000,000) | |
| | 62-1230009 | Lincoln Investment Advisors Corporation | (109,100,000) | | (109,100,000) | |
| 13028 | 26-0629864 | Lincoln Reinsurance Company of South Carolina | | | 10,788,484 | (434,212,352) |
| 67652 | 23-2044248 | First Penn-Pacific Life Insurance Company | (54,000,000) | | (50,817,373) | 415,799,492 |
| | 35-1140070 | Lincoln National Corporation | 1,175,000,000 | (30,024,232) | 1,144,975,768 | |
| | 35-1151034 | Lincoln Financial Advisors Corporation | (15,000,000) | | (15,000,000) | |
| 65676 | 35-0472300 | The Lincoln National Life Insurance Company | (927,900,000) | (54,587,309) | (1,978,090,070) | 10,586,375,341 |
| | 35-1716060 | Lincoln National Reinsurance Company (Barbados) Limited | | 75,000,000 | 1,051,118,241 | (5,110,926,120) |
| | 35-2134263 | Lincoln Retirement Services Company, LLC | (16,000,000) | | (16,000,000) | |
| | 46-3267240 | Lincoln Financial Limited Liabilty Company I | | (56,450,819) | (56,450,819) | |
| 9999999 | | Control Totals | 0 | 0 | 0 | 13,370,608 |

**Detailed Explanation**
The variance in column 13 is due to the Lincoln Life & Annuity Company of New York ("LNY") ceded reserve on the variable annuity business being different than the assumed reserve held by the Lincoln National Life Insurance Company ("LNL") on the same business. The variance is due to the fact that there are stand alone company provisions in the calculation for both the gross and net reserve. The business ceded from LNY to LNL includes derivatives supporting those reserves. LNL holds the derivatives which generates a different reserve assumed in comparison to the reserve LNY is ceding.

---

[44] M Financial Group, *supra* note 44, at 8.

4.189 Despite improperly taking reserve credit for ceding policy liabilities to its captives and substantially underfunding its reserves as a result, Lincoln National Life failed to properly disclose such substantial departures from NAIC SAP in Note 1 of its Financial Statements.

4.190 Even if Lincoln National Life had properly accounted for its reinsurance with its captives, the enormous volume and dollar amount by which the transactions with its affiliates grew make no sense and simply reflect the fact that Lincoln National Life's motives and true business model have shifted to one of placing investors ahead of its own customers.

4.191 The Moody's report described above also specifically referenced Lincoln National Corp. and Lincoln National Life. The table included at Appendix III reports that Lincoln National Life had taken reserve credits on their life business of nearly $7 billion from their *unauthorized* general account affiliates. To see the mix of which captives were involved, the December 12, 2013 sworn annual statement of Lincoln National Life shows these captives are domiciled across South Carolina, Vermont and Barbados:

Annual Statement for the year 2012 of the **The Lincoln National Life Insurance Company**

**SCHEDULE S - PART 3 - SECTION**

Reinsurance Ceded Life Insurance, Annuities, Deposit Funds and C
Without Life or Disability Contingencies, and Related Benefits Listed by Reinsuring Compa

| 1 NAIC Company Code | 2 Federal ID Number | 3 Effective Date | 4 Name of Company | 5 Domiciliary Jurisdiction | 6 Type of Reinsurance Ceded | 7 Amount In Force at End of Year | 8 Reserve C Current Year |
|---|---|---|---|---|---|---|---|
| **General Account - Unauthorized - Affiliates - U.S. Affiliates** | | | | | | | |
| 13028... | 26-0629864... | 10/01/2007 | LINCOLN REINSURANCE COMPANY OF SOUTH CAROLINA............ | SC......... | CO/I......... | | 424,926,144 |
| 13893... | 27-0219307... | 12/31/2009 | LINCOLN REINSURANCE COMPANY OF VERMONT I......... | VT......... | COFW/I... | 72,113,991,351 | 1,143,101,995 |
| 13920... | 27-2826427... | 07/01/2010 | LINCOLN REINSURANCE COMPANY OF VERMONT II......... | VT......... | COFW/I... | | |
| 14116... | 45-2493225... | 08/01/2011 | LINCOLN REINSURANCE COMPANY OF VERMONT III......... | VT......... | COFW/I... | 4,464,467,647 | 1,680,935,814 |
| 14147... | 45-3071138... | 10/01/2011 | LINCOLN REINSURANCE COMPANY OF VERMONT IV......... | VT......... | CO/I......... | | 936,889,315 |
| 0899999 | Total - General Account - Unauthorized - Affiliates - U.S. Affiliates | | | | | 76,578,458,998 | 4,185,853,268 |
| **General Account - Unauthorized - Affiliates - Non-U.S Affiliates** | | | | | | | |
| 00000... | AA-3160057... | 11/09/1994 | LINCOLN NATIONAL REINSURANCE COMPANY (BARBADOS) LIMITED........ | BRB...... | ACO/I......... | | 20,263,724 |
| 00000... | AA-3160057... | 01/01/2001 | LINCOLN NATIONAL REINSURANCE COMPANY (BARBADOS) LIMITED........ | BRB...... | COFW/IG..... | | 4,362 |
| 00000... | AA-3160057... | 07/01/2003 | LINCOLN NATIONAL REINSURANCE COMPANY (BARBADOS) LIMITED........ | BRB...... | GMDBFW/I... | | 831,245,710 |
| 00000... | AA-3160057... | 10/01/2003 | LINCOLN NATIONAL REINSURANCE COMPANY (BARBADOS) LIMITED........ | BRB...... | COFW/I... | | 210,787,529 |
| 00000... | AA-3160057... | 01/01/2005 | LINCOLN NATIONAL REINSURANCE COMPANY (BARBADOS) LIMITED........ | BRB...... | AMCO/I... | | |
| 00000... | AA-3160057... | 12/01/2005 | LINCOLN NATIONAL REINSURANCE COMPANY (BARBADOS) LIMITED........ | BRB...... | COFW/I... | | 704,950,471 |
| 00000... | AA-3160057... | 10/01/2011 | LINCOLN NATIONAL REINSURANCE COMPANY (BARBADOS) LIMITED........ | BRB...... | OTH/I... | | |
| 00000... | AA-3160057... | 12/31/2012 | LINCOLN NATIONAL REINSURANCE COMPANY (BARBADOS) LIMITED........ | BRB...... | COFW/I... | 2,190,819,187 | 904,546,602 |
| 0899999 | Total - General Account - Unauthorized - Affiliates - Non-U.S Affiliates | | | | | 2,190,819,187 | 2,671,798,398 |
| 1099999 | Total - General Account - Unauthorized - Affiliates | | | | | 78,769,278,185 | 6,857,651,666 |

4.192 Additionally, the OFR found the following regarding the assets of Lincoln's captive reinsurers:

| Ceding Insurer | Captive Reinsurer | Asset Composition | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Part 1: Statutory Reserve Credit Taken | Part 2: Reserve Credit Taken | Supporting Assets | Cash | NAIC 1 | NAIC 2 | NAIC 3 | NAIC 4+ | Evergreen LOC | Other LOC | Other |
| Lincoln National Life Insurance Co. | Lincoln Re Co. of VT I | 1,379 | 1,379 | 1,379 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 65.5% | 34.5% |
| | Lincoln Re Co. of VT III | 1,893 | 1,893 | 1,893 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 44.1% | 55.9% |
| | Lincoln Re Co. of VT IV | 1,023 | 1,023 | 1,023 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 98.9% | 1.1% |
| | Lincoln Reinsurance Co. of SC | 441 | 441 | 543 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | | 100.0% |

Appendix Figure A-1.  Just as with Voya, the Asset Composition percentages are all under the far right two columns as "Other LOC" and just plain "Other."  The Other LOC heading meaning that these LOCs are not "Evergreen," or guaranteed to be renewed, and the "Other" being a mysterious category that is not comprised

1    of cash, hard assets, nor any other obligations rated by the NAIC.

2        4.193 It is difficult to explain the sheer magnitude of the Defendants'

3    "reinsurance" abuse.  The "reinsurance" transactions are imprudent and have no

4    legitimate business purpose.  Importantly, life insurance industry insiders are well

5    aware of the fact that the value of a prudent life insurer's portfolio of reinsurers is

6    dependent on the *quality, independence,* and *capital* of those reinsurers.  Lincoln

7    National Life ceding $10.7 billion of liabilities to itself or its sister companies, as

8    compared to *unaffiliated* traditional reinsurance of $9 billion, defies all accounting

9    and prudence fundamentals.  In its "reinsurance" transactions with wholly-owned

10   Vermont and South Carolina captives, Lincoln National Life has wasted precious

11   policyholder funds, receiving literally nothing of real value in return; merely the

12   *real* cost of an *unreal* ruse.

13       4.194 To put this in perspective, Lincoln National Life reported only $7.1

14   billion in Total Surplus on December 31, 2015.  However, Lincoln National Life

15   has significantly "reduced" its policy liabilities through $10.6 billion in affiliated

16   reinsurance, which equals 149% of reported surplus.

17       4.195 What Lincoln National Life has done is simply illogical; an insurance

18   company cannot receive any balance sheet benefit by transferring policy liabilities

19   to its wholly-owned subsidiary, as shown by the below graphic.  Because Lincoln

20   National Life has merely shoved its liabilities downward into its captives, the

liabilities, in fact, go nowhere.  In reinsurance parlance, *no risk has been transferred*.  It is very well documented in reinsurance texts, accounting guidelines, and even major white-collar criminal investigations and convictions that total absence of true risk transfer renders a "reinsurance transaction" a sham.



4.196 Specific to these affiliated transactions, the NAIC Model Holding Company Act statutes require, as previously stated, the following:

> (a) Material transactions within an insurance holding company system to which an insurer subject to registration under section 38a-135 is a party shall be subject to the following requirements: (1) The terms shall be fair and reasonable; (2) Agreements concerning cost sharing services and management must include provisions required by the commissioner in rules adopted under IC 4-22-2; (3) The charges or fees for services performed shall be reasonable; (4) The expenses incurred and payment received shall be allocated to the insurer in conformity with customary insurance accounting practices consistently applied; (5) The books, accounts and records of each party as to all transactions

described in this subsection shall be so maintained as to clearly and accurately disclose the precise nature and details of the transactions, including such accounting information necessary to support the reasonableness of the charges or fees to the respective parties; (6) The insurer's surplus as regards policyholders following any transactions with affiliates or shareholder dividend shall be reasonable in relation to the insurer's outstanding liabilities and adequate to its financial needs.

Ind. Code § 27-1-23-4; *see also* N.Y. Ins. Laws § 1505.

4.197 The manner in which Lincoln National Life effected and reported its transactions with its captives failed to comply with *all* of the following standards:

- Transferring policy liabilities to wholly-owned subsidiaries does not qualify as "risk transfer" sufficient to support the related reserve credits;
- Transferring policy liabilities to wholly-owned subsidiaries without transferring commensurate admitted assets cannot qualify as "fair and reasonable;"
- Because the captives (both onshore and offshore) do not file statements with the NAIC and do not even make financial statements available to the public, none of the material transactions with the captives comply with the requirement that "the books, accounts and records shall be so maintained as to clearly and accurately disclose the nature and details of the transactions…;"
- Because Lincoln National Life does not transfer admitted assets commensurate with the policy liabilities, the transactions are deemed "window dressing." If such lopsided transactions were permitted, no one would ever be able to determine the insurer's true financial condition;
- Because Lincoln National Life has not actually shed the policy liabilities, they are, in essence, reinsuring themselves, a circular transaction;
- Although it can't be determined without access to discovery if Lincoln National Life is actually "discounting" its policy liabilities in the captive jurisdiction, it has been reported that some life insurers have discounted the reserves both offshore and onshore;
- Lincoln National Life has failed to disclose in its Note 1 of the Notes to Financial Statements the fact that Lincoln National Life has received, on

its own balance sheet, very material benefits from sham transactions that are being booked at the captives' level.

4.198 Yet, even though Lincoln National Life took hundreds-of-millions–of-dollars of reinsurance credit for numerous captive reinsurance transactions, and even though it knew that these transactions departed from NAIC SAP, Lincoln National Life falsely reported that these transactions did ***not*** depart from NAIC SAP and in fact followed NAIC SAP in Note 1 of its sworn Annual Statements.

4.199 This scheme had a simple and common purpose: to give Lincoln National Life the false appearance of strong surplus and RBC and overall financial strength.

**C.     Defendants Move Policyholders to the End of the Line, Putting Investors Ahead to Receive Excessive Stockholder Dividends**

4.200 The use of the above-described sham reinsurance transactions, paired with the implementation of drastic COI increases, have allowed Defendants to divert significant assets to investors in the form of stockholder dividends.

1.     Voya's Payment of Dividends to Voya Financial

4.201 To that point, Defendant Voya paid $1,725,045,742 in stock dividends to Voya Holdings and ultimately to Defendant Voya Financial from 2006 through September 30, 2016.  The illustration below demonstrates the handsome dividend increases paid by Voya to Voya Holdings, which eventually made it to Voya Financial:

**Voya Retirement Ins & Annuity Co**
**Dividends Paid to Stockholders**

| Year | Dividends Paid to Stockholders |
|------|-------------------------------|
| 2015 | ($321,000,000) |
| 2014 | ($371,000,000) |
| 2013 | ($264,000,000) |
| 2012 | ($190,045,742) |
| 2011 | $0 |
| 2010 | ($203,000,000) |
| 2009 | $0 |
| 2008 | $0 |
| 2007 | ($145,000,000) |
| 2006 | ($231,000,000) |
|      | ($1,725,045,742) |

4.202 Notably, most of the stockholder dividends paid during that period would have been required by law to be classified as "extraordinary."

4.203 Extraordinary dividends can be issued only when Voya's financial health meets the legally required thresholds.  The justification behind this requirement is obvious; a company should not issue dividends when it does not possess the requisite financial health to do so.  To that point, Connecticut explicitly addresses the circumstances where stockholder dividends may be issued:

> **Regulation of dividends and distributions -- Extraordinary dividends and distributions**
>
> (3) "earned surplus" means "unassigned funds-surplus", as defined in the annual report of the insurance company that was most recently submitted pursuant to section 38a-53, reduced by twenty-five per cent of unrealized appreciation in value or revaluation of assets or

CLASS ACTION COMPLAINT - 85
CASE NO. 2:14-CV-00235-RMP

1

unrealized profits on investments, as defined in such report . . . .

2

3

(f) (1) For the purposes of this subsection, an extraordinary dividend or distribution is any dividend or distribution of cash or other property, whose fair market value together with that of other dividends or distributions made within the preceding twelve months, exceeds the greater of (A) ten per cent of such insurance company's surplus as of the thirty-first day of December last preceding, or (B) the net gain from operations of such insurance company, if such company is a life insurance company, or the net income, if such company is not a life insurance company, for the twelve-month period ending the thirty-first day of December last preceding, but shall not include pro rata distributions of any class of the insurance company's own securities.

4

5

6

7

8

9

10

Conn. Gen. Stat. § 38a-136.

11

4.204 As described, during the relevant period, Voya did not possess the

12

requisite financial health to justify paying extraordinary dividends. Voya was only

13

able to pay such dividends through the above described sham reinsurance scheme.

14

By "ceding" the policy liabilities, Voya "freed" up cash, and used that cash to pay

15

these dividends.

16

4.205 The affiliated transactions used by Voya had a massive impact on

17

Voya's finances, yet crucial aspects of the shell game Voya and Voya Financial

18

played with their captives and affiliated entities went undisclosed in the sworn

19

financial statements Voya filed annually under penalty of perjury. The incomplete

20

disclosures by Voya paint a picture of "form" only that might appear proper on the

CLASS ACTION COMPLAINT - 86
CASE NO. 2:14-CV-00235-RMP

surface.  But it is the *substance*—the true nature and details of the transaction—that is missing.

4.206 Indeed, Voya's annual financial statements falsely portrayed a stable company with ample capital and assets on hand to meet its long-term obligations and pay such monstrous dividends.

4.207 While the Voya dividend scheme has greatly benefited Voya Financial's executives and shareholders, it has placed significant downward pressure on Voya's liquidity and benchmark ratios.  Now, at this late stage, Voya Financial continues to require Voya to pay ever-increasing dividends to Voya Financial; however, Voya is cash strapped.  Having already leveraged its life insurance blocks of business through these captive schemes, Voya has continued paying hefty dividends by taking the funds from policyholders through a fraudulent COI increase.

2. <u>Lincoln National Life's Payment of Dividends to Lincoln National Corp.</u>

4.208 In similar fashion, Lincoln National Life paid $7,620,876,224 in stock dividends to Lincoln National Corp. from 2006 through September 30, 2016.  The illustration below demonstrates the handsome dividend increases paid by Lincoln National Life to Lincoln National Corp.:

**Lincoln National Life Insurance Company**

| Year | Stockholder Dividends Paid |
|------|----------------------------|
| Q3 2016 | ($850,000,000) |
| 2015 | ($1,121,000,000) |
| 2014 | ($705,000,000) |
| 2013 | ($640,000,000) |
| 2012 | ($605,000,000) |
| 2011 | ($800,000,000) |
| 2010 | ($684,000,000) |
| 2009 | ($405,000,000) |
| 2008 | ($400,000,000) |
| 2007 | ($1,060,876,224) |
| 2006 | ($350,000,000) |
| | **($7,620,876,224)** |

4.209 Notably, most of the stockholder dividends paid during that period would also have been required by law to be classified as "extraordinary."

4.210 Extraordinary dividends can be issued only when Lincoln National Life's financial health meets the legally required thresholds. The justification behind this requirement is obvious; a company should not issue dividends when it does not possess the requisite financial health to do so. To that point, Indiana explicitly addresses the circumstances where stockholder dividends may be issued:

**Indiana Insurance Code Section 27-1-23-4**

(g) No domestic insurer subject to registration under section 3 of this chapter shall pay an extraordinary dividend or make any other extraordinary distribution to its security holders until:

(1) Thirty (30) days after the commissioner has received notice of the declaration thereof and has not within such period disapproved such payment; or

(2) The commissioner shall have approved such payment within such thirty (30) day period.

(h) For purposes of subsection (g), an extraordinary dividend or distribution is any dividend or distribution of cash or other property whose fair market value, together with that of other dividends or distributions made within the twelve (12) consecutive months ending on the date on which the proposed dividend or distribution is scheduled to be made, exceeds the greater of:

(1) ten percent (10%) of such insurer's surplus as regards policyholders as of the most recently preceding December 31; or

(2) the net gain from operations of such insurer, if such insurer is a life insurer, or the net income, if such insurer is not a life insurer, for the twelve (12) month period ending on the most recently preceding December 31.

Ind. Code § 27-1-23-4.

4.211 As described, during the relevant period, Lincoln National Life did not possess the requisite financial health to justify paying extraordinary dividends. Lincoln National Life was only able to pay such dividends through the above described sham reinsurance scheme.  By "ceding" the policy liabilities, Lincoln National Life "freed" up cash, and used that cash to pay these dividends.

4.212 The affiliated transactions used by Lincoln National Life and Defendants had a massive impact on Lincoln National Life's finances, yet crucial

CLASS ACTION COMPLAINT - 89
CASE NO. 2:14-CV-00235-RMP

1  aspects of the shell game Lincoln National Corp. played with its captives and

2  affiliated entities went undisclosed in the sworn financial statements Lincoln

3  National Life filed annually under penalty of perjury.  The incomplete disclosures

4  by Lincoln National Life paint a picture of "form" only that might appear proper

5  on the surface.  But it is the *substance*—the true nature and details of the

6  transaction—that is missing.

7      4.213 Indeed, just like Voya's, Lincoln National Life's annual financial

8  statements falsely portrayed a stable company with ample capital and assets on

9  hand to meet its long-term obligations and pay such monstrous dividends.

10      4.214 While the Lincoln National Life dividend scheme has greatly

11  benefited Lincoln National Corp.'s executives and shareholders, it has placed

12  significant downward pressure on Lincoln National Life's liquidity and benchmark

13  ratios.  Now, at this late stage, Lincoln National Corp. continues to require Lincoln

14  National Life to pay ever-increasing dividends to Lincoln National Corp.; however,

15  Lincoln National Life is cash strapped.  Having already leveraged its life insurance

16  blocks of business through these captive schemes, Lincoln National Life had

17  allowed Lincoln National Corp. to continue paying hefty dividends by taking the

18  funds from policyholders through a fraudulent COI increase.

19  **D.    Defendants' COI Increase**

20      4.215 Defendants market and sell life insurance policies through an

CLASS ACTION COMPLAINT - 90
CASE NO. 2:14-CV-00235-RMP

expansive marketing machine, predominantly made up of agents and brokers.  On information and belief, the marketing specifics touted by agents and brokers lack the requisite information necessary for potential policyholders to understand how COI is calculated and the effect various factors may have on monthly debits to their policies' cash value.

4.216 To that point, information provided to policyholders fails to illuminate how Defendants determine premiums and how policyholders could potentially bear the cost of various expenses.

4.217 Not surprisingly, policyholders do not possess the basic information necessary to determine whether Defendants accurately calculate and attribute COI, and the ultimate cash value of the policy.

1.    Lincoln and Voya's Special Relationship Regarding the Life Policies at Issue

4.218 Beginning in October 1998, Aetna (now Voya) began reinsuring Plaintiffs' and the Class members' blocks of policies with Lincoln.

4.219 Interestingly, **99%** of Voya's *unaffiliated* reinsurance transactions (i.e. not wholly-owned captive reinsurance transactions) are with Lincoln NY— equaling $1.78 billion of $1.8 billion.

4.220 In addition to serving as a reinsurer for Plaintiffs' and the Class members' policies, Lincoln became the administrative agent of Voya's policies and became the sole line of communication regarding Plaintiffs' and Class members'

1   policies.

2       4.221 Voya and Lincoln entered into an administrative services agreement

3   effective as of October 1, 1998, through which Lincoln was paid by Voya to

4   provide certain administrative services on behalf of Voya.[45]

5       4.222 All correspondence, annual statements, and policyholder inquiries

6   have been handled by Lincoln, on behalf of Voya.    Importantly, although

7   policyholders purchased an Aetna (now Voya) policy, Lincoln and Voya have

8   blurred the distinction between their independent companies.

9       4.223 Despite being the reinsurer, the coinsurance agreement between

10   Lincoln and Voya allows Lincoln to also reinsure the liabilities, and does not limit

11   it in doing so.  In fact, Lincoln ***can even use its own captives***, and upon information

12   and belief, does so. ("3.9 Third-Party Reinsurance.  In the event the Reinsurer

13   desires to retrocede to any third-party reinsurer (whether or not Affiliated with the

14   Reinsurer) any portion of the Liabilities reinsured by it under this Agreement, the

15   Reinsurer shall be responsible for obtaining such retrocessional coverage at its sole

16   expense.").[46]

17

---

18   [45] *See* Coinsurance Agreement between Aetna Life Insurance and Annuity
Company and The Lincoln National Life Insurance Company (Oct. 13, 1998),
19   Voya Financial, Inc. Form S-1/A p. 1541 (Jan. 23, 2013),
http://d1lge852tjjqow.cloudfront.net/CIK-0001535929/c51a388f-03bf-4c44-
20   a508-4acda8f90a5b.pdf.
[46] *Id.* at 1559.

CLASS ACTION COMPLAINT - 92
CASE NO. 2:14-CV-00235-RMP

1    4.224 In its 2015 Annual Report, Voya Financial states that Lincoln National

2    Life established a trust to secure its obligations under the reinsurance transaction.

3    4.225 In fact, ING and Lincoln entered into this trust agreement in March

4    2007.[47]  This agreement requires Lincoln to place "102% of the amount needed to

5    fund all of the Reinsured Liabilities" into the trust with ING named as beneficiary.[48]

6    4.226 This trust has portfolio investment goals that rely extremely heavily

7    on government bonds and mortgage-backed securities.[49]  Less than a year after

8    Lincoln and Voya entered into the trust agreement, the Great Recession began.  As

9    a result, mortgage-backed securities plummeted in value, and government bonds

10    and investments were hit with record low interest rates.

11    4.227 Thus, the Lincoln/Voya trust's investments have not performed as

12    expected, and the Defendants were not receiving the investment income they

13    expected.  Due to the massive hit the trust investments took from 2008-2010 (and

14    perhaps beyond), it is unlikely that these investments have recovered.

15    4.228 Additionally, upon information and belief, Lincoln National Life

16    and/or Lincoln NY was reinsuring some of its liability under the Coinsurance

17    Agreement with its own captives, furthering the Defendants' desperate need for

18

19    _____

20    [47] Voya Financial, Inc. Form S-1/A, *supra* note 14, at 1654.
     [48] *Id.* at 1670.
     [49] *Id.* at 1678.

CLASS ACTION COMPLAINT - 93
CASE NO. 2:14-CV-00235-RMP

1  cash.

2      4.229 As the trust beneficiary, Voya receives annual reports on the trust's

3  status.  Therefore, Voya knew and has known for a decade that something needed

4  to be done to increase the trust's assets as they back the Voya policies ceded to

5  Lincoln.  Consequently, upon information and belief, Lincoln collaborated with

6  Voya to increase the COI on the policies at issue here.

7      4.230 Under the terms of the Coinsurance Agreement, Lincoln may make

8  recommendations with respect to the COI on the policies, and Voya is to take "into

9  account the recommendation of the Reinsurer with respect thereto."[50] Thus, neither

10  party unilaterally made the decision to increase the COI.

11      4.231 Because of the precarious positions both companies are in due to: (1)

12  dumping liabilities into captive reinsurance companies, (2) paying excessive

13  dividends to enrich shareholders (at policyholders expense), (3) failing to adjust

14  investments over the past decade after low interest rates, and (4) bad investment

15  returns since the Great Recession, Lincoln and Voya conspired to generate new

16  assets through recouping past losses by massively increasing the COI on Plaintiffs

17  and Class members.[51]

18

19  _____

[50] *Id.* at 1556.

20  [51] *See* Ron Sussman, *Commentary: Cost of Insurance Increases Keep Coming*,
INSURANCENEWS.NET (Oct. 14, 2016)

CLASS ACTION COMPLAINT - 94
CASE NO. 2:14-CV-00235-RMP

1    4.232 Upon information and belief, Voya and Lincoln selected Plaintiffs'

2    and Class members' policies based on their age in order to purposely force many,

3    if not most, policyholders into a lapse or surrendering their policies for the cash

4    value, due to the increase in their COI rate.[52]

5    4.233 Additionally, Voya and Lincoln targeted these policies as the

6    policyholders had large amounts saved in the Account Value of their policies.  As

7    the colossal COI increase took effect on Plaintiffs and Class members policies, their

8    Account Values quickly decreased as Voya and Lincoln profited from a windfall.

9    4.234 Plaintiffs and Class members have literally watched as Defendants

10   plundered the very savings they dutifully built up over the course of their lives in

11   their Account Values.  What was once sold to them by Defendants as a selling point

12   to increase their savings and ability to take policy loans has quickly become an

13   irresistible asset for Defendants to steal, effectively making Plaintiffs' and Class

14   members' investments worthless.

15   4.235 Voya compensated Lincoln as administrative agent and reinsurance

16

17   https://www.insurancenewsnet.com/innarticle/commentary-cost-insurance-
     increases-keep-coming.

18   [52] *Id.* ("A common theme among the carriers that have, so far, announced these
     COI increases is that the insureds most affected are 70 and over.  Most of them

19   will be unable to replace their coverage due to age, medical conditions and the
     cost of suitable replacement policies. . . . The actual, and possibly intended,

20   consequence of these COI increases will be a high percentage of lapsed policies,
     which will surely benefit the carrier.")

CLASS ACTION COMPLAINT - 95
CASE NO. 2:14-CV-00235-RMP

for Plaintiffs' and Class members' policies for notifying them of the incredible cost of insurance spike, handling inquiries from policyholders, managing policyholders' Account Value and premium collection, and essentially serving as an institutional layer between policyholders and Voya.

2.    Overview of Life Policies at Issue

4.236 To maintain life insurance coverage for the guaranteed period, a purchaser of a universal life or variable universal life policy makes an initial premium payment, and continues to make premium payments for, at a minimum, the guaranteed period.

4.237 For example, the policies at issue are universal life and variable universal life insurance policies.  Under the terms of the policy, any premium payments made in excess of the monthly deduction are credited to the policy's cash value.  Policyholders are given the option to pay additional premiums, not to exceed $25,000 during each policy year.

4.238 Under the convoluted terms of these particular policies, the cash value is determined on a monthly basis as follows: (a) minus (b) where:

(a)    is the sum of
(1)    the cash value on the last previous monthly deduction day with interest to date; and
(2)    premiums paid since the last previous monthly deduction day with interest to date;
and (b) is the sum of
(1)    any withdrawals since the last previous monthly deduction day with interest to date; and

CLASS ACTION COMPLAINT - 96
CASE NO. 2:14-CV-00235-RMP

(2)    the monthly deduction for the month which is then starting, if the date of calculation is a monthly deduction day.

4.239 Voya and Lincoln contend that they determine the COI attributable to the universal life policies subject to this lawsuit on a monthly basis, and that the COI is determined by a policyholder's age, sex, and rating classification.

4.240 With respect to the premium class, for example, Plaintiffs N. Pace and Large-Gurin were in a "nonsmoker" class, and Plaintiff Swenson is categorized into a "Standard" premium class.[53]

4.241 For the universal life insurance policies subject to this lawsuit, Aetna (now Voya) reserved to itself the right to adjust the monthly COI rates.  No policyholder can independently calculate the monthly deduction on his or her policy—meaning they cannot verify that the COI rate Voya charges them is accurate—because Voya does not disclose the equation it uses.  In fact, the only insight a policyholder has into the manner in which COI is determined is the following tortuous policy language:

> **Cost of Insurance**
> The cost of insurance on any monthly deduction day will be (1) multiplied by the result of (2) minus (3) where:
> (1)    is the Cost of Insurance Rate on that date, divided by 1000
> (2)    is the death benefit on that date, divided by 1.0036748

---

[53] *See* Monte M Swenson Aetna Policy, attached hereto as Exhibit 5, p. 3.

CLASS ACTION COMPLAINT - 97
CASE NO. 2:14-CV-00235-RMP

(3)    is the cash value on that date before computing the monthly deductions for the Cost of Insurance for the policy and any waiver of premium rider.

**Cost of Insurance Rate**

The Monthly Cost of Insurance is based on the Insured's sex, attained age, and premium class.    Attained age means age on the birthday nearest the first day of the policy year in which the monthly deduction day occurs. For the Initial Specified Amount, the premium class on the Date of Issue will be used.    For each increase, the premium class for that increase will be used.

The monthly Cost of Insurance rates may be adjusted by AEtna[54] from time to time.    Adjustments will be on a class basis and will be based on AEtna's estimates for future cost factors, such as mortality, investment income, expenses and the length of time policies stay in force. Any adjustments will be made on a uniform basis. However, the rate during any policy year may never exceed the rate shown for that year in the Table of Guaranteed Maximum Insurance Rates in this policy. Those rates are based on the 1958 Commissioners Standard Ordinary Mortality Table, male or female.[55]

4.242 Additionally, correspondence sent by Lincoln National Life to policyholders has defined COI as "the mortality charge for the risk covered by the policy."[56]

4.243 Even the most capable policyholder, reading her policy with

---

[54] Now, Voya.

[55] Ex. 3, p. 7.

[56] *See* Nov. 20, 2015 Letter from Lincoln National Life to Monte Swenson Re Balance Due Notification, attached hereto as Exhibit 6.

excruciating care, cannot determine what her COI charges should be at any given period.  Instead, she must fully rely on Voya to accurately calculate the COI for her policy and to alert her to any adverse conditions that would negatively affect her expectations for the policy.

### 3.    Lincoln Sends Annual Reports Indicating the Voya Policies Are Adequately Funded and Minimal Fees Are Charged

4.244 Under the terms of the policies, Voya must send policyholders reports at least once during each policy year.

4.245 These summaries are sent by Lincoln NY, and tell policyholders (a) the payments they have made, (b) the monthly expenses and cost of insurance deductions, (c) what interest has been credited to the policy's cash value, and (d) the rate at which interest has been credited.  The annual statements do not tell policyholders what their COI rate is, but rather simply provide the COI charge.

4.246 Over the years, Plaintiffs' annual statements, and the statements of all members of the Class, stated that the policies were performing as they had been marketed.  Most experienced accumulated account value increases each month through June 2016.

4.247 For example, the Annual Policy Summary for Plaintiff Swenson's G1208751 policy for the period from June 20, 2015 to June 19, 2016 showed that Lincoln NY, as administrative agent of Voya, charged him $24 in administrative charges, and charged between $277.72 and $277.92 in COI charges each month.

4.248 Plaintiff W. Pace's Annual Policy Summary for the period from December 15, 2014 to December 14, 2015 showed that Lincoln NY, as administrative agent of Voya, charged him $60 in administrative charges, and charged between $371.31 and $398.54 in COI charges each month.

4.249 Similarly, the Annual Policy Summary for the policy owned by Plaintiff C. Pace for the period from April 27, 2015 to April 26, 2016 shows that Lincoln NY, as administrative agent of Voya, charged him $24 in administrative charges, and charged $386.56 monthly.

4.250 Likewise, Plaintiff Large-Gurin's Annual Policy Statement for the period from June 3, 2015 to June 2, 2016 showed that Lincoln NY, as administrative agent of Voya, charged her $24 in administrative charges, and charged between $74.25 and $74.43 in COI charges each month.

4.251 Finally, Plaintiff Kantor's Annual Policy Statement for the period from August 24, 2014 to August 23, 2015 showed that Lincoln NY, as administrative agent of Voya, charged her $5 in administrative charges, and charged between $30.06 and $30.21 in COI charges each month

4.    Defendants Implement Dramatic COI Increases to Generate Cash and Cause Lapse

4.252 At no time between the policies' effective date and June 2016 did Defendants make any statement to policyholders that would indicate that the policies' "experience" was failing to meet Voya's (or Lincoln NY's) original

expectations.  To the contrary, in fact, every public representation Defendants made indicated that the companies were performing strongly, reducing costs, and outperforming the market.

4.253 Despite stream of information from Defendants that painted them as the picture of well-performing insurers, Lincoln announced, through a bulletin distributed to agents and brokers only sometime prior to May 9, 2016, that effective June 1, 2016, Lincoln would increase COI for several universal life plans issued by Aetna, for which Lincoln NY acts as administrative agent and reinsurer.[57]

4.254 Neither Lincoln NY nor Voya notified the affected universal life policyholders that their COI charges would dramatically increase until two weeks prior to the monthly deduction reflecting the increase.  The letter sent to policyholders did not explain why the COI charges were increasing, other than the fact that "lower investment income and elevated costs are expected," and it did not give any further insight into how COI was calculated.[58]

4.255 Plaintiffs' policies, and the policies of all members of the Class, were subject to the COI increases.

5.    Defendants Misrepresent the True Reasons Behind the COI Increase

4.256 According to policy language, a Voya policy's finances depend on the

---

[57] Ex. 1.
[58] Ex. 2.

1    interaction of several variables.  To administer the policies, Defendants make

2    monthly deductions and monthly deposits to the accounts.  This requires

3    Defendants to review and update the non-guaranteed (*i.e.*, variable) elements of the

4    policies—COI, interest paid on the policy's cash value, and the monthly expense—

5    on a monthly basis.  The policies specifically state that any changes in the COI are

6    "on a class basis and will be based on Aetna's estimates for ***future*** cost factors . . .

7    ." (Emphasis added).

8        4.257 Supposedly, at some point before June 1, 2016—most likely during

9    the Great Recession of 2008, which greatly affected their trust account—

10   Defendants realized that a combination of "lower investment income and higher

11   reinsurance costs" along with other "material changes in future expectations of key

12   cost factors" required Defendants to increase the COI rate.  This contention is

13   reflected in a "Summary of Changes" bulletin sent to Lincoln Benefit Life brokers

14   and agents regarding the Voya policies at issue.[59]

15       4.258 If Defendants' claims are true, they should have realized almost ten

16   years ago that the COI charges did not adequately account for future experience.

17   Nonetheless, they chose to lull policyholders into a false belief that their policies

18   were performing adequately and that they should continue to pay excess premiums

19

20   _____

[59] Ex. 1.

CLASS ACTION COMPLAINT - 102
CASE NO. 2:14-CV-00235-RMP

1  and build the policies' cash value.

2  4.259 During this time that Defendants apparently believed that the

3  policyholders should have been paying higher COI rates than they were, they

4  continued to send annual statements that they knew to be false to encourage

5  policyholders to rely on their universal life policies for future death benefits.

6  4.260 Had Defendants notified Plaintiffs as soon as they realized that they

7  had made a unilateral mistake accounting for "future expectations," the Plaintiffs

8  would have been in a better position to respond to Defendants' mistake. They could

9  have attempted to purchase life insurance elsewhere, they could have reduced their

10  premium payments to the minimum required premium and stopped adding to the

11  policies' cash values, or they could have surrendered their policies for the available

12  proceeds.

13  4.261 During the period when Defendants knew of their claimed mistake but

14  concealed it, the Plaintiffs' damages increased as their ability to purchase life

15  insurance elsewhere diminished and they continued to increase their policies' cash

16  values only to have the cash value raided by Defendants beginning in June 2016.

17  4.262 In fact, Defendants were aware of (and likely intended[60]) this result,

18

19  [60] *See* Sussman, *supra* note 51 ("One cannot help but wonder if these rate
    increases were really designed to cull a significant portion of insureds from

20  carriers' portfolios. There is no question that a policy that lapses or is
    surrendered with diminished value is the insurer's best path towards renewed

CLASS ACTION COMPLAINT - 103
CASE NO. 2:14-CV-00235-RMP

1    stating in the communication to agents and brokers that "the increase COI charge

2    will increase the monthly deduction, which will lower the policy's future cash value

3    and may shorten the length of time the policy will stay in force without increased

4    premiums."[61]

5        4.263 Defendants offered multiple suggestions for agents to give

6    policyholders faced with the COI increase. Policyholders could: (1) "continu[e] to

7    pay the current planned periodic premium for a potentially shorter coverage period

8    and/or reduced policy Cash Value;" (2) "pay[] additional premiums;" (3) "reduc[e]

9    the specified face amount"; or (4) submit "1035 exchanges".[62] Regardless of the

10   option chosen by the policyholder, Defendants benefit substantially.

11       4.264 In so raising the COI rate, Defendants did not consider the interest of

12   their policyholders. Its willful decision to allow the policyholders' damages to

13   escalate to a point where many policyholders would have no choice but to forfeit

14   their policies or allow their cash value to be eroded is tantamount to an attempt to

15   cancel the policies and/or raid the policies of accumulated policyholder savings.

16       4.265 Defendants' claimed to their policyholders that "future expectations

17   of key cost factors" were the basis behind their decision to increase COI is nothing

18

19   profitability. Unfortunately for the insured's and their families, they will lose
     everything they saved over the last 17 or so years.").

20   [61] Ex. 1.
     [62] *Id.*

CLASS ACTION COMPLAINT - 104
CASE NO. 2:14-CV-00235-RMP

1   more than a convenient legal ruse, because it is hard to make the argument that

2   mortality is the actual culprit.  Rather, these increases are the direct result of

3   Defendants' participation in complex captive reinsurance transactions that freed up

4   significant capital that was then up-streamed as dividends to Voya Financial and

5   Lincoln National Corp., essentially paying out many billions of dollars that could

6   have been used to stabilize the carrier financials and prevent them from having to

7   raise COI rates.[63]

8   **E.    Universal Policies at Issue**

9          1.    <u>Plaintiff Monte Swenson</u>

10          4.266 Plaintiff Monte Swenson purchased a universal life policy from Aetna,

11  policy number G1208751, in 1988.

12          4.267 Aetna was acquired by ING Life Insurance and Annuity Company,

13  which in turn was rebranded as Voya Financial.  Lincoln NY acts as reinsurer and

14  administrative agent for his policy and every Class member's policy.

15          4.268 Plaintiff Swenson's policy provides a $100,000 death benefit

16  coverage.  Additionally, the policy included a projected account value, based on

17  the payment of excess premiums and planned interest.

18  ───────────────

19  [63] Sussman, *supra* note 51; *see also* COI Rate Risk: an analysis of the cause and effect, p.7 CAMBRIDGE GUARANTEE GROUP (Dec. 2016); Mary Williams Walsh, *Why Some Life Insurance Premiums Are Skyrocketing*, THE NEW YORK TIMES

20  (Aug. 13, 2016), https://www.nytimes.com/2016/08/14/business/why-some-life-insurance-premiums-are-skyrocketing.html?_r=1.

4.269 The policy enjoyed a minimum guaranteed 4.5% annual interest accrual on the account cash value.

4.270 Mr. Swenson paid his premiums on the policy in accordance with the contractual obligations for all relevant periods.

4.271 The planned monthly premium for Mr. Swenson's policy was $102.90, however both Lincoln NY *and* Lincoln National Life sent Mr. Swenson multiple letters over the life of the policy, requiring him to increase his premiums to keep the policy in force.

4.272 In June 2016, the COI charged for policy G1208751 increased dramatically. The monthly COI jumped from $277.90 to $418.04, an increase of $140.14 per month.

4.273 By dramatically increasing COI charges, Lincoln NY and Voya are raiding Plaintiff's policies' cash value and attempting to force them to surrender the policy.

4.274 According to an updated illustration provided by Lincoln NY and Voya, as of December 21, 2016, Plaintiff Swenson had paid $43,713.58 in premiums.

4.275 Additionally, the December 2016 illustration for Mr. Swenson's policy demonstrated that due to the drastic COI increase, the policy would lapse in less than a year, even if paying a monthly premium of $511.45. Another illustration

1   provided in the same correspondence demonstrated that even if Plaintiff increased

2   his monthly premium to $564.72, the policy would lapse in less than four years.

3       4.276 The policy specifically states that any changes in the COI are "on a

4   class basis and will be based on Aetna's estimates for ***future*** cost factors . . . ."[64]

5       4.277 Despite the COI letter from Lincoln NY (acting as administrative

6   agent for Voya) to Plaintiff Swenson stating that his COI increase was due to

7   "lower investment income and elevated costs," Lincoln's internal communication

8   states that COI is increased due to "lower investment income and ***higher***

9   ***reinsurance costs***," based on an actuarial analysis.[65]

10          2.    <u>Plaintiff Wilbur Pace</u>

11      4.278 Plaintiff W. Pace purchased a universal life insurance policy, from

12  Aetna, policy G1071375, on December 15, 1986.

13      4.279 Aetna was acquired by ING Life Insurance and Annuity Company,

14  which in turn was rebranded as Voya Financial.  Lincoln NY acts as reinsurer and

15  administrative agent for his policy and every Class member's policy.

16      4.280 The policy provides a $50,000 death benefit coverage.  Additionally,

17  the policy included a projected account value, based on the payment of excess

18  premiums and planned interest.

19

20  _____
    [64] *See, e.g.*, Ex. 3.
    [65] *See* Ex. 1 (emphasis added).

    CLASS ACTION COMPLAINT - 107
    CASE NO. 2:14-CV-00235-RMP

1    4.281 Mr. W. Pace's policy also enjoyed a minimum guaranteed 4.5%

2    annual interest accrual on the accounts' cash values.

3    4.282 Mr. W. Pace paid his quarterly premiums of $328.50 in accordance

4    with the contractual obligations for all relevant periods.

5    4.283 In June 2016, the COI charged for policy G1071375 increased

6    dramatically. Plaintiff W. Pace's monthly COI jumped from $432.89 to $611.58,

7    and has increased on a monthly basis $4-$9 per month since that time.

8    4.284 By dramatically increasing COI charges, Lincoln NY and Voya are

9    raiding Mr. Pace's policy cash value and attempting to force him to surrender his

10    policy.

11    4.285 According to an updated illustration provided by Lincoln NY and

12    Voya, as of August 14, 2016, Plaintiff W. Pace had paid $49,876.30 in premiums

13    for a $50,000 death benefit.

14    4.286 Plaintiff Pace has witnessed his Account Value drop from $6,008.44

15    in December 2015 to $1,109.82 after the COI increase. The new Voya illustration

16    provided by Lincoln in August 2016 projects his Account Value to dwindle to $376

17    at the end of 2016 and then to completely disappear during 2017, thereby causing

18    his policy to lapse.

19    4.287 The policy specifically states that any changes in the COI are "on a

20    class basis and will be based on Aetna's estimates for *future* cost factors . . . ."

CLASS ACTION COMPLAINT - 108
CASE NO. 2:14-CV-00235-RMP

(Emphasis added.)

4.288 Despite the COI letter from Lincoln NY (acting as administrative agent for Voya) to Plaintiff W. Pace stating that his COI increase was due to "lower investment income and elevated costs," Lincoln's internal communication states that COI is increased due to "lower investment income and *higher reinsurance costs*," based on an actuarial analysis.[66]

3.    Plaintiffs Noah and Christopher Pace

4.289 Plaintiff Noah Pace purchased a universal life policy from Aetna, policy number G1087960, in 1987.

4.290 Plaintiff Christopher Pace became the owner and payor of the policy on or about 2009-2010.

4.291 Aetna was acquired by ING Life Insurance and Annuity Company, which in turn was rebranded as Voya Financial. Lincoln NY acts as reinsurer and administrative agent for their policy and every Class member's policy.

4.292 The policy provides a $100,000 death benefit coverage. Additionally, the policy included a projected account value, based on the payment of excess premiums and planned interest.

4.293 Mr. N. Pace's policy also enjoyed a minimum guaranteed 4.5% annual interest accrual on the accounts' cash values.

---

[66] *See* Ex. 1 (emphasis added).

1    4.294 Mr. N. Pace and subsequently Mr. C. Pace paid over and above the

2  monthly premiums of $156.00 in accordance with the contractual obligations for

3  all relevant periods.

4    4.295 Plaintiffs N. and C. Pace were paying $415 per month in the past

5  year—$269 per month in excess of his monthly premiums to ensure higher cash

6  value and ensure coverage past the guaranteed value projections issued upon

7  procurement of his policy.

8    4.296 In June 2016, the COI charged for policy G1087960 increased

9  dramatically by forty percent.  Plaintiffs' monthly COI jumped from $386.56 to

10  $587.25, an increase of $200.69 per month.

11    4.297 By dramatically increasing COI charges, Lincoln NY and Voya are

12  raiding Plaintiffs' policy cash value and attempting to force them to surrender the

13  policy.

14    4.298 According to an updated illustration provided by Lincoln NY and

15  Voya, as of December 16, 2016, Plaintiff N. and C. Pace had paid $51,901.82 in

16  premiums.

17    4.299 Additionally, the December 2016 illustration demonstrated that even

18  by drastically reducing the death benefit from $100,000 to $25,000, the policy

19  would lapse within three years, at best.

20    4.300 Plaintiffs N. and C. Pace have witnessed their Account Value drop

CLASS ACTION COMPLAINT - 110
CASE NO. 2:14-CV-00235-RMP

from $1,132.60 in April 2016 to $1.41 in January 2017 due to the COI increase. The policy has entered a grace period twice, due to the massive COI increase, and Plaintiffs struggle to meet the ridiculous demands of Lincoln, as administering agent of Voya.

4.301 An October 27, 2016 letter required Plaintiffs to pay $1,317.52 in order to keep the policy in force through January 2017.

4.302 Plaintiffs are unable to afford the drastic increase in their cost of insurance in addition to their monthly premium and therefore their policy has entered into a grace period prior to lapsing.

4.303 The policy specifically states that any changes in the COI are "on a class basis and will be based on Aetna's estimates for *future* cost factors . . . ."

4.304 Despite the COI letter from Lincoln NY (acting as administrative agent for Voya) to Plaintiff C. Pace stating that his COI increase was due to "lower investment income and elevated costs," Lincoln's internal communication states that COI is increased due to "lower investment income and *higher reinsurance costs*," based on an actuarial analysis.[67]

4.    Plaintiff Louise Large-Gurin

4.305 Plaintiff Large-Gurin purchased a universal life policy from Aetna, policy G1289284, in 1989.

---

[67] *See* Ex. 1 (emphasis added).

CLASS ACTION COMPLAINT - 111
CASE NO. 2:14-CV-00235-RMP

1    4.306 Aetna was acquired by ING Life Insurance and Annuity Company,

2    which in turn was rebranded as Voya Financial.  Lincoln NY acts as reinsurer and

3    administrative agent for their policy and every Class member's policy.

4    4.307 The policy provides a $100,000 death benefit.  Additionally, the

5    policy included a projected account value, based on the payment of excess

6    premiums and guaranteed interest.

7    4.308 Ms. Large-Gurin's policy also enjoyed a minimum guaranteed 4.5%

8    annual interest accrual on the accounts' cash values.

9    4.309 Ms. Large-Gurin paid her quarterly premiums of $154.50 in

10    accordance with their contractual obligations for all relevant periods.

11    4.310 In June 2016, the COI charged for policy G1289284 increased

12    dramatically.  As of September 2016, the COI had jumped to $99.83, from $74.25

13    in May.

14    4.311 By dramatically increasing COI charges, Voya and Lincoln NY are

15    raiding Ms. Large-Gurin's policy cash values and attempting to force her to

16    surrender their policy.

17    4.312 According to an updated illustration provided by Lincoln NY and

18    Voya, as of July 25, 2016, Plaintiff Large-Gurin had paid $16,201.97 in premiums.

19    4.313 Additionally, the July 2016 illustration demonstrated that due to the

20    drastic COI increase, the policy would lapse within ten years.  Another illustration

1    provided in the same correspondence demonstrated that even if Plaintiff increased

2    her quarterly premium from $154.50 to $656.88, then the policy would lapse within

3    nineteen years.

4        4.314 The policy specifically states that any changes in the COI are "on a

5    class basis and will be based on Aetna's estimates for *future* cost factors . . . ."

6    (Emphasis added.)

7        4.315 Despite the COI letter from Lincoln NY (acting as administrative

8    agent for Voya) to Plaintiff Large-Gurin stating that her COI increase was due to

9    "lower investment income and elevated costs," Lincoln's internal communication

10   states that COI is increased due to "lower investment income and *higher*

11   *reinsurance* costs," based on an actuarial analysis.[68]

12       5.    Plaintiff Elizabeth Kantor

13       4.316 Plaintiff Kantor purchased a universal life policy from Aetna, policy

14   G1499283, in 1992.

15       4.317 Aetna was acquired by ING Life Insurance and Annuity Company,

16   which in turn was rebranded as VFI.  LNY acts as reinsurer and administrative

17   agent for her policy and every Class member's policy.

18       4.318 The policy provides a $25,000 death benefit coverage.  Additionally,

19   the policy included a projected account value, based on the payment of excess

20

---

[68] *See* Ex. 1 (emphasis added).

CLASS ACTION COMPLAINT - 113
CASE No. 2:14-CV-00235-RMP

1    premiums and planned interest.

2        4.319 Ms. Kantor's policy also enjoyed a minimum guaranteed 4.5% annual

3    interest accrual on the accounts' cash values.

4        4.320 Ms. Kantor paid her quarterly premiums of $84.75 in accordance with

5    the contractual obligations for all relevant periods.

6        4.321 In June 2016, the COI charged for policy G1499283 increased

7    dramatically up to 55% percent.  Ms. Kantor's COI increased from approximately

8    $30 a month to $57 a month.

9        4.322 By dramatically increasing COI charges, LNY and Voya are raiding

10   Ms. Kantor's policy cash value and attempting to force her to surrender the policy.

11       4.323 According to an updated illustration provided by LNY and Voya, as

12   of June 30, 2016, Ms. Kantor had paid $8,136.00 in premiums.

13       4.324 Additionally, the June 2016 illustration demonstrated that by

14   continuing to pay her current premium of $84.75 per quarter her policy would lapse

15   in eight years. Even by drastically increasing her premiums to $278.06 per quarter,

16   the policy life would only extend by fifteen years.

17       4.325 Plaintiff Kantor has witnessed her Account Value drop on a monthly

18   basis due to the COI increase.

19       4.326 The policy specifically states that any changes in the COI are "on a

20   class basis and will be based on Aetna's estimates for *future* cost factors . . . ."

CLASS ACTION COMPLAINT - 114
CASE NO. 2:14-CV-00235-RMP

4.327 Despite the COI letter from LNY (acting as administrative agent for Voya) to Plaintiff C. Pace stating that his COI increase was due to "lower investment income and elevated costs," Lincoln's internal communication states that COI is increased due to "lower investment income and *higher reinsurance costs*," based on an actuarial analysis.[69]

6.    Class Members

4.328 Plaintiffs are not alone.  Lincoln, as administrative agent for Voya, has dramatically increased COI charges on all of the following universal life policies: (1) Aetna Enhanced UL 1995, (2) AetnaVest Estate Protector I, (3) AetnaVest Estate Protector II, (4) AetnaVest I, (5) AetnaVest II, (6) AetnaVest Plus, (7) Estate Protector (8) Estate Protector 2 & 3, (9) Life Partners, (10) Life Partners II, (11) Revised Aetna Enhanced UL, (12) Aetna Enhanced UL 1997, (13) Select UL 1994, (14) Revised Select UL, (15) Select UL 1997, (16) Universal Life 2, (17) Universal Life 83, (18) Universal Life 84, (19) Universal Life 85/86/87, and (20) Universal Life 89.

4.329 The COI increases on these policies are drastic and unprecedented in the history of these policies.  COI is being increased from 15% to 55%, depending upon the policy block.

4.330  Lincoln and Voya are increasing the COI because they are financially

---

[69] *See* Ex. 1 (emphasis added).

CLASS ACTION COMPLAINT - 115
CASE NO. 2:14-CV-00235-RMP

1  unstable—a fact they have cleverly hidden through a captive reinsurance scheme—
2  and to fund exorbitant dividend payments to their parent corporations.

3      4.331 When the COI increase was implemented, the COI of Plaintiff
4  Swenson's policy increased dramatically from $277.90 to $418.04 per month—an
5  increase of over 50%.

6      4.332 Plaintiff W. Pace's COI continued to increase incrementally from
7  December 15, 2015 to May 15, 2016.  However, when the COI increase was
8  implemented on June 15, 2016, Plaintiff W. Pace's monthly COI increased
9  dramatically from $432.89 to $611.58—an increase of over 40%.

10      4.333 Similarly, Plaintiff C. Pace's COI increased from $386.56 to $587.25
11  per month—an increase of over 50%.

12      4.334 Plaintiff Large-Gurin's monthly COI charges likewise dramatically
13  increased, from $74.25 to $99.83—an increase of over 30%.

14      4.335 Plaintiff Kantor's monthly COI charges increased from approximately
15  $30 a month to approximately $57 a month—an increase of over 50%.

16      4.336 Because the monthly premiums Plaintiffs and all similarly situated
17  policyholders are paying is now less than the COI charges (while the monthly
18  premium payments have historically exceeded the monthly COI charges),
19  Defendants are "paying" themselves the increased COI charges by taking money
20  from the policies' accumulated cash values.

CLASS ACTION COMPLAINT - 116
CASE NO. 2:14-CV-00235-RMP

1

**F.    Defendants' Publicly Filed Financial Statements Demonstrate that the Defendants Justifications to Raise COI Rates Are Untrue**

2

3    4.337 The story Defendants chose to tell the agents selling Aetna/ING/Voya

4    products was markedly different than the story they wanted policyholders to hear.

5    Attached to the letter informing policyholders of the increase in their COI rates,

6    was a document with a number of "Policy Owner Questions" and answers provided

7    by Lincoln NY:

8

9    **Policy Owner Questions**

1. Why are Cost of Insurance (COI) rates increasing on my policy and what does that mean?
   The expected cost of providing insurance coverage has risen, due to a variety of factors including lower investment income and higher expenses. COIs have been adjusted to appropriately reflect changes in these factors.

2. Are cost of insurance rates going up for all policies?
   Yes, this action affects all policyholders holding the impacted products.

3. How much are the COI Rates going up?
   The amount of the COI rate increases depends upon the product. In no instance will the revised COI rates exceed the guaranteed maximum COI rates indicated in your policy.

4. I have a bank draft systematic payment with Lincoln for my premiums. Will my premium payments automatically increase as a result of this change?
   No, this is a flexible premium product, and therefore you will need to notify us if you decide to change your automatic premium payments.

5. Will this impact any policy guarantees?
   No. The policy guarantees under your policy will remain the same as prior to the change.

6. Can I continue to pay my current premium, and if so, how will that impact my policy?
   Yes, you can continue to pay your current premium, and as long as there is sufficient cash value, you can maintain your policy at the current specified face amount. However, it is important to note that at some point you may need to increase the amount of premium paid in order to keep your policy in force. The impact of this can be determined by requesting an *inforce illustration*. An illustration is an example of how your policy might perform under certain conditions. Illustration requests should be emailed to mylifeillustrations@lfg.com.

7. Will I need to increase my premium amount?
   You may choose to increase your premiums if you want to achieve the same policy objectives that you had targeted prior to the COI increase. The best way to learn how much your premiums need to change is to ask for an *inforce illustration*. For fastest service, please email your request to mylifeillustrations@lfg.com.

8. What are the options other than paying additional premiums?
   You may have the option to shorten the policy coverage period, reduce your face amount (subject to any minimum requirements and IRS rules), exchange for another policy or surrender your policy.
   - Reduce the face amount to the level supported by your current premium – assuming it's above any minimum face amount requirements. If you would like to pursue this option, please contact us at mylifeillustrations@lfg.com.
   - Policy surrender (cancellation of your policy) -- if you would like to pursue this option please send your request to mypolicysurrender@lfg.com. However, we do recommend that you speak with your advisor to fully understand your circumstances and options, which may have tax implications.

10

11

12

13

14

15

16

17

18

19

20

CLASS ACTION COMPLAINT - 117
CASE NO. 2:14-CV-00235-RMP

4.338 Voya and Lincoln NY want policyholders to believe, and expressly say, that the COI increase is the result of "a variety of factors including lower investment income and higher expenses."

4.339 The available data for Voya and Lincoln National Life, as a whole and for the specific policies affected by the COI increase prove that Defendants' statements are false. Indeed, financial statements for Voya, Lincoln National Life and Lincoln NY reflect that their investment returns and costs associated with administering the insurance business have remained consistent.

4.340 Ron Sussman, founder and chief executive officer of PolicyAudits.com and CPI companies, wrote an article describing Lincoln's COI increase on another block of policies: "when you dig into the financials of the companies that are announcing these increases, it becomes readily apparent that this is not about survival at all. In most, if not all cases, these rate increases are being instituted to boost the return on investment on these older blocks of businesses."[70]

4.341 In fact, over the past few years, Lincoln National Life has continuously represented to the Indiana Department of Insurance that its performance was so strong that Indiana should permit it to pay extraordinary

---

[70] Sussman, *supra* note 51.

CLASS ACTION COMPLAINT - 118
CASE NO. 2:14-CV-00235-RMP

1  dividends—more than $7.6 billion in dividends, in fact, which it paid to Lincoln

2  National Corp.

3      4.342 Likewise, Voya represented to the Connecticut Insurance Department

4  that its performance was also strong enough to support the payment of dividends

5  to Voya Financial in the amount of $1.7 billion.

6      4.343 Moreover, the public statements Defendants have made in recent years

7  contradict their COI increase explanation.

8      4.344 For example, Voya's 2016 Third Quarter Report indicated a higher

9  investment income than the prior year.[71]  And in its 2015 Annual Report, Voya

10  Financial boasts that: "Our strong market positions have allowed us to properly

11  scale our business to achieve greater profitability."[72]

12      4.345 Additionally, Voya touted its reinsurance relationship with Lincoln by

13  stating: "The S&P financial strength rating of our reinsurers with the two largest

14  reinsurance recoverable balances are AA- rated or better.  These reinsurers are (i)

15  Lincoln National Life Insurance Company and Lincoln Life & Annuity Company

16

17  _____

18  [71] Voya Retirement Insurance and Annuity Company, Quarterly Statement (Sept. 30, 2016),
    http://s1.q4cdn.com/733568831/files/doc_financials/2016/q3/VRIAC_BB_Final_

19  3Q16.pdf.
    [72] Voya Financial, Inc., Annual Report, p. 21 (2015),

20  http://s1.q4cdn.com/733568831/files/doc_financials/2015/annual/138420_006_web_clean.pdf.

CLASS ACTION COMPLAINT - 119
CASE NO. 2:14-CV-00235-RMP

1   of New York, subsidiaries of Lincoln National Corporation ("Lincoln") and (ii)

2   Hannover Re."[73]

3       4.346 Voya expresses confidence in the trust created by Lincoln, detailed

4   above, but fails to give shareholders and policyholders alike any concern for

5   "higher costs"—much less higher reinsurance costs—or lower investment income

6   related to the relevant policies ceded to Lincoln: "Effective October 1, 1998, the

7   Company disposed of a block of its individual life insurance business under an

8   indemnity reinsurance arrangement with a subsidiary of Lincoln National

9   Corporation ("Lincoln") for $1.0 billion.    Under the agreement, Lincoln

10  contractually assumed from the Company certain policyholder liabilities and

11  obligations, although the Company remains obligated to contract owners.    The

12  Lincoln subsidiary established a trust to secure its obligations to the Company

13  under the reinsurance transaction.    Of the Reinsurance recoverable on the

14  Consolidated Balance Sheets, $1.8 billion and $1.9 billion as of December 31, 2015

15  and 2014, respectively, is related to the reinsurance recoverable from the subsidiary

16  of Lincoln under this reinsurance agreement."[74]

17      4.347 Lincoln National Corp. likewise bragged in its 2015 Annual Report:

18          Notably, we continue to deliver consistent and profitable
            growth including:

19

20  [73] *Id.* at 144.
    [74] *Id.* at 274.

CLASS ACTION COMPLAINT - 120
CASE NO. 2:14-CV-00235-RMP

- Income from operations per share of $5.461 x Operating revenues of $13.9 billion reached a record level
- Positive consolidated net flows in each quarter resulted in annual net flows of $6 billion, up 9 percent from 2014 x Assets under management totaled $219 billion, a year-end record
- Book value per share, excluding AOCI, exceeded $52, up 6 percent from 2014
- Operating return on equity, excluding AOCI, was 11 percent
- Capital returned to shareholders accelerated as share buybacks grew by 38 percent from 2014 coupled with a 25 percent increase in common stock dividends declared
- Statutory capital as of year-end once again exceeded $8 billion[75]

4.348 Pertinent to its life insurance business, Lincoln further claimed: "As we look forward, we remain confident that our key strategic objectives aimed at driving long-term, sustainable growth in our four business segments—Life Insurance, Annuities, Retirement Plan Services and Group Protection—are firmly intact. Importantly, these objectives and our financial plans are reviewed by our Board of Directors, and the Board shares management's optimism."[76]

4.349 Curiously, Lincoln fails to mention any concerns about investment income under the "Investment" section reporting on its life insurance business.[77]

---

[75] Lincoln National Life, Annual Report to Shareholders (2015), https://www.lfg.com/wcs-static/pdf/ar10k15.pdf.
[76] *Id.*
[77] *Id.* at 9.

CLASS ACTION COMPLAINT - 121
CASE NO. 2:14-CV-00235-RMP

1    4.350 As recently as the third quarter of 2016, Lincoln stated: "Life

2    Insurance reported income from operations of $167 million versus $36 million in

3    the prior-year quarter.  Excluding notable items in both periods, earnings were

4    consistent with the prior-year period.  Both quarters benefited from strong variable

5    investment income."[78]

6    4.351 Finally, Lincoln NY (administrative agent for the relevant Voya

7    policies) clearly demonstrates in its 2015 GAAP statement that Lincoln did not

8    have any concerns regarding investment income and its life insurance business:

9    "Based upon this evaluation as of December 31, 2015, management believes we

10    have the ability to generate adequate amounts of cash from our normal operations

11    (*e.g.*, insurance premiums and fees and investment income) to meet cash

12    requirements with a prudent margin of safety without requiring the sale of our

13    temporarily-impaired securities."[79]

14    4.352 Nowhere in Defendants' public statements do they express concern

15    for investment income or higher costs—much less higher reinsurance costs—that

16

17    _____

18    [78] *Lincoln Financial Group Reports Third Quarter 2016 Results and Announces Increase in Dividend*, LINCOLN NATIONAL CORPORATION, p. 3 (Nov. 2, 2016), available at: https://www.lfg.com/wcs-

19    static/pdf/3Q%20earnings%20press%20release.pdf.

    [79] Financial Statements, Lincoln Life & Annuity Company of New York (Dec. 31,

20    2015    and    2014),    https://www.lfg.com/wcs-static/pdf/2015%20Lincoln NY%20GAAP.pdf.

CLASS ACTION COMPLAINT - 122
CASE NO. 2:14-CV-00235-RMP

1    would impact the policies involved in this litigation.

2        4.353 Furthermore, Lincoln's claim that "higher reinsurance costs" in its

3    Summary of Changes document[80] as a reason for the massive COI increase is

4    unbelievable, considering that ***Lincoln is the reinsurer*** for the Voya policies at

5    issue.  In other words, at face value, Lincoln manufactured the COI increase simply

6    to increase its profits as reinsurer of the Voya policies in question.

7        4.354 Even if Lincoln exercised its option under the trust agreement with

8    Voya to reinsure part or all of its liabilities, it has been demonstrated that Lincoln

9    excessively uses captive reinsurance companies.  Again, Lincoln would control the

10    reinsurance costs for its own captives.   Any "higher reinsurance costs" are

11    completely manipulated by Lincoln, and are thus merely a façade to increase COI.

12        4.355 The above shows that the explanations Defendants have given for

13    significantly increasing COI charges are false.  Instead, on information and belief,

14    Defendants increased COI to accomplish two goals: (1) generate cash to fund

15    extraordinary and regular dividend payments to Voya Financial and Lincoln

16    National Corp. and their shareholders—specifically to raid the affected policies'

17    for their accumulated cash value in order to fund ever increasing dividend demands

18    from Voya Financial and Lincoln National Corp., and (2) to rid itself of billions of

19

20 ───────────────────────

[80] Ex. 1.

CLASS ACTION COMPLAINT - 123
CASE NO. 2:14-CV-00235-RMP

1    dollars of liabilities coming due over the next 15 years.

2    ### V.  RICO ALLEGATIONS

3    **A.    Standing, Injury, and Proximate Cause**

4    5.1    Plaintiffs and the members of the putative Class are each "persons"

5    within the meaning of 18 U.S.C. § 1961(3).  Defendants, their captives and

6    affiliated companies and the other Enterprise Associates are "persons" within the

7    meaning of 18 U.S.C. § 1961(3).

8    5.2    Plaintiffs and each member of the putative Class have sustained injury

9    to their business or property by reason of the acts and the conduct of Defendants

10   alleged in this Complaint, including their loss of money due to their payment of

11   excessive premiums, by having their account values reduced by the charging of

12   excessive premiums, and by having their policies either lapse or surrendering them,

13   thereby losing the benefit of the guaranteed rates and coverage.

14   5.3    Plaintiffs and the other members of the proposed Class suffered

15   concrete damages on by having to pay an unwarranted and meritless cost of

16   insurance increase.   For example, Plaintiff C. Pace sustains damages of

17   approximately $269 per month, representing the increased COI charges caused by

18   Defendants' wrongful conduct.

19

20

CLASS ACTION COMPLAINT - 124
CASE NO. 2:14-CV-00235-RMP

1    5.4    In addition, Plaintiff C. Pace and other Class members who

2    surrendered their policies before expiration of the pertinent surrender charge period

3    have sustained additional damages in the form of surrender charges.

4    5.5    Furthermore, Plaintiffs and the other members of the Class suffered

5    concrete damages in the form of depleted account values and account values lower

6    than those they would have received if Defendants had not engaged in the

7    fraudulent and manipulative practices alleged above.

8    5.6    But for the conduct of Defendants alleged herein, Plaintiffs and the

9    other members of the putative Class would not have been injured.

10    5.7    The losses suffered by Plaintiffs and each member of the putative

11    Class were proximately caused by Defendants, as the alleged fraudulent scheme

12    and enterprise was a direct and substantial factor in causing their injury.  As in

13    *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008), the injury suffered

14    by Plaintiffs and each member of the Class here was "a foreseeable and natural

15    consequence of [Defendants] scheme" to increase COI rates in order to recoup their

16    losses and pay shareholder dividends.  Moreover, there are no victims beyond

17    Plaintiffs and the putative Class more directly injured by Defendants' scheme and

18    enterprise who can be counted on to seek remedies under RICO.

19    5.8    The harm suffered by Plaintiffs and each member of the Class

20    amounts to compensable injury caused by Defendants' conduct of an enterprise

1  through a pattern of racketeering.  *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479
2  (1985).

3      5.9    Plaintiffs and the Class were the targets of the RICO scheme.  They
4  purchased policies underwritten and issued by Voya, and administered and
5  reinsured by Lincoln, and continued to pay premiums and increased COI charges
6  based on those Defendants' false express and implied representations of positive
7  surplus and financial strength and stability and that these charges are due to
8  increased future costs, a patently false assertion by Defendants.

9      5.10   In addition, Plaintiff and each member of the Class was injured by the
10  overt acts taken by Defendants and their affiliates and unaffiliated entities in
11  furtherance of their conspiracy to violate Section 1962(c) which are themselves
12  predicate acts, including the generation of bogus reinsurance credits used to depict
13  the Defendants as having positive surplus when these companies were actually
14  insolvent by hiding liabilities through a serious of fraudulent transactions among
15  the Defendants, fraudulently overstating assets in violation of statutory accounting
16  rules, and fraudulently recouping past losses through increasing the cost of
17  insurance under the pretense of increased future costs.

18  **B.    The Alleged Associated-in-Fact RICO Enterprise**

19      5.11   The following group of individuals associated-in-fact as an
20  "enterprise" within the meaning of 18 U.S.C. § 1961(4) to charge massive COI

CLASS ACTION COMPLAINT - 126
CASE NO. 2:14-CV-00235-RMP

1   increases on policies insured by Voya and reinsured and administered by Lincoln

2   during the Class Period while concealing their true financial condition and the true

3   reasons for those massive COI increases:

4         • Voya Retirement Insurance & Annuity Company;

5         • Voya Financial, Inc.;

6         • Lincoln National Life Insurance Company;

7         • Lincoln Life & Annuity Company of New York;

8         • Lincoln National Corporation;

9   This association-in-fact is referred to herein as the "RICO Enterprise," and its

10  constituents the "Enterprise Associates."

11      5.12   As set forth herein, the RICO Enterprise has an ascertainable structure

12  that is separate and distinct from the persons that constitute the enterprise and it is

13  separate and apart from the pattern of racketeering activity alleged herein.

14      5.13   As alleged more fully below, the Enterprise Associates conducted the

15  affairs of the RICO Enterprise through a pattern of racketeering activity.  The

16  Enterprise Associates fraudulently concealed and conspired to fraudulently conceal

17  (1) the true financial condition and financial instability of Voya Financial and

18  Lincoln National, and (2) the true reasons for the increased COI charges on the

19  insurance products underwritten and issued by Voya and reinsured and

20  administered by Lincoln National and Lincoln NY.

CLASS ACTION COMPLAINT - 127
CASE NO. 2:14-CV-00235-RMP

5.14   As a direct result of this fraudulent scheme, Defendants were able to and did charge Plaintiffs and the Class excessive COI premiums for their insurance products, and Plaintiffs and Class members paid excessive COI premiums they should not have had to pay based on false representations by Voya and Lincoln as to the true nature of the charges.

5.15   The alleged RICO Enterprise has a sufficiently ascertainable structure in that it has (1) a purpose, (2) relationships among the associates, and (3) longevity sufficient to achieve its purpose. *Boyle v. United States*, 129 S. Ct. 2237 (2009).

1.    Purpose of the RICO enterprise.

5.16   The RICO Enterprise is an ongoing and continuing organization of companies associated for the common or shared purpose of defrauding consumers by fraudulently charging increased COI premiums while concealing both the true reason for those increases and the Defendants' troubled financial condition and financial instability in order to continue reaping the financial rewards and funnel money out of Voya and Lincoln NY and Lincoln National to their upstream affiliates and Enterprise Associates.

5.17   The RICO Enterprise functioned, in part, by deceiving Plaintiffs and the Class regarding the true reasons for the increased COI charges during the Class Period.  Through this ruse to promote and effectuate a scheme to increase revenue from existing policyholders to fund past and future distributions out of Voya and

1  Lincoln NY and Lincoln National Life, and to even cause these policies to lapse so

2  as to remove the underlying insurance liabilities for these products, the Enterprise

3  Associates have, through the RICO Enterprise, engaged in a pattern of racketeering

4  activity that involves a fraudulent scheme to increase revenues for Voya and

5  Lincoln National and their affiliates.

6         2.     <u>Relationships among Separate and Distinct Associates</u>

7         5.18   To pull off this scheme, Voya had to create and operate Security Life

8  of Denver International Limited ("SLDIL"); Roaring River, LLC, ("RR"); Roaring

9  River II, LLC, ("RR II"); Roaring River IV, LLC, ("RR IV"); and Langhorne I,

10  LLC, ("L I") ("the Voya Captives"). Additionally, Lincoln National Life and

11  Lincoln NY had to create and operate Lincoln Reinsurance Company of Vermont

12  I ("LRCV I"); Lincoln Reinsurance Company of Vermont III ("LRCV III");

13  Lincoln Reinsurance Company of Vermont IV ("LRCV IV"); and Lincoln

14  Reinsurance Company of South Carolina ("LRCSC") (the "Lincoln Captives").

15         5.19   These financial captives are an integral part of the scheme because

16  their finances are not publicly disclosed under state law, and these entities enabled

17  the RICO Enterprise's unlawful activity to artificially inflate surplus and RBC,

18  fraudulently misrepresent to the public and policyholders the true impact of their

19  paying large dividends to funnel money out of Voya and Lincoln National Life and

20  Lincoln NY to its upstream affiliates and Enterprise Associates, and fraudulently

1 misrepresent and conceal the true reason for the substantial increases in COI

2 charges Defendants demanded Plaintiffs and Class pay.

3     5.20   The decision to use these entities to misrepresent the true financial

4 condition of Voya, Lincoln National Life, and Lincoln NY not only facilitated but

5 enabled the RICO Enterprise's unlawful activity; in particular, Defendants used the

6 separately incorporated nature of these entities to perpetrate the fraudulent scheme

7 and the acts of mail and wire fraud that were at the center of that scheme.

8     5.21   Each associate of the RICO Enterprise has an existence separate and

9 distinct from its participation in the racketeering activities of the RICO Enterprise.

10 Each alleged entity associate is organized as a separate company, with separate

11 boards, separate books and records, separate accounts and separate existences for

12 legal and regulatory purposes.

13     5.22   Because the Voya Captives and Lincoln Captives were created to

14 facilitate the scheme, the RICO Enterprise has an existence and structure that is

15 separate and distinct from other affairs of its members.  Moreover, Voya did not

16 own the Lincoln Captives, and Lincoln did not own the Voya Captives, and those

17 entities engaged in business operations separate and apart from their activities on

18 behalf of the RICO Enterprise alleged herein.

19     5.23   Members of the RICO Enterprise engage in business operations

20 separate and distinct from other affairs of its members and separate and apart from

their activities on behalf of the RICO Enterprise.  For example, and in addition to the facts pled above in this Complaint:

- Voya Financial owns Voya, an insurance company selling insurance and annuity products to consumers around the United States;

- Lincoln National Corp. owns Lincoln NY and Lincoln National Life, insurance companies selling insurance and annuity products to consumers around the United States;

- Voya Financial is publicly traded on the New York Stock Exchange under the symbol "VOYA";

- Lincoln National Life is publicly traded on the New York Stock Exchange under the symbol "LNC";

5.24   The Enterprise Associates nevertheless became associated with the RICO Enterprise, and conducted or participated in the affairs of the RICO Enterprise in addition to their own affairs.  The activities in which the associates of the RICO Enterprise engaged facilitating the racketeering activities are not, however, ordinary legitimate business activities and, in fact, were unlawful and would be inimical to the interests of the RICO Enterprise members.

5.25   Each member of the RICO Enterprise has a different and clearly defined role and relationship in the conduct of the affairs of the RICO Enterprise, and as alleged above, all of the associates took some part in directing the RICO Enterprise's affairs:

- As more fully set forth above, the Voya and Lincoln Captives served as corrupt "captive" entities that were created to accept

ceded liabilities from Voya and Lincoln, respectively, and artificially boost RBC despite their lack of independent payment ability. The secrecy of the finances of these captives allowed Defendants to conceal the fraudulent scheme.

• As more fully set forth above, Voya Financial, Voya and their affiliated entities profited from the scheme by taking over $1.7 Billion in dividends that otherwise would have been used to offset existing insurance liabilities, all the while pretending the company was valuable, solvent and capable of meeting its future obligations.

• As more fully set forth above, Lincoln and their affiliated entities profited from the scheme by paying over $7.6 Billion in dividends that otherwise would have been used to offset existing insurance liabilities, all the while pretending the company was valuable, solvent and capable of meeting its future obligations.

• As more fully set forth above, Voya and Lincoln agreed to impose massive COI increases on Voya's policyholders in order to collect more money from policyholders, reduce the account values of policyholders, or cause these policyholders to either lapse or surrender their policies (or any combination of these things), while concealing from policyholders and the public the true reasons for these massive COI increases.

5.26   In these ways and others, each of the Enterprise Associates directly or indirectly participated in, or managed aspects of, facilitated or otherwise took some part in directing the unlawful activities comprising the RICO Enterprise's affairs.

5.27   The cooperation exhibited by the members of the RICO Enterprise fell outside the bounds of the parties' normal commercial relationships and was undertaken to advance the corrupt purposes of the RICO Enterprise.

CLASS ACTION COMPLAINT - 132
CASE NO. 2:14-CV-00235-RMP

5.28    The RICO Enterprise's decision to operate through the Voya Captives and Lincoln Captives thus facilitated its unlawful activity.    The Enterprise Associates consciously used the separate corporate forms of the Voya Captives and Lincoln Captives in order to make the fraudulent scheme harder to detect and better conceal the true nature of the COI increases and the extent of their misrepresentations and wrongdoing.

3.    Continuous Existence

5.29    The RICO Enterprise has had an ongoing and continuous existence during the Class Period sufficient to permit the Enterprise Associates to pursue the RICO Enterprise's purpose.    Throughout the Class Period, the members of the RICO Enterprise associated in fact increase the COI charges while concealing the true reasons for those increase and their true financial condition, on an ongoing rather than *ad hoc* basis.

5.30    No Associate of the RICO Enterprise could have accomplished the goals of the scheme on its own initiative.

5.31    The RICO Enterprise has displayed a continuity of membership during the Class Period exceeding two years, during which time Enterprise Associates acted continuously in their respective roles in the RICO Enterprise.

5.32    During the Class Period, each Enterprise Associate in the RICO Enterprise was aware of the scheme to misstate Voya's and Lincoln's true financial

CLASS ACTION COMPLAINT - 133
CASE NO. 2:14-CV-00235-RMP

1    condition and to disguise the true reason for the COI charges being imposed on

2    Plaintiffs and the Class and was a knowing and willing participant in that scheme.

3         4.    Interstate Commerce

4         5.33    The RICO Enterprise engages in and affects interstate commerce

5    because it involves activities across state boundaries, such as the receipt of

6    increased COI payments and the transmission of false information to Plaintiffs and

7    the Class regarding the true reason for the COI increases.

8    **C.    Pattern of Racketeering Activity**

9         5.34    As alleged above, both Voya and Lincoln consistently misrepresented

10   their true financial condition and fraudulently misrepresented the true reason for

11   the COI increases to Plaintiffs and the Class.

12        5.35    Voya, Lincoln, and the other Enterprise Associates have engaged in a

13   "pattern of racketeering activity," as defined by 18 U.S.C. § 1961(5), by

14   committing or aiding and abetting in the commission of at least two acts of

15   racketeering activity, i.e., indictable violations of 18 U.S.C. § 1341 (mail fraud)

16   and 18 U.S.C. § 1343 (wire fraud), as described above, within the past three years.

17   The Enterprise Associates have committed or aided and abetted in the commission

18   of countless acts of racketeering activity, including but not limited to sending

19   notices of the COI increases to Plaintiffs and the Class, communicating the false

20   reasons for those increases with Plaintiffs and the Class, and collecting money from

CLASS ACTION COMPLAINT - 134
CASE NO. 2:14-CV-00235-RMP

1   Plaintiffs and the Class.  Each racketeering act was related, had a similar purpose,

2   involved the same or similar participants and method of commission, had similar

3   results, and impacted similar victims, including the Plaintiff and other members of

4   the Class.

5        5.36   The   multiple   predicate   acts   of   racketeering   activity   that   Voya,

6   Lincoln, and the other Enterprise Associates committed and/or conspired to, or

7   aided and abetted in the commission of, were related to each other and amount to

8   and pose a threat of continued racketeering activity, and therefore constitute a

9   "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5).

10  **D.   Predicate Acts**

11       5.37   Section 1961(1)(B) of RICO provides that "racketeering activity"

12  includes any act indictable under 18 U.S.C. § 1341 (relating to mail fraud) and 18

13  U.S.C. § 1343 (relating to wire fraud).

14       5.38   For the purpose of executing and/or attempting to execute the above-

15  described scheme, Voya, Lincoln, and the other Enterprise Associates, in violation

16  of 18 U.S.C. § 1341, placed in post offices and/or in authorized repositories matter

17  and things to be sent or delivered by the Postal Service, caused matter and things

18  to be delivered by commercial interstate carriers, and received matter and things

19  from the Postal Service and/or commercial interstate carriers, including, but not

20  limited to, statements and other materials relating to the increased COI charges and

CLASS ACTION COMPLAINT - 135
CASE NO. 2:14-CV-00235-RMP

1    the transmission to the public of false or materially misleading financial

2    information in statements filed with the respective state regulators and the NAIC

3    that disguised the true reason for the massive increase in COI charges.

4        5.39    As alleged above, the Annual Statements submitted by both Voya and

5    Lincoln National to the NAIC and its respective regulators from at least 2007 to

6    2016 included fraudulent or material representations of, among other things, the

7    surplus and RCB these companies would have reported but for their departure from

8    NIAC SAP standards.

9        5.40    For the purpose of executing and/or attempting to execute the above-

10   described scheme to defraud or obtain money by means of false pretenses,

11   representations or promises, Voya, Lincoln, and the other Enterprise Associates,

12   also in violation of 18 U.S.C. § 1343, transmitted and received by wire, matter and

13   things, which include, but are not limited to, reductions in the account value of

14   Plaintiffs and the Class, wire transfers by and among affiliates for purposes of

15   funneling cash out of the companies and moving liabilities off balance sheet.  In

16   addition, pursuant to and as part of the scheme to defraud, Voya, Lincoln, and the

17   other Enterprise Associates intended that Lincoln NY and/or Lincoln National Life

18   would and did receive payments from Plaintiff and other Class members that were

19   transmitted or cleared through the use of interstate wires in violation of 18 U.S.C.

20   § 1343.

5.41    Voya, Lincoln, and the other Enterprise Associates, at a minimum, aided and abetted violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§1341 and 1343 offenses pursuant to 18 U.S.C. § 2.

5.42    Many of the precise dates of the RICO Enterprise's fraudulent use of the U.S. Mail and wire facilities have been deliberately hidden and cannot be alleged without access to the books and records of Voya, Lincoln, and the other Enterprise Associates.    Indeed, the success of the scheme depended upon concealment, and Voya, Lincoln, and the other Enterprise Associates have withheld details of the scheme from Plaintiff and Class members.    Generally, however, Plaintiff can describe the occasions on which the predicate acts of mail and wire fraud would have occurred, and how those acts were in furtherance of a scheme. They include thousands of communications to perpetuate and maintain the scheme, including, among other things:

- creating the Voya Captives and Lincoln Captives;

- entering into reinsurance agreements with the Voya Captives and Lincoln Captives (including the reinsurance agreements cited above in this Complaint);

- maintaining the reinsurance agreements between Voya and Lincoln NY and Lincoln National Life cited above in this Complaint);

- transmitting and receiving promotional materials extolling Voya and Lincoln's purportedly positive surplus, stable financial condition and A.M. Best rating;

- transmitting false or materially misleading financial statements that hid the true reason for the COI increases to the respective state regulators and to the NAIC (including the Annual Statements cited above in this Complaint);

- transmitting false statements to Plaintiffs and the Class that misrepresent the true reasons for the massive COI increases (including the May 31, 2016 letter attached as Exhibit 2); and

- processing premium payments received from the policyholders, including those received from Plaintiffs.

5.43  Plaintiffs in particular received statements in the mail from Voya and Lincoln regarding the massive COI increases, communicated with Voya and Lincoln by mail about the massive COI increases, and paid money to Voya and Lincoln to cover the massive COI increases by either mailing checks or electronic debiting of their bank accounts.  Voya, Lincoln, and the other Enterprise Associates used "dishonest methods or schemes" involving "the deprivation of something of value by trick, deceit, chicane or overreaching."  *McNally v. United States*, 483 U.S. 350, 358 (1987).

5.44  The omissions of material facts, acts of concealment, and failures to disclose of Lincoln, Voya, and the other Enterprise Associates were knowing and intentional, and made for the purpose of deceiving Plaintiffs and the Class into paying for the massive COI increases.

5.45    Voya, Lincoln, and the other Enterprise Associates either knew or recklessly disregarded the fact that their omissions and misrepresentations were material and were relied upon by Plaintiff and the Class as shown by their payments of the COI increases or surrender of their policies.

5.46    Although not necessary to make out a violation of the mail or wire fraud statutes, Plaintiff and the Class relied, to their detriment, on the alleged fraudulent material omissions and misrepresentations of Voya's and Lincoln's true financial condition and true reason for the massive COI increases. Reliance by at least some of Voya's policyholder allowed Voya and Lincoln to charge the excessive COI increases, injuring all policyholders during the Class Period. *Bridge v. Phoenix Bond & Indemnity Co*., 553 U.S. 639 (2008).

5.47    Voya, Lincoln, and the other Enterprise Associates knew Plaintiffs and the Class relied on their misrepresentations and omissions concerning the true financial condition of Voya and Lincoln and the true reasons for the massive COI increases, and knew that Plaintiffs and the Class would incur substantial loss as a result.

5.48    Accordingly, Voya and Lincoln have obtained money and property belonging to the Plaintiffs and Class members, and Plaintiffs and the other members of the Class have been injured in their business or property by the overt

acts of mail and wire fraud of these Defendants and the other Enterprise Associates,

and by their aiding and abetting each other's acts of mail and wire fraud.

## VI.  CLASS ALLEGATIONS

6.1    Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of

Civil Procedure, on their own behalf and as representatives of the following class:

> All individuals who purchased, contributed to, or
> participated in the purchase of the policies at issue and
> who received coverage from insurance policies issued by
> Aetna (now Voya), and reinsured and administered by
> Lincoln NY, that experienced a cost of insurance
> increase beginning in 2016 and identified in the
> Summary of Changes document[81] as the following
> policies:  (1) Aetna Enhanced UL 1995, (2) AetnaVest
> Estate Protector I, (3) AetnaVest Estate Protector II, (4)
> AetnaVest I, (5) AetnaVest II, (6) AetnaVest Plus, (7)
> Estate Protector (8) Estate Protector 2 & 3, (9) Life
> Partners, (10) Life Partners II, (11) Revised Aetna
> Enhanced UL, (12) Aetna Enhanced UL 1997, (13)
> Select UL 1994, (14) Revised Select UL, (15) Select UL
> 1997, (16) Universal Life 2, (17) Universal Life 83, (18)
> Universal Life 84, (19) Universal Life 85/86/87, and (20)
> Universal Life 89 ("Affected Policies").

6.2    In addition to the National Class, Plaintiffs seek to bring four state

subclasses that assert claims under statutes specific to each state, or are in the

alternative to the National Class based on common law claims. The state subclasses

are defined as follows:

> **Alabama Subclass:** All individuals in the State of
> Alabama who purchased, contributed to, or participated

---

[81] Ex. 1.

in the purchase of the policies at issue and who received coverage from insurance policies issued by Aetna (now Voya), and reinsured and administered by Lincoln NY, that experienced a cost of insurance increase beginning in 2016 and identified as the Affected Policies.

**Connecticut Subclass:** All individuals in the State of Connecticut who purchased, contributed to, or participated in the purchase of the policies at issue and who received coverage from insurance policies issued by Aetna (now Voya), and reinsured and administered by Lincoln NY, that experienced a cost of insurance increase beginning in 2016 and identified as the Affected Policies

**Missouri Subclass:** All individuals in the State of Missouri who purchased, contributed to, or participated in the purchase of the policies at issue and who received coverage from insurance policies issued by Aetna (now Voya), and reinsured and administered by Lincoln NY, that experienced a cost of insurance increase beginning in 2016 and identified as the Affected Policies.

**North Carolina Subclass:** All individuals in State of North Carolina who purchased, contributed to, or participated in the purchase of the policies at issue and who received coverage from insurance policies issued by Aetna (now Voya), and reinsured and administered by Lincoln NY, that experienced a cost of insurance increase beginning in 2016 and identified as the Affected Policies.

**Washington Subclass:** All individuals in the State of Washington who purchased, contributed to, or participated in the purchase of the policies at issue and who received coverage from insurance policies issued by Aetna (now Voya), and reinsured and administered by Lincoln NY, that experienced a cost of insurance

increase beginning in 2016 and identified as the Affected Policies.

6.3     The class satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure in that (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law and fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; (4) the Plaintiffs will fairly and adequately protect the interests of the class; (5) individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts and increase the delay and expense to all parties and the court system from the issues raised by this action; and (6) the questions of law or fact common to the class members predominate over any questions affecting any individual members:

6.4     The members of the class are so numerous that joinder of all class members in this action is impracticable.  Plaintiffs believe that there are over 10,000 members of the class.

6.5     There are questions of fact and law common to the class, including but not limited to the following:

a.      whether Defendants engaged in a conspiracy and scheme to defraud Plaintiffs through misrepresentations regarding Lincoln National Corp., Lincoln National Life, Lincoln NY, Voya Financial, and Voya Financial strength

CLASS ACTION COMPLAINT - 142
CASE NO. 2:14-CV-00235-RMP

1  and by failing to disclose deviations from NAIC SAP and the financial

2  ramifications resulting from said deviations;

3        b.     whether the Plaintiffs' and Class members' policies described

4  above were defective by virtue of their being underfunded;

5        c.     whether the Defendants knew that the Life Policies were

6  underfunded at the time it marketed and sold the policies to Plaintiffs;

7        d.     whether the Defendants conspired to market and did market the

8  Plaintiffs' and Class members' Policies for the purposes of defrauding members of

9  the class;

10        e.     the actual financial health of Lincoln National Corp., Lincoln

11  National Life, Lincoln NY, Voya Financial, and Voya after accounting for its

12  proper financial valuation;

13        f.     the true economic justification for raising the cost of insurance

14  under the Plaintiffs' and Class members' Policies;

15        g.     whether Lincoln National Corp., Lincoln National Life, Lincoln

16  NY, Voya Financial, and Voya failed to maintain statutorily required reserve

17  amounts;

18        h.     whether Lincoln National Corp., Lincoln National Life, Lincoln

19  NY, Voya Financial, and Voya breached its contractual obligations to Plaintiffs by

20  raising the cost of insurance for improper purposes;

CLASS ACTION COMPLAINT - 143
CASE NO. 2:14-CV-00235-RMP

1    i.    whether Defendants engaged in a conspiracy to commit mail or

2    wire fraud through the course of their actions towards Plaintiffs and Class

3    members;

4    j.    whether Defendants were unjustly enriched by their actions

5    towards Plaintiffs and Class members;

6    k.    whether Defendants converted the premiums and policy values

7    of Plaintiffs and Class members;

8    l.    whether Defendants defrauded Plaintiffs through their

9    communications, acts, and/or omissions;

10    m.    whether Defendants violated the Racketeer Influenced and

11    Corrupt Organizations Act;

12    n.    whether Defendants violated state consumer protection/unfair

13    and deceptive trade practices acts;

14    o.    the extent of injuries sustained by members of the class; and

15    p.    the appropriate type and/or measure of damages.

16    6.6    Plaintiffs' claims are typical of the claims of all members of the class

17    because Plaintiffs and all members of the putative Class have been damaged by the

18    same unlawful/improper uniform misconduct the Defendants alleged herein.

19    6.7    Plaintiffs will fairly and adequately protect the interests of the

20    members of the class. In addition, Plaintiffs are represented by counsel who are

CLASS ACTION COMPLAINT - 144
CASE NO. 2:14-CV-00235-RMP

1    experienced and competent in the prosecution of complex litigation, including class

2    action litigation. Finally, the interests of Plaintiffs are coincident with, and not

3    antagonistic to, those of the class.

4            6.8    Class action treatment is superior to the alternatives, if any, for the fair

5    and efficient adjudication of the controversy alleged herein.  Such treatment will

6    permit a large number of similarly situated persons to prosecute their common

7    claims in a single forum simultaneously, efficiently, and without the unnecessary

8    duplication of effort and expense that could result from individualized litigation.

9    Further, individualized litigation would create the danger of inconsistent or

10   contradictory judgments arising from the same set of facts.  Class action treatment

11   will also permit the adjudication of relatively small claims by the class members,

12   as measured against the effort and expense required to individually litigate these

13   complex claims against Defendants.

14           6.9    Plaintiffs know of no difficulties that are likely to be encountered in

15   the management of this action that would preclude its maintenance as a class action.

16

17

18

19

20

CLASS ACTION COMPLAINT - 145
CASE NO. 2:14-CV-00235-RMP

# VII.  COUNTS

## COUNT ONE
## VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. SECTION 1962(c)
**(Against All Defendants on behalf of Plaintiffs and the Nationwide Class)**

7.1    Plaintiffs and the Class repeat and reallege all allegations contained in Sections I through VI above, including paragraphs 1.1 to 6.9, as if set forth separately in this Claim for Relief.

7.2    This claim arises under 18 U.S.C. §1962(c), which provides in relevant part:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . .

7.3    In violation of 18 U.S.C. § 1962(c), Defendants and the other Enterprise Associates have conducted or participated, directly or indirectly, in the conduct of the affairs of the RICO Enterprise through a "pattern of racketeering activity," as defined by 18 U.S.C. §1961(5).  Therefore, Defendants and the other Enterprise Associates have violated 18 U.S.C. § 1962(c).

7.4    The injuries of Plaintiffs and the other members of the putative Class were directly and proximately caused by the alleged racketeering activity.

7.5    As a result and by reason of the foregoing, Plaintiffs and the Class members have been injured, suffered harm, and sustained damage to their business and property, and are therefore entitled to recover actual and treble damages, and their costs of suit, including reasonable attorney fees, pursuant to 18 U.S.C. § 1964(c).

**COUNT TWO**
**VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. SECTION 1962(d)**
**(Against All Defendants on behalf of Plaintiffs and the Nationwide Class)**

7.6    Plaintiffs and the Class repeat and reallege all allegations contained in Sections I through VI above, including paragraphs 1.1 to 6.9, as if set forth separately in this Claim for Relief.

7.7    This claim arises under 18 U.S.C. § 1962(d), which provides in relevant part: "It shall be unlawful for any person to conspire to violate any of the provisions of subsection . . . (c) of this section."

7.8    In violation of 18 U.S.C. § 1962(d), Defendants and the other Enterprise Associates conspired to defraud the Plaintiff and other members of the putative Class of their money and property through excessive COI charges pursuant to the pattern of racketeering activity and the fraudulent scheme described above. Defendants and the other Enterprise Associates agreed to conduct or to participate

1    in the affairs of the enterprise and agreed to commit at least two of the predicate

2    acts identified above.

3        7.9    The injuries of Plaintiffs and the Class members were directly and

4    proximately caused by the alleged racketeering activity.

5        7.10    As a result and by reason of the foregoing, the Plaintiffs and the Class

6    members have been injured, suffered harm and sustained damage to their business

7    and property, and are therefore entitled to recover actual and treble damages, and

8    their costs of suit, including reasonable attorney fees, pursuant to 18 U.S.C. §

9    1964(c).

10                    **<u>COUNT THREE</u>**
                    **BREACH OF CONTRACT**
11    **(Against Voya, Lincoln National Life, and Lincoln NY on behalf of Plaintiffs
      and the Nationwide Class, and in the alternative the State Specific**
12                        **Subclasses)**

13        7.11    Plaintiffs and the Class repeat and reallege all allegations contained in

14    Sections I through VI above, including paragraphs 1.1 to 6.9, as if set forth

15    separately in this Claim for Relief.

16        7.12    Plaintiffs and Class members each entered in a contract with Voya

17    when they purchased their life insurance policies.    Lincoln NY and Lincoln

18    National Life act as Voya's agent in the administration of this contract.

19        7.13    Throughout the life of each respective life insurance policy, Plaintiffs

20    have paid to Defendants all premiums and charges due under the policies as set

CLASS ACTION COMPLAINT - 148
CASE NO. 2:14-CV-00235-RMP

1    forth at the time of execution of the policies, and Plaintiffs have performed all

2    obligations and conditions under the policies.

3        7.14    Under the life insurance policies, Defendants owed and continue to

4    owe duties and obligations to Plaintiffs and members of the Class.  Among these

5    duties is the duty to properly administer the policy consistent with the terms and

6    obligations set forth within the respective life insurance policies.  This includes the

7    duty to determine the correct monthly deduction from a policyholder's account, the

8    duty to notify policyholders in a timely manner whenever Defendants believed a

9    policy's COI expenses increased; and to refrain from increasing the COI except

10   under very specific conditions.

11       7.15    Defendants materially breached the terms of the life insurance policies

12   and its duties to Plaintiffs under the policies when they:

13           a.      instituted unreasonable COI increases for purposes not

14   authorized under the life insurance policies;

15           b.      failed to determine the correct monthly deduction from the life

16   insurance policies' accounts in accordance with the policies' terms and

17   conditions;

18           c.      failed to notify policyholders as soon as Defendants

19   determined that their "expectations" for the life insurance policies were

20

CLASS ACTION COMPLAINT - 149
CASE NO. 2:14-CV-00235-RMP

1   inaccurate and that the policies were not performing sufficiently and required an

2   increase in COI;

3       d.      failed to determine in a reasonably timely manner that the life

4   insurance policies were not charged the appropriate COI;

5       e.      failed to maintain adequate assets backings reserves sufficient

6   to make good on its obligations under the policies; and

7       f.      failed to administer and/or maintain said policies consistent

8   with Defendants' inherent duties of good faith and fair dealing implied in the

9   performance of every contract.

10      7.16    As a direct and proximate result of Defendants' conduct, Plaintiffs and

11  members of the putative Class have been damaged in an amount to be determined

12  at trial.  The aforementioned damages include, but are not limited to, the diminished

13  value in Plaintiffs' and the Class members' life insurance policies; the improper

14  increased cost of insurance premiums; and any damages suffered by Plaintiffs and

15  members of the Class from not having the opportunity to pursue and secure

16  alternatives to the diminished life insurance policies at issue that occurred due to

17  their reliance on the representations of financial solvency of the life insurance

18  policies by Defendants.

19

20

CLASS ACTION COMPLAINT - 150
CASE NO. 2:14-CV-00235-RMP

**COUNT FOUR**
**UNJUST ENRICHMENT**
**(Against All Defendants on behalf of Plaintiffs and the Nationwide Class, and in the alternative the State Specific Subclasses)**

7.17   Plaintiffs and the Class repeat and reallege all allegations contained in Sections I through VI above, including paragraphs 1.1 to 6.9, as if set forth separately in this Claim for Relief.

7.18   Plaintiffs conferred benefits upon Defendants; specifically, paid money in the form of premiums and excess premiums to fund their life insurance policies, and Defendants used those funds to earn investment income and to pay extraordinary dividends to Voya Financial, Lincoln National Corp., and ultimately Voya Financial's and Lincoln National Corp.'s shareholders.

7.19   Defendants knew that they were enjoying such benefits from the Plaintiffs' premium and excess premium payments.

7.20   Defendants misused the benefits Plaintiffs conferred on them by engaging in the above-described schemes to pay extraordinary dividends to Voya Financial, Lincoln National Corp., and Voya Financial's and Lincoln National Corp.'s shareholders.

7.21   Defendants chose not to inform Plaintiffs that their "expectations" for the subject universal life insurance policies were not being met as soon as they

1    knew such information, causing Plaintiffs to continue make premium and excess

2    premium payments to the Plaintiffs' detriment.

3        7.22    Defendants have unlawfully raided Plaintiffs' cash value accounts

4    under the guise of a justified contractually mandated increase in COI.

5        7.23    Actions of Defendants have caused policyholders to abandon their

6    universal life insurance policies without receiving the benefit of said policies.

7        7.24    Actions of Defendants have caused policyholders to rely on false

8    statements Defendants have made and, as a result, permit the Defendants to raid

9    their policies' cash value.

10        7.25    It is inequitable for Defendants to retain the benefits they have enjoyed

11    from Plaintiffs' premium payments and excess premium payments.

12        7.26    As a direct and proximate result of Defendants' conduct, Plaintiffs and

13    members of the putative Class have been damaged in an amount to be determined

14    at trial.  The aforementioned damages include, but are not limited to, the diminished

15    value in Plaintiffs' and Class members' life insurance policies; the improper

16    increased COI premiums; and any damages suffered by Plaintiffs and members of

17    the Class from not having the opportunity to pursue and secure alternatives to the

18    diminished life insurance policies at issue that occurred due to their reliance on the

19    representations of financial solubility of the life insurance policies by Defendants.

20    Plaintiffs and the members of the putative Class are entitled to restitution for all

premiums paid or, in the alternative, the unlawful and artificially inflated COI charges that Defendants have paid themselves from the policies' cash value.

**COUNT FIVE**
**CONVERSION**
**(Against all Defendants on behalf of Plaintiffs and the Nationwide Class, and in the alternative the State Specific Subclasses)**

7.27   Plaintiffs and the Class repeat and reallege all allegations contained in Sections I through VI above, including paragraphs 1.1 to 6.9, as if set forth separately in this Claim for Relief.

7.28   On and before June 2016, Plaintiffs' had acquired significant cash values as part of their universal life insurance policies.

7.29   Plaintiffs' policies' cash values were specific and identifiable, and were the Plaintiffs' personal property.

7.30   Beginning in November 2016, and continuing every month thereafter, Voya, Lincoln NY, and Lincoln National Life caused money to be withdrawn from the Plaintiffs' cash value accounts and deposited into Defendants' accounts.

7.31   Specifically, Voya, Lincoln NY, and Lincoln National Life were acting as agents of Voya Financial and Lincoln National Corp. in withdrawing funds from Plaintiffs' and Class members' account values, in order to convert these funds into dividends to be paid to Voya Financial, Lincoln National Corp., and their shareholders.

CLASS ACTION COMPLAINT - 153
CASE NO. 2:14-CV-00235-RMP

7.32    In so doing, Defendants have exerted ownership and dominion over the Plaintiffs' personal property in denial of the Plaintiffs' rights.

7.33    As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the putative Class have been damaged in an amount to be determined at trial.

**COUNT SIX**
**FRAUD**
**(Against all Defendants on behalf of Plaintiffs and the Nationwide Class and in the alternative the State Specific Subclasses)**

7.34    Plaintiffs and the Class repeat and reallege all allegations contained in Sections I through VI above, including paragraphs 1.1 to 6.9, as if set forth separately in this Claim for Relief.

7.35    Defendants have falsely stated to Plaintiffs' that Voya, Lincoln NY, and Lincoln National Life were justifiably and lawfully increasing the COI charged to their universal life policies.

7.36    Defendants falsely represented to the Plaintiffs, as stated above, that they were well-funded companies, operating efficiently, increasing profits and cash flows, and reducing costs. These statements were made through direct policyholder communications, through statements made on Defendants' websites, and through public financial statements filed with governmental agencies.

CLASS ACTION COMPLAINT - 154
CASE NO. 2:14-CV-00235-RMP

1    7.37   At the time Defendants made these statements, they knew them to be

2    false.

3    7.38   Defendants made these statements with the express intention of

4    defrauding the Plaintiffs.

5    7.39   Plaintiffs relied on Defendants' statements and were entitled to rely

6    on such statements.  In reliance on those statements, Plaintiffs continued to pay

7    premiums and excess premiums long after they otherwise would have; additionally,

8    Plaintiffs did not attempt to obtain alternative life insurance policies at an earlier

9    date when they either could have obtained them and/or could have obtained them

10   at a lesser charge than they can now.

11   7.40   Moreover, Plaintiffs relied on Defendants' statements regarding the

12   COI increases and allowed Voya, Lincoln NY, and Lincoln National Life to

13   withdraw the increased COI charges from their policies' cash value.

14   7.41   Specifically, the COI increase has depleted the account value of

15   Plaintiff N. Pace's and Plaintiff C. Pace's policy so drastically that they cannot

16   afford the $1,317.52 required to keep the policy in force through January 2017.  As

17   a result, this policy is currently in a grace period and will likely lapse at the end of

18   the month.

19   7.42   If Defendants had not made such false statements, Plaintiffs would not

20   have taken the above-described actions.

CLASS ACTION COMPLAINT - 155
CASE NO. 2:14-CV-00235-RMP

7.43   As a result of the fraudulent actions and misrepresentations Lincoln National Corp., Lincoln National Life, Lincoln NY, Aetna, and Voya have taken, the Plaintiffs have suffered compensable injuries as stated above.

**COUNT SEVEN**
**VIOLATION OF THE CONNECTICUT**
**UNFAIR TRADE PRACTICES ACT**
**(Against Voya, Lincoln NY, and Lincoln National Life**
**on behalf of Plaintiffs and the Nationwide Class,**
**and in the alternative the Connecticut Subclasses)**

7.44   Plaintiffs and the Class repeat and reallege all allegations contained in Sections I through VI above, including paragraphs 1.1 to 6.9, as if set forth separately in this Claim for Relief.

7.45   The Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a *et seq.,* prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce." Conn. Gen. Stat. § 42-110b(a).

7.46   Voya, Lincoln NY, and Lincoln National Life are "person[s]" within the meaning of Conn. Gen. Stat. § 42-110a(3).

7.47   Voya, and Lincoln NY and Lincoln National Life as agents of Voya, engaged in unfair business practices in violation of the Connecticut Unfair Trade Practices Act as described herein, by, among other things, unfairly increasing Plaintiffs' and Class members' COI and providing Plaintiffs and Class members with deceptive information regarding the reasons for the increase. Voya, Lincoln

1  NY, and Lincoln National Life are now taking Plaintiffs' and Class Members'

2  Account Values, to benefit themselves and recoup their own losses, when they had

3  originally used the ability to increase savings and take policy loans as a selling

4  point to induce Plaintiffs and Class members to purchase the policies in the first

5  place.

6      7.48   Additionally, Voya, Lincoln NY, and Lincoln National Life falsely

7  represented to the Plaintiffs, as stated above, that they were well-funded companies,

8  operating efficiently, increasing profits and cash flows, and reducing costs.  These

9  statements were made through direct policyholder communications, through

10  statements made on Defendants' websites, and through public financial statements

11  filed with governmental agencies.

12      7.49   Voya, Lincoln NY, and Lincoln National Life unfairly increased

13  Plaintiffs' and Class members' COI rates by 15-55%, in order to recoup their prior

14  losses and generate more funds with which they will be able to pay additional

15  exorbitant dividends—material facts which they concealed from Plaintiffs and

16  Class members.

17      7.50   Voya, Lincoln NY, and Lincoln National Life knew that the COI

18  increase was a means to recoup their losses and generate more funds with which

19  they will be able to pay additional exorbitant dividends to Voya Financial, Lincoln

20  National Corp., and their shareholders.  Additionally, Voya, Lincoln NY, and

1   Lincoln National Life knew that the "elevated costs," which they told Plaintiffs and

2   Class members were the basis of the decision to raise COI rates, were actually

3   higher *reinsurance* costs, a fact which was told to their agents and brokers.  Voya's,

4   Lincoln NY's and Lincoln National Life's reinsurance costs are figures wholly

5   manipulated by Voya, Lincoln NY, and Lincoln, as they themselves, through

6   captive reinsurers, are reinsuring the policies.  Moreover, Voya, Lincoln NY, and

7   Lincoln National Life knew that they were not financially stable companies nor

8   were they operating efficiently.

9       7.51   Voya, Lincoln NY, and Lincoln National Life instead intentionally

10  misrepresented the true reasons behind the COI increase when informing Plaintiffs

11  and Class Members of the increase.  They led Plaintiffs and Class members to

12  believe that this was a justifiable increase, based on sound financial information.

13      7.52   Voya, Lincoln NY, and Lincoln National Life thus violated the

14  Connecticut Unfair Trade Practices Act by, at a minimum: employing deception,

15  deceptive acts or practices, fraud, misrepresentations, or concealment, suppression

16  or omission of any material fact with intent that others rely upon such concealment,

17  suppression or omission, in connection with the COI increase on the policies at

18  issue.

19      7.53   The decisions, acts, misrepresentations, concealment, and schemes

20  violating the Connecticut Unfair Trade Practices Act by Voya, Lincoln NY, and

1    Lincoln National Life emanated from Voya's headquarters in Connecticut and

2    affected Plaintiffs and the Nationwide Class.

3        7.54    Voya, Lincoln NY, and Lincoln National Life knew or should have

4    known that their conduct violated the Connecticut Unfair Trade Practices Act.

5        7.55    Plaintiffs and Class members reasonably expected Voya, Lincoln NY,

6    and Lincoln National Life to fairly calculate their COI charges, and implement

7    them based solely upon sound financial reasoning.

8        7.56    As described herein, Plaintiffs and Class members relied on Voya's,

9    Lincoln NY's, and Lincoln National Life's statements and were entitled to rely on

10   such statements.  In reliance on those statements, Plaintiffs and Class members

11   continued to pay premiums and excess premiums long after they otherwise would

12   have; additionally, Plaintiffs did not attempt to obtain alternative life insurance

13   policies at an earlier date when they either could have obtained them and/or could

14   have obtained them at a lesser charge than they can now.

15       7.57    Moreover, Plaintiffs relied on Voya's, Lincoln NY's, and Lincoln

16   National Life's statements regarding the COI increases and allowed Voya, Lincoln

17   NY, and Lincoln National Life to withdraw the increased COI charges from their

18   policies' cash value.

19

20

CLASS ACTION COMPLAINT - 159
CASE NO. 2:14-CV-00235-RMP

1    7.58   As such, Voya's, Lincoln NY's and Lincoln National Life's unfair or

2  deceptive acts or practices were likely to and did in fact deceive reasonable

3  consumers, including Plaintiffs and Class members.

4    7.59   Voya's, Lincoln NY's, and Lincoln National Life's conduct offends

5  public policy as established by statutes, the common law or otherwise and is within

6  at least the penumbra of some common law, statutory or other established concept

7  of unfairness; is immoral, unethical, oppressive, or unscrupulous; and causes

8  substantial injury to consumers, competitors, or other businesses.  Thus, Voya's,

9  Lincoln NY's, and Lincoln National Life's unfair and deceptive increasing of

10  Plaintiffs' and Class members' COI to recoup their own losses due to their captive

11  insurance scheme and/or pay shareholder dividends has great public impact, as

12  described above, and it is in the public's interest to remedy this action.

13    7.60   Voya's, Lincoln NY's, and Lincoln National Life's conduct caused

14  substantial injury to Plaintiffs and members of the Class.

15    7.61   As a direct and proximate result of Voya's, Lincoln NY's, and Lincoln

16  National Life's unfair and unlawful practices, Plaintiffs and Class members have

17  suffered and will continue to suffer injury and ascertainable losses of money and

18  property and are entitled to damages in an amount to be proven at trial, including

19  punitive damages, and costs and reasonable attorneys' fees.

20

**COUNT EIGHT**
**VIOLATION OF NEW YORK**
**DECEPTIVE ACTS AND PRACTICES ACT**
**(Against Voya Financial and Lincoln NY on behalf of Plaintiffs and the**
**Nationwide Class)**

7.62   Plaintiffs and the Class repeat and reallege all allegations contained in Sections I through VI above, including paragraphs 1.1 to 6.9, as if set forth separately in this Claim for Relief.

7.63   New York General Business Law Section 349, the New York Deceptive Acts and Practices Act, makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349. Defendants' conduct, as set forth herein, constitutes deceptive acts or practices under this section.

7.64   Plaintiffs, Class members, Voya Financial, and Lincoln NY are "persons' under New York General Business Law Section 349(h).

7.65   Voya Financial's and Lincoln NY's actions as set forth herein occurred in the conduct of trade or commerce under the New York Deceptive Acts and Practices Act.

7.66   Voya Financial, and Lincoln NY engaged in unfair business practices in violation of the New York Deceptive Acts and Practices Act as described herein, by, among other things, unfairly increasing Plaintiffs' and Class members' COI and providing Plaintiffs and Class members with deceptive information regarding

the reasons for the increase.  Voya Financial and Lincoln NY are now taking Plaintiffs' and Class Members' Account Values, to benefit themselves and recoup their own losses, when they had originally used the ability to increase savings and take policy loans as a selling point to induce Plaintiffs and Class members to purchase the policies in the first place.

7.67   Lincoln NY unfairly increased Plaintiffs' and Class members' COI rates by 15-55%, in order to recoup its prior losses and generate more funds with which they will be able to pay additional exorbitant dividends to Voya Financial and Lincoln National Corp.—material facts which they concealed from Plaintiffs and Class members.

7.68   Voya Financial and Lincoln NY knew that the COI increase was a means to recoup their losses and generate more funds with which they will be able to pay additional exorbitant dividends to Voya Financial, Lincoln National Corp., and their shareholders.  Additionally, Voya Financial and Lincoln NY knew that the "elevated costs," which they told Plaintiffs and Class members were the basis of the decision to raise COI rates, were actually higher ***reinsurance*** costs, a fact which was told to their agents and brokers.  Defendants' reinsurance costs are figures wholly manipulated by Defendants, as they themselves, through captive reinsurers, are reinsuring the policies.  Moreover, Voya Financial and Lincoln NY

1    knew that they were not financially stable companies nor were they operating

2    efficiently.

3        7.69    Voya Financial and Lincoln NY instead intentionally misrepresented

4    the true reasons behind the COI increase when informing Plaintiffs and Class

5    Members of the increase.  They led Plaintiffs and Class members to believe that

6    this was a justifiable increase, based on sound financial information.

7        7.70    Voya Financial and Lincoln NY knew or should have known that their

8    conduct violated the New York Deceptive Acts and Practices Act.

9        7.71    Voya Financial and Lincoln NY thus violated the New York

10    Deceptive Acts and Practices Act by, at a minimum: employing deception,

11    deceptive acts or practices, fraud, misrepresentations, or concealment, suppression

12    or omission of any material fact with intent that others rely upon such concealment,

13    suppression or omission, in connection with the COI increase implemented on the

14    policies at issue.

15        7.72    The decisions, acts, misrepresentations, concealment, and schemes

16    violating the New York Deceptive Trade Acts and Practices Act by Voya Financial

17    and Lincoln NY emanated from Voya Financial's and Lincoln NY's respective

18    headquarters in New York and affected Plaintiffs and the Nationwide Class.

19

20

CLASS ACTION COMPLAINT - 163
CASE NO. 2:14-CV-00235-RMP

7.73    Plaintiffs and Class members reasonably expected Voya Financial and Lincoln NY to fairly calculate their COI charges, and implement them based solely upon sound financial reasoning.

7.74    As described herein, Plaintiffs relied on Voya Financial's and Lincoln NY's statements and were entitled to rely on such statements.  In reliance on those statements, Plaintiffs and Class members continued to pay premiums and excess premiums long after they otherwise would have; additionally, Plaintiffs did not attempt to obtain alternative life insurance policies at an earlier date when they either could have obtained them and/or could have obtained them at a lesser charge than they can now.

7.75    Moreover, Plaintiffs relied on Voya Financial's and Lincoln NY's statements regarding the COI increases and allowed Voya, Lincoln NY, and Lincoln National Life to withdraw the increased COI charges from their policies' cash value.

7.76    As such, Voya Financial's and Lincoln NY's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs and Class members.

7.77    Voya Financial's and Lincoln NY's conduct offends public policy as established by statutes, the common law or otherwise and is within at least the penumbra of some common law, statutory or other established concept of

CLASS ACTION COMPLAINT - 164
CASE NO. 2:14-CV-00235-RMP

unfairness; is immoral, unethical, oppressive, or unscrupulous; and causes substantial injury to consumers, competitors, or other businesses.  Thus, Voya Financial's and Lincoln NY's unfair and deceptive increasing of Plaintiffs' and Class members' COI to recoup their own losses due to their captive insurance scheme and/or pay shareholder dividends has great public impact, as described above, and it is in the public's interest to remedy this action.

7.78   Voya Financial's and Lincoln NY's conduct caused substantial injury to Plaintiffs and members of the Class.

7.79   As a direct and proximate result of Voya Financial's and Lincoln NY's unfair and unlawful practices, Plaintiffs and Class members have suffered and will continue to suffer injury and ascertainable losses of money and property and are entitled to damages in an amount to be proven at trial, including punitive damages, and costs and reasonable attorneys' fees.

# COUNT NINE
## VIOLATION OF MISSOURI MERCHANDISING PRACTICES ACT
### (Against All Defendants on behalf of Plaintiff Large-Gurin and the Missouri Subclass)

7.80    Plaintiffs and the Class repeat and reallege all allegations contained in Sections I through VI above, including paragraphs 1.1 to 6.9, as if set forth separately in this Claim for Relief.

7.81    The Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq.*, makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce . . . ." Mo. Rev. Stat. § 407.20.

7.82    Plaintiff Large-Gurin and the Missouri Subclass are "persons" within the meaning of Missouri Revised Statute Section 407.010(5).

7.83    The policies at issue are "merchandise" within the meaning of Missouri Revised Section 407.010(4), which includes "intangibles" and "services." Additionally, the definition of "trade or commerce" also encompasses the sale, offer to sell, and distribution of life insurance policies, as they are both services and intangible property. Mo. Rev. Stat. § 407.010(7).

7.84   Defendants engaged in unfair business practices in violation of the Missouri Merchandising Practices Act as described herein, by, among other things, unfairly increasing Plaintiff Large-Gurin's and Missouri Subclass members' COI and providing Plaintiff Large-Gurin and Missouri Subclass members with deceptive information regarding the reasons for the increase.  Defendants are now taking Plaintiff Large-Gurin's and Missouri Subclass members' Account Values, to benefit themselves and recoup their own losses, when they had originally used the ability to increase savings and take policy loans as a selling point to induce Plaintiff Large-Gurin and Missouri Subclass members to purchase the policies in the first place.

7.85   Additionally, Defendants falsely represented to Plaintiff Large-Gurin and Missouri Subclass members, as stated above, that they were well-funded companies, operating efficiently, increasing profits and cash flows, and reducing costs.  These statements were made through direct policyholder communications, through statements made on Defendants' websites, and through public financial statements filed with governmental agencies.

7.86   Defendants unfairly increased Plaintiff Large-Gurin's and Missouri Subclass Members' COI rates by 15-55%, in order to recoup their prior losses and generate more funds with which they will be able to pay additional exorbitant

1   dividends—material facts which they concealed from Plaintiff Large-Gurin and

2   Missouri Subclass members.

3       7.87   Defendants knew that the COI increase was a means to recoup their

4   losses and generate more funds with which they will be able to pay additional

5   exorbitant dividends to Voya Financial, Lincoln National Corp., and their

6   shareholders.  Additionally, Defendants knew that the "elevated costs," which they

7   told Plaintiff Large-Gurin and Missouri Subclass members were the basis of the

8   decision to raise COI rates, were actually higher *reinsurance* costs, a fact which

9   was told to their agents and brokers.  Defendants' reinsurance costs are figures

10  wholly manipulated by Defendants, as they themselves, through captive reinsurers,

11  are reinsuring the policies.   Moreover, Defendants knew that they were not

12  financially stable companies nor were they operating efficiently.

13      7.88  Defendants instead intentionally misrepresented the true reasons

14  behind the COI increase when informing Plaintiff Large-Gurin and members of the

15  Missouri Subclass of the increase.  They led Plaintiff Large-Gurin and Missouri

16  Subclass members to believe that this was a justifiable increase, based on sound

17  financial information.

18      7.89  Defendants thus violated the Missouri Merchandise Trade Practices

19  Act by, at a minimum: employing deception, deceptive acts or practices, fraud,

20  misrepresentations, or concealment, suppression or omission of any material fact

1   with intent that others rely upon such concealment, suppression or omission, in

2   connection with the advertisement, sale, and administration—including the COI

3   increase—of the policies at issue.

4       7.90   Defendants knew or should have known that their conduct violated the

5   Missouri Merchandising Practices Act.

6       7.91   Plaintiff Large-Gurin and members of the Missouri Subclass

7   reasonably expected Defendants to fairly calculate their COI charges, and

8   implement them based solely upon sound financial reasoning.

9       7.92   As described herein, Plaintiff Large-Gurin and members of the

10   Missouri Subclass relied on Defendants' statements and were entitled to rely on

11   such statements.   In reliance on those statements, Plaintiff Large-Gurin and

12   Missouri Subclass members continued to pay premiums and excess premiums long

13   after they otherwise would have; additionally, Plaintiffs did not attempt to obtain

14   alternative life insurance policies at an earlier date when they either could have

15   obtained them and/or could have obtained them at a lesser charge than they can

16   now.

17       7.93   Moreover, Plaintiff Large-Gurin and members of the Missouri

18   Subclass relied on Defendants' statements regarding the COI increases and allowed

19   Voya, Lincoln NY, and Lincoln National Life to withdraw the increased COI

20   charges from their policies' cash value.

CLASS ACTION COMPLAINT - 169
CASE NO. 2:14-CV-00235-RMP

7.94   As such, Defendants' deception, fraud, unfair practice, misrepresentation and omissions were likely to and did in fact deceive reasonable consumers, including Plaintiff Large-Gurin and members of the Missouri Subclass.

7.95   Defendants' conduct offends public policy as established by statutes, the common law or otherwise and is within at least the penumbra of some common law, statutory or other established concept of unfairness; is immoral, unethical, oppressive, or unscrupulous; and causes substantial injury to consumers, competitors, or other businesses.   Thus, Defendants' unfair and deceptive increasing of Plaintiff Large Gurin's and Missouri Subclass members' COI to recoup their own losses due to their captive insurance scheme and/or pay shareholder dividends has great public impact, as described above, and it is in the public's interest to remedy this action.

7.96   Defendants' conduct caused substantial injury to Plaintiff Large-Gurin and members of the Missouri Subclass.

7.97   As a direct and proximate result of Defendants unfair and unlawful practices, Plaintiff Large-Gurin and Missouri Subclass members have suffered and will continue to suffer injury and ascertainable losses of money and property and are entitled to damages in an amount to be proven at trial, including punitive damages, and costs and reasonable attorneys' fees.

## **COUNT TEN**

CLASS ACTION COMPLAINT - 170
CASE NO. 2:14-CV-00235-RMP

**VIOLATION OF THE NORTH CAROLINA UNFAIR
AND DECEPTIVE TRADE PRACTICES ACT
(Against All Defendants on behalf of Plaintiffs N. Pace and C. Pace and the
North Carolina Subclass)**

7.98    Plaintiffs and the Class repeat and reallege all allegations contained in Sections I through VI above, including paragraphs 1.1 to 6.9, as if set forth separately in this Claim for Relief.

7.99    The North Carolina Deceptive Trade Practices Act, N.C. Gen .Stat. §§ 75-1.1, *et seq.*, makes unlawful the "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce[.]" The North Carolina Deceptive Trade Practices Act provides a right of action for any person injured "by reason of any act or thing done by any other person, firm or corporation in violation of" the Act.  N.C. Gen. Stat. § 75-16.

7.100 Plaintiffs N. Pace and C. Pace and the North Carolina Subclass are "persons" under the North Carolina Deceptive Trade Practices Act, N.C. Gen Stat. §§ 75-1.1, *et seq*.

7.101 Defendants acts and practices complained of herein were performed in the course of Defendants' trade or business and thus occurred or affected "commerce" as defined in N.C. Gen. Stat. § 75-1.1(b).

7.102 Defendants engaged in unfair business practices in violation of the North Carolina Deceptive Trade Practices Act as described herein, by, among other

1    things, unfairly increasing Plaintiffs N. Pace's and C. Pace's and North Carolina

2    Subclass members' COI and providing Plaintiffs and North Carolina Subclass

3    members with deceptive information regarding the reasons for the increase.

4    Defendants are now taking Plaintiffs' and North Carolina Subclass members'

5    Account Values, to benefit themselves and recoup their own losses, when they had

6    originally used the ability to increase savings and take policy loans as a selling

7    point to induce Plaintiffs N. Pace and C. Pace and North Carolina Subclass

8    members to purchase the policies in the first place.

9        7.103 Additionally, Defendants falsely represented to Plaintiffs N. Pace and

10    C. Pace and the North Carolina Subclass, as stated above, that they were well-

11    funded companies, operating efficiently, increasing profits and cash flows, and

12    reducing costs.    These statements were made through direct policyholder

13    communications, through statements made on Defendants' websites, and through

14    public financial statements filed with governmental agencies.

15        7.104 Defendants unfairly increased Plaintiffs N. Pace's and C. Pace's and

16    North Carolina Subclass members' COI rates by 15-55%, in order to recoup their

17    prior losses and generate more funds with which they will be able to pay additional

18    exorbitant dividends—material facts which they concealed from Plaintiffs N. Pace

19    and C. Pace and North Carolina Subclass members.

20

CLASS ACTION COMPLAINT - 172
CASE NO. 2:14-CV-00235-RMP

7.105 Defendants knew that the COI increase was a means to recoup their losses and generate more funds with which they will be able to pay additional exorbitant dividends to Voya Financial, Lincoln National Corp., and their shareholders.  Additionally, Defendants knew that the "elevated costs," which they told Plaintiffs N. Pace and C. Pace and North Carolina Subclass members were the basis of the decision to raise COI rates, were actually higher ***reinsurance*** costs, a fact which was told to their agents and brokers.  Defendants' reinsurance costs are figures wholly manipulated by Defendants, as they themselves, through captive reinsurers, are reinsuring the policies.  Moreover, Defendants knew that they were not financially stable companies nor were they operating efficiently.

7.106 Defendants instead intentionally misrepresented the true reasons behind the COI increase when informing Plaintiffs N. Pace and C. Pace and members of the North Carolina Subclass of the increase.  They led Plaintiffs and North Carolina Subclass members to believe that this was a justifiable increase, based on sound financial information.

7.107 Defendants' conduct proves that they have acted in bad faith, and have violated the North Carolina Deceptive Trade Practices Act by, at a minimum: employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others

1   rely upon such concealment, suppression or omission, in connection with the

2   advertisement, sale, and administration of the policies at issue.

3       7.108 Defendants knew or should have known that their conduct violated the

4   North Carolina Deceptive Trade Practices Act.

5       7.109 Plaintiffs N. Pace and C. Pace and members of the North Carolina

6   Subclass reasonably expected Defendants to fairly calculate their COI charges, and

7   implement them based solely upon sound financial reasoning.

8       7.110 As described herein, Plaintiffs N. Pace and C. Pace and members of

9   the North Carolina Subclass relied on Defendants' statements and were entitled to

10  rely on such statements.  In reliance on those statements, Plaintiffs and North

11  Carolina Subclass members continued to pay premiums and excess premiums long

12  after they otherwise would have; additionally.  Additionally, Plaintiffs did not

13  attempt to obtain alternative life insurance policies at an earlier date when they

14  either could have obtained them and/or could have obtained them at a lesser charge

15  than they can now.

16      7.111 Moreover, Plaintiffs N. Pace and C. Pace and members of the North

17  Carolina Subclass relied on Defendants' statements regarding the COI increases

18  and allowed Voya, Lincoln NY, and Lincoln National Life to withdraw the

19  increased COI charges from their policies' cash value.

20

CLASS ACTION COMPLAINT - 174
CASE NO. 2:14-CV-00235-RMP

7.112 As such, Defendants' deception, fraud, unfair practice, misrepresentation and omissions were likely to and did in fact deceive reasonable consumers, including Plaintiffs N. Pace and C. Pace and North Carolina Subclass members.

7.113 Furthermore, under the North Carolina Deceptive Trade Practices Act, a claim may be founded on, among other things, a *per se* violation of a statute or an unfair (or deceptive) practice unregulated by statute but involving the public interest.

7.114 Defendants violated 18 U.S.C. § 1962, as set forth above, and thereby committed a *per se* violation of the North Carolina Deceptive Trade Practices Act, , N.C. Gen .Stat. §§ 75-1.1, *et seq.*

7.115 Defendants' conduct offends public policy as established by statutes, the common law or otherwise and is within at least the penumbra of some common law, statutory or other established concept of unfairness; is immoral, unethical, oppressive, or unscrupulous; and causes substantial injury to consumers, competitors, or other businesses.    Thus, Defendants' unfair and deceptive increasing of Plaintiffs N. Pace's and C. Pace's and North Carolina Subclass members' COI to recoup their own losses due to their captive insurance scheme and/or pay shareholder dividends has great public impact, as described above, and it is in the public's interest to remedy this action.

CLASS ACTION COMPLAINT - 175
CASE NO. 2:14-CV-00235-RMP

7.116 Defendants' conduct caused substantial injury to Plaintiffs N. Pace and C. Pace and members of the North Carolina Subclass.

7.117 As a direct and proximate result of Defendants unfair and unlawful practices, Plaintiffs N. Pace and C. Pace and North Carolina Subclass members have suffered and will continue to suffer injury and ascertainable losses of money and property and are entitled to damages in an amount to be proven at trial, including punitive damages, and costs and reasonable attorneys' fees.

**COUNT ELEVEN**
**VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW**
**(Against Lincoln National Corp. on behalf on behalf of Plaintiffs and the Nationwide Class, and in the alternative the State Specific Subclasses)**

7.118 Plaintiffs and the Class repeat and reallege all allegations contained in Sections I through VI above, including paragraphs 1.1 to 6.9, as if set forth separately in this Claim for Relief.

7.119 The Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1, *et seq.*, prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ." 73 P.S. § 201-2(3).

7.120 Plaintiffs, Class members, and Lincoln National Corp. are "persons" within the meaning of 73 P.S. § 201-2(2).

7.121 Lincoln National Corp. is engaged in "trade" or "commerce" within the meaning of 73 P.S. § 201-2(3).

7.122 Lincoln National Corp. engaged in unfair business practices in violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1 as described herein, by, among other things, unfairly causing Plaintiffs' and Class members' COI to increase and providing Plaintiffs and Class members with deceptive information regarding the reasons for the increase. Lincoln National Corp. is now taking Plaintiffs' and Class Members' Account Values, to benefit itself and its shareholders and recoup its own losses. Interestingly, Lincoln National Corp. and its subsidiaries had originally used the ability to increase savings and take policy loans as a selling point to induce Plaintiffs and Class members to purchase the policies in the first place.

7.123 Additionally, Lincoln National Corp. falsely represented to the Plaintiffs, as stated above, that it was a well-funded companies, operating efficiently, increasing profits and cash flows, and reducing costs. These statements were made through direct policyholder communications, through statements made on Lincoln National Corp.'s website, and through public financial statements filed with governmental agencies.

7.124 Lincoln National Corp. unfairly caused Plaintiffs' and Class members' COI rates to increase by 15-55%, in order to recoup its prior losses and generate more funds with which it will be able to pay additional exorbitant dividends—material facts which it concealed from Plaintiffs and Class members.

7.125 Lincoln National Corp. knew that the COI increase was a means to recoup its losses and generate more funds with which it will be able to pay additional exorbitant dividends to its shareholders.  Additionally, Lincoln National Corp. knew that the "elevated costs," which it told Plaintiffs and Class members were the basis of the decision to raise COI rates, were actually higher ***reinsurance*** costs, a fact which was told to Lincoln agents and brokers.  Lincoln National Corp. reinsurance costs are figures wholly manipulated by Defendants, as they themselves, through captive reinsurers, are reinsuring the policies.  Moreover, Lincoln National Corp. knew that it was not a financially stable company nor was it operating efficiently.

7.126 Lincoln National Corp. instead intentionally misrepresented the true reasons behind the COI increase when informing Plaintiffs and Class Members of the increase.  It led Plaintiffs and Class members to believe that this was a justifiable increase, based on sound financial information.

7.127 Lincoln National Corp. thus violated the Pennsylvania Unfair Trade Practices and Consumer Protection Law by, at a minimum: employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the COI increase on the policies at issue.

7.128 Lincoln National Corp. knew or should have known that its conduct violated the Pennsylvania Unfair Trade Practices and Consumer Protection Law.

7.129 Plaintiffs and Class members reasonably expected Lincoln National Corp. to ensure that its COI charges were fairly calculated and implemented based solely upon sound financial reasoning.

7.130 As described herein, Plaintiffs relied on Defendants' statements and were entitled to rely on such statements.  In reliance on those statements, Plaintiffs and Class members continued to pay premiums and excess premiums long after they otherwise would have; additionally, Plaintiffs did not attempt to obtain alternative life insurance policies at an earlier date when they either could have obtained them and/or could have obtained them at a lesser charge than they can now.

7.131 Moreover, Plaintiffs relied on Defendants' statements regarding the COI increases and allowed Voya, Lincoln NY, and Lincoln National Life to withdraw the increased COI charges from their policies' cash value.

7.132 As such, Lincoln National Corp.'s unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs and Class members.

7.133 Furthermore, under the Pennsylvania Unfair Trade Practices and Consumer Protection Law, a claim may be founded on, among other things, a *per*

*se* violation of a statute or an unfair (or deceptive) practice unregulated by statute but involving the public interest. *See Gabrial v. O'Hara*, 534 A.2d 488 (Pa. 1987).

7.134 Defendants violated 18 U.S.C. § 1962, as set forth above, and thereby committed a *per se* violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1, *et seq*. Lincoln National Corp.'s conduct offends public policy as established by statutes, the common law or otherwise and is within at least the penumbra of some common law, statutory or other established concept of unfairness; is immoral, unethical, oppressive, or unscrupulous; and causes substantial injury to consumers, competitors, or other businesses.   Thus, Lincoln National Corp.'s unfair and deceptive increasing of Plaintiffs' and Class members' COI to recoup their own losses due to their captive insurance scheme and/or pay shareholder dividends has great public impact, as described above, and it is in the public's interest to remedy this action.

7.135 Lincoln National Corp.'s conduct caused substantial injury to Plaintiffs and members of the Class.

7.136 As a direct and proximate result of Lincoln National Corp.'s unfair and unlawful practices, Plaintiffs and Class members have suffered and will continue to suffer injury and ascertainable losses of money and property and are entitled to damages in an amount to be proven at trial, including punitive damages, and costs and reasonable attorneys' fees.

## COUNT TWELVE
### VIOLATION OF WASHINGTON CONSUMER PROTECTION ACT
**(Against All Defendants on behalf of Plaintiff Swenson and the Washington Subclass)**

7.137 Plaintiffs and the Class repeat and reallege all allegations contained in Sections I through VI above, including paragraphs 1.1 to 6.9, as if set forth separately in this Claim for Relief.

7.138 The Washington Consumer Protection Act, Wash. Rev. Code § 19.86, *et seq.*, makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Wash. Rev. Code § 19.86.020.

7.139 Plaintiff Swenson, members of the Washington Subclass, and Defendants are "persons" within the meaning of Wash. Rev. Code § 19.86.010(2).

7.140 Defendants are engaged in "trade" or "commerce" within the meaning of Wash. Rev. Code § 19.86.010(2).

7.141 Defendants engaged in unfair business practices in violation of the Washington Consumer Protection Act as described herein, by, among other things, unfairly increasing Plaintiff Swenson's and Washington Subclass members' COI and providing Plaintiff Swenson and Washington Subclass members with deceptive information regarding the reasons for the increase. Defendants are now taking Plaintiff Swenson's and Washington Subclass members' Account Values,

1  to benefit themselves and recoup their own losses, when they had originally used

2  the ability to increase savings and take policy loans as a selling point to induce

3  Plaintiff Swenson and Washington Subclass members to purchase the policies in

4  the first place.

5      7.142 Additionally, Defendants falsely represented to Plaintiff Swenson and

6  the Washington Subclass, as stated above, that they were well-funded companies,

7  operating efficiently, increasing profits and cash flows, and reducing costs.  These

8  statements were made through direct policyholder communications, through

9  statements made on Defendants' websites, and through public financial statements

10  filed with governmental agencies.

11      7.143 Defendants unfairly increased Plaintiff Swenson's and Washington

12  Subclass members' COI rates by 15-55%, in order to recoup their prior losses and

13  generate more funds with which they will be able to pay additional exorbitant

14  dividends—material facts which they concealed from Plaintiff Swenson and

15  Washington Subclass members.

16      7.144 Defendants knew that the COI increase was a means to recoup their

17  losses and generate more funds with which they will be able to pay additional

18  exorbitant dividends to Voya Financial, Lincoln National Corp., and their

19  shareholders.  Additionally, Defendants knew that the "elevated costs," which they

20  told Plaintiff Swenson and Washington Subclass members were the basis of the

CLASS ACTION COMPLAINT - 182
CASE NO. 2:14-CV-00235-RMP

decision to raise COI rates, were actually higher ***reinsurance*** costs, a fact which was told to their agents and brokers.  Defendants' reinsurance costs are figures wholly manipulated by Defendants, as they themselves, through captive reinsurers, are reinsuring the policies.  Moreover, Defendants knew that they were not financially stable companies nor were they operating efficiently.

7.145 Defendants instead intentionally misrepresented the true reasons behind the COI increase when informing Plaintiff Swenson and members of the Washington Subclass of the increase.  They led Plaintiff Swenson and Washington Subclass members to believe that this was a justifiable increase, based on sound financial information.

7.146 Defendants' conduct proves that they have acted in bad faith, and have violated the Washington Consumer Protection Act by, at a minimum: employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement, sale, and administration of the policies at issue.

7.147 Defendants knew or should have known that their conduct violated the Washington Consumer Protection Act.

1    7.148 Plaintiff Swenson and members of the Washington Subclass

2  reasonably expected Defendants to fairly calculate their COI charges, and

3  implement them based solely upon sound financial reasoning.

4    7.149 As described herein, Plaintiff Swenson and members of the

5  Washington Subclass relied on Defendants' statements and were entitled to rely on

6  such statements.   In reliance on those statements, Plaintiff Swenson and

7  Washington Subclass members continued to pay premiums and excess premiums

8  long after they otherwise would have; additionally, Plaintiffs did not attempt to

9  obtain alternative life insurance policies at an earlier date when they either could

10  have obtained them and/or could have obtained them at a lesser charge than they

11  can now.

12    7.150 Moreover, Plaintiff Swenson and members of the Washington

13  Subclass relied on Defendants' statements regarding the COI increases and allowed

14  Voya, Lincoln NY, and Lincoln National Life to withdraw the increased COI

15  charges from their policies' cash value.

16    7.151 As such, Defendants' deception, fraud, unfair practice,

17  misrepresentation and omissions were likely to and did in fact deceive reasonable

18  consumers, including Plaintiff Swenson and Washington Subclass members.

19

20

1    7.152 Furthermore, under the Washington Consumer Protection Act, a claim

2    may be founded on, among other things, a *per se* violation of a statute or an unfair

3    (or deceptive) practice unregulated by statute but involving the public interest.

4    7.153 Defendants violated 18 U.S.C. § 1962, as set forth above, and thereby

5    committed a *per se* violation of the Washington Consumer Protection Act, Wash.

6    Rev. Code § 19.86, *et seq*.

7    7.154 Defendants' conduct offends public policy as established by statutes,

8    the common law or otherwise and is within at least the penumbra of some common

9    law, statutory or other established concept of unfairness; is immoral, unethical,

10   oppressive, or unscrupulous; and causes substantial injury to consumers,

11   competitors, or other businesses.   Thus, Defendants' unfair and deceptive

12   increasing of Plaintiff Swenson's and Washington Subclass members' COI to

13   recoup their own losses due to their captive insurance scheme and/or pay

14   shareholder dividends has great public impact, as described above, and it is in the

15   public's interest to remedy this action.

16   7.155 Defendants' conduct caused substantial injury to Plaintiff Swenson

17   and members of the Washington Subclass.

18   7.156 As a direct and proximate result of Defendants unfair and unlawful

19   practices, Plaintiff Swenson and North Carolina Subclass members have suffered

20   and will continue to suffer injury and ascertainable losses of money and property

1  and are entitled to damages in an amount to be proven at trial, including punitive

2  damages, and costs and reasonable attorneys' fees.

3                              **VIII.  PRAYER FOR RELIEF**

4       WHEREFORE, Plaintiffs pray for a judgment:

5       A.    Certifying the Class as requested herein;

6       B.    Awarding Plaintiffs and Class members compensatory damages,

7  trebled, in an amount to be determined at trial;

8       C.    Awarding Plaintiffs and Class members restitution damages in an

9  amount to be determined at trial;

10      D.    Punitive Damages;

11      E.    Awarding Plaintiffs declaratory and injunctive relief;

12      F.    Awarding Plaintiffs and Class members attorneys' fees and costs;

13  and

14      G.    Affording Plaintiffs and Class members with such further and other

15  relief as deemed just and proper by the Court.

16                              **IX.  JURY DEMAND**

17      Plaintiffs demand a jury trial of all issues triable by right by jury.

18      RESPECTFULLY SUBMITTED AND DATED this 2nd day of February,

19  2017.

20

CLASS ACTION COMPLAINT - 186
CASE NO. 2:14-CV-00235-RMP

TURKE & STRAUSS PLLC

By:  /s/ Samuel J. Strauss, WSBA #46971
        Samuel J. Strauss, WSBA #46971
        936 North 34th Street, Suite 300
        Seattle, Washington 98103-8869
        Telephone: (608) 237-1774
        Facsimile: (608) 259-9114
        Email: sam@turkestrauss.com

        W. Daniel "Dee" Miles, III, *Pro Hac Vice Pending*
        Andrew E. Brashier, *Pro Hac Vice Pending*
        Rachel N. Boyd, *Pro Hac Vice Pending*
        BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, P.C.
        272 Commerce Street
        Post Office Box 4160 (36103)
        Montgomery, Alabama 36104
        Telephone: (334) 269-2343
        Facsimile: (334) 954-7555
        Email: dee.miles@beasleyallen.com
        Email: andrew.brashier@beasleyallen.com
        Email: rachel.boyd@beasleyallen.com

        Geoffrey R. McDonald, *Pro Hac Vice Pending*
        Justin M. Sheldon, *Pro Hac Vice Pending*
        Frank H. Hupfl, III, *Pro Hac Vice Pending*
        GEOFF MCDONALD & ASSOCIATES, P.C.
        3315 West Broad Street
        Richmond, Virginia 23230
        Telephone: (804) 888-8888
        Facsimile: (804) 359-5426
        Email: gmcdonald@mcdonaldinjurylaw.com
        Email: jsheldon@mcdonaldinjurylaw.com
        Email: fhupfl@mcdonaldinjurylaw.com

        Charles Crueger, *Pro Hac Vice Pending*

CLASS ACTION COMPLAINT - 187
CASE NO. 2:14-CV-00235-RMP

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

Erin Dickinson, *Pro Hac Vice Pending*
CRUEGER DICKINSON LLC
4532 N. Oakland Ave.
Whitefish Bay, Wisconsin 53202
Telephone: (414) 210-3900
Facsimile:  (414) 273-8476
Email: cjc@cruegerdickinson.com
Email: ekd@cruegerdickinson.com

*Attorneys for Plaintiffs*

CLASS ACTION COMPLAINT - 188
CASE NO. 2:14-CV-00235-RMP

1

CERTIFICATE OF SERVICE

2

I, Samuel J. Strauss, hereby certify that on February 2, 2017, I

3

electronically filed the foregoing with the Clerk of the Court using the CM/ECF

4

system which will send notification of such filing to the following:

5

6

DATED this 2nd day of February, 2017.

7

TURKE & STRAUSS PLLC

8

By: /s/ Samuel J. Strauss, WSBA #46971

9

Samuel J. Strauss, WSBA #46971
936 North 34th Street, Suite 300

10

Seattle, Washington 98103-8869
Telephone: (608) 237-1774

11

Facsimile: (608) 259-9114
Email: sam@turkestrauss.com

12

13

14

15

16

17

18

19

20

CLASS ACTION COMPLAINT - 189
CASE NO. 2:14-CV-00235-RMP