1   BRENDAN V. MONAHAN (WSBA #22315)
    JAIME CUEVAS, JR. (WSBA #51108)
2   STOKES LAWRENCE
    VELIKANJE MOORE & SHORE
3   120 N. Naches Avenue
    Yakima, Washington 98901-2757
4   (509) 853-3000

5   ALAN B. VICKERY (admitted *pro hac vice*)
    JACK G. STERN (admitted *pro hac vice*)
6   JOHN F. LASALLE (admitted *pro hac vice*)
    BOIES SCHILLER FLEXNER LLP
7   575 Lexington Avenue, 7th Floor
    New York, New York 10022
8   (212) 446-2300

9   MOTTY SHULMAN (admitted *pro hac vice*)
    BOIES SCHILLER FLEXNER LLP
10  333 Main Street
    Armonk, New York 10504
11  (914) 749-8200

12  SEAN P. RODRIGUEZ (admitted *pro hac vice*)
    BOIES SCHILLER FLEXNER LLP
13  1999 Harrison Street, Suite 900
    Oakland, CA 94612
14  (510) 874-1000

15  Attorneys for All Defendants

16                UNITED STATES DISTRICT COURT

17            FOR THE EASTERN DISTRICT OF WASHINGTON

18  MONTE SWENSON, *et al.*, individually    | No.  2:17-cv-00048-SAB
    and on behalf of all others similarly
19  situated,
                                             | **DEFENDANTS' MOTION TO
20         Plaintiffs,                        | STRIKE AND MOTION TO
                                             | DISMISS**
21  v.
                                             | *Jury trial demand by Plaintiff*
22  VOYA RETIREMENT INSURANCE &             | *Putative class action*
    ANNUITY COMPANY, LINCOLN
23  LIFE & ANNUITY COMPANY OF              | *Oral argument requested – to be set at*
    NEW YORK, *et al.*,                     | *the Court's convenience*
24
           Defendants.
25

26

27

28

DEFENDANTS' MOTION TO STRIKE AND MOTION TO DISMISS            1

1

## TABLE OF CONTENTS

2  PRELIMINARY STATEMENT .............................................................. 15

3  SUMMARY OF ALLEGATIONS ......................................................... 18

4  MOTION TO STRIKE ......................................................................... 21

5  MOTION TO DISMISS ....................................................................... 24

6      I.    THE NON-CONTRACT CLAIMS SHOULD BE DISMISSED

7             BECAUSE THEY ARE IMPLAUSIBLE AND FAIL TO

8             ALLEGE ANY CONCRETE NON-CONTRACTUAL

9             DAMAGES ........................................................................ 24

10           A.    The Non-Contract Claims Fail To Satisfy Rule 9(b) .............. 25

11           B.    The Alleged Fraudulent Conspiracy Is Implausible And

12                   Irrational And Is Therefore Insufficient As A Matter Of

13                   Law ...................................................................... 27

14           C.    No Negative Inference Can Be Drawn From Lawful

15                   Business Conduct, Rendering The Non-Contract Claims

16                   Implausible ........................................................... 31

17           D.    The Complaint Fails To Plausibly Allege Concrete, Non-

18                   Speculative Harm To Plaintiffs Caused By Anything

19                   Other Than The Alleged Breach Of Contract........................... 35

20      II.    THE RICO CLAIMS (COUNTS 1-2) SHOULD BE

21             DISMISSED BECAUSE PLAINTIFFS FAIL TO ALLEGE

22             RICO CAUSATION AND A PATTERN OF

23             RACKETEERING ............................................................ 37

24           A.    The Complaint Does Not Plead RICO Causation ................... 39

25           B.    Plaintiffs Fail To Adequately Plead Predicate Acts

26                   Constituting A Pattern Of Racketeering Activity.................... 42

27

28

III.   THE COMMON LAW CLAIMS (COUNTS 4-6) SHOULD BE
       DISMISSED UNDER ESTABLISHED PRINCIPLES
       CONCERNING EXPRESS CONTRACTS ........................................43
       A.   The Existence Of An Express Contract Bars The Unjust
            Enrichment Claim Against VRIAC (Count 4) .........................43
       B.   There Can Be No Unjust Enrichment Claim Against Voya
            Financial And The Lincoln Affiliate Defendants Because
            Plaintiffs Did Not Pay Them (Count 4)...................................44
       C.   The Economic Loss Rule Bars The Conversion Claim
            (Count 5) And The Fraud Claim (Count 6) .............................46
       D.   The Conversion Claim (Count 5) Is Not Viable Because
            Plaintiffs Do Not Allege That Any Chattel Was Taken..........50
       E.   The Common Law Fraud Claim (Count 6) Fails Because
            Plaintiffs Do Not Adequately Plead The Elements of
            Reasonable Reliance And Proximate Causation ....................52
IV.    EVERY STATE STATUTORY CLAIM (COUNTS 7-12)
       SHOULD BE DISMISSED ................................................................55
       A.   Connecticut (Count 7) .............................................................55
       B.   New York (Count 8) .................................................................56
       C.   Missouri (Count 9)...................................................................56
       D.   North Carolina (Count 10)......................................................57
       E.   Pennsylvania (Count 11) .........................................................57
       F.   Washington (Count 12) ............................................................58
V.     PLAINTIFFS CANNOT STATE ANY CONTRACT CLAIM
       AGAINST THE LINCOLN DEFENDANTS. ...................................59

# <u>TABLE OF AUTHORITIES</u>

## CASES

*9310 Third Ave. Assocs., Inc. v. Schaffer Food Svc. Co.*,
   210 A.D.2d 207 (N.Y. App. Div. 1994)...............................................50

*Abbott Laboratories v. Adelphia Supply USA*,
   2017 WL 57802 (Jan. 4 2017, E.D.N.Y.) ............................................42

*Abrahams v. Young & Rubicam, Inc.*,
   240 Conn. 300 (1997) ........................................................................55

*Active Ventilation Prod., Inc. v. Prop. & Cas. Ins. Co. of Hartford*,
   2009 WL 2506360 (Conn. Super. Ct. July 15, 2009) ..........................55

*Affiliated FM Ins. Co. v. LTK Consulting Servs., Inc.*,
   170 Wash. 2d 442 (Wash. 2010)...................................................46, 47

*Alejandre v. Bull*,
   159 Wash. 2d 674 (Wash. 2007).........................................................46

*AMERCO, Inc. v. C.I.R.*,
   979 F.2d 162 (9th Cir. 1992)...............................................................33

*Amgen Inc. v. Conn.Ret.Plans and Trust Funds*,
   133 S. Ct. 1184 (2013) .......................................................................53

*Anatian v. Coutts Bank (Switzerland) Ltd.*,
   193 F.3d 85 (2d Cir. 1999)..................................................................38

*Anza v. Ideal Steel Supply Corp.*,
   547 U.S. 451 (2006) ...........................................................................39

*Arnold v. AT&T, Inc.*,
   2012 WL 1441417 (E.D. Mo. Apr. 12, 2012)......................................48

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009).....................................................................25, 32

*Ass'n of Washington Pub. Hosp. Dists. v. Philip Morris Inc.*,
   241 F.3d 696 (9th Cir. 2001)..........................................................38, 41

*Atl. Gypsum Co. v. Lloyds Intern'l Corp.*,
   753 F. Supp. 505 (S.D.N.Y. 1990)......................................................29

*Aubrey v. Sanders*,
   346 F. App'x 847 (3d Cir. 2009) ........................................................54

*Bader v. Siegel*,
   238 A.D.2d 272 (N.Y. App. Div. 1997)..............................................56

*Bakhchinyan v. Countrywide Bank, N.A.*,
   2014 WL 1273810 (W.D. Wash. Mar. 27, 2014) ................................54

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ....................................................29, 30, 31, 32

*Blair v. City of Hannibal*,
   179 F. Supp. 3d 901 (E.D. Mo. 2016)................................................44

*Blake v. Bank of Am., N.A.*,
   845 F. Supp. 2d 1206 (M.D. Ala. 2012) ............................................47

*Boswell v. Panera Bread Co.*,
   91 F. Supp. 3d 1141 (E.D. Mo. 2015)................................................51

*BP W. Coast Prod. LLC v. SKR Inc.*,
   989 F. Supp. 2d 1109 (W.D. Wash. 2013)..........................................52

*Brand v. AXA Equitable Life Ins. Co.*,
   No. CIV.A. 08-2859, 2008 WL 4279863 (E.D. Pa. Sept. 16, 2008) ...59

*British Ins. Co. of Cayman v. Safety Nat. Cas.*,
   335 F.3d 205 (3d Cir. 2001)...............................................................59

*Bryant v. Mattel, Inc.*,
   573 F. Supp. 2d 1254 (C.D. Cal. 2007) .............................................42

*Bumpers v. Cmty. Bank of N. Virginia*,
   367 N.C. 81 (2013)............................................................................57

*Butler v. Butler*,
   239 N.C. App. 1, 768 S.E.2d 332 (2015)............................................45

*Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*,
   637 F.3d 1047 (9th Cir. 2011)...........................................22, 24, 25, 53

*California Architectural Bldg. Prod., Inc. v. Franciscan Ceramics, Inc.*,
   818 F.2d 1466 (9th Cir. 1987).............................................................30

*Campbell v. Naman's Catering, Inc.*,
  842 So. 2d 654 (Ala. 2002) ...................................................................52

*Cervantes Orchards & Vineyards, LLC v. Deere & Co.* ("*Cervantes I*"),
  2014 WL 12639127 (E.D. Wash. Dec. 19, 2014)...........................................23, 24

*Cervantes Orchards & Vineyards, LLC v. Deere & Co.* ("*Cervantes II*")
  2015 WL 4429054, at *9 (E.D. Wash. July 17, 2015)........................................23

*Citimortgage, Inc. v. K. Hovnanian Am. Mortg., L.L.C.*,
  2013 WL 5355471 (E.D. Mo. Sept. 20, 2013).......................................................47

*City of New York v. Smokes-Spirits.com, Inc.*,
  12 N.Y.3d 616 (2009) .....................................................................................56

*City of Roseville Employees' Ret. Sys. V. Sterling Fin. Corp.*,
  47 F. Supp. 3d 1205 (E.D. Wash. 2014) .................................................................53

*Clapper v. Amnesty Int'l, USA*,
  133 S. Ct. 1138 (2013) .......................................................................................36

*Clougherty Packing Co. v. C.I.R.*,
  811 F.2d 1297 (9th Cir. 1987)...............................................................................33

*Core-Mark Int'l Corp. v. Commonwealth Ins. Co.*,
  2005 WL 1676704 (S.D.N.Y. July 19, 2005) ....................................................49

*Cromeans v. Morgan Keegan & Co.*,
  303 F.R.D. 543 (W.D. Mo. 2014) ........................................................................54

*Dannix Painting, LLC v. Sherwin-Williams Co.*,
  732 F.3d 902 (8th Cir. 2013)...................................................................................48

*Davis v. State Farm Life Ins. Co.*,
  163 F. Supp. 3d 299 (E.D.N.C. 2016)...................................................................57

*De Los Angeles Gomez v. Bank of America, N.A.*,
  642 F. App'x 670 (9th Cir. 2016).........................................................................39

*Deming v. Nationwide Mut. Ins. Co.*,
  279 Conn. 745 (2006) .........................................................................................52

*Detweiler Bros. v. John Graham & Co.*,
  412 F. Supp. 416 (E.D. Wash. 1976) ..................................................................59

*Dickman v. Banner Life Ins. Co.*,
   2016 WL 7383869 (D. Md. 2016) ........................................................ 36

*Drexel Burnham Lambert Inc. v. Saxony Heights Realty Assocs.*,
   777 F. Supp. 228 (S.D.N.Y. 1991) ..................................................... 29

*Dwyer v. Unit Power, Inc.*,
   965 S.W.2d 301 (Mo. Ct. App. 1998) ................................................ 51

*Eclectic Props., LLC v. Marcus & Millichap Co.*,
   751 F.3d 990 (9th Cir. 2014) ............................................. 31, 32, 34, 35

*Efron v. Embassy Suites (Puerto Rico), Inc.*,
   223 F.3d 12 (1st Cir. 2000) ................................................................ 42

*Ex parte Household Retail Servs. Inc.*,
   744 So. 2d 871 (Ala. 1999) ............................................................... 54

*Facaros v. Qwest Corp.*,
   2011 WL 2270588 (D. Or. June 7, 2011) ......................................... 32

*Faltermeier v. FCA US LLC*,
   2016 WL 4771100 (W.D. Mo. Sept. 13, 2016) ................................. 57

*Farar v. Churchill*,
   135 U.S. 609 (1890) .......................................................................... 32

*Fidelity Mortgage Corp. v. Seattle Times Co.*,
   213 F.R.D. 573 (W.D. Wash. 2003) ................................................. 26

*First Glob. Commc'ns, Inc. v. Bond, No.*,
   2006 WL 231634 (W.D. Wash. Jan. 27, 2006) ................................ 52

*Gen. Electric Cap. Corp. v. Union Planters Bank, N.A*,
   409 F.3d 1049 (8th Cir. 2005) .......................................................... 51

*Georgia Malone & Co., Inc. v. Rieder*,
   973 N.E.2d 743 (N.Y. 2012) ............................................................ 45

*Goldman v. Metro. Life Ins. Co.*,
   5 N.Y.3d 561 (2005) ......................................................................... 44

*Gomez v. Guthy-Renker, LLC*,
   2015 WL 4270042 (C.D. Cal. July 13, 2015) ..................... 32, 38, 39, 42

*Hargis v. JLB Corp.*,
    357 S.W.3d 574 (Mo. 2011)...................................................................45

*Hartford Whalers Hockey Club v. Uniroyal Goodrich Tire Co.*,
    649 A.2d 518 (1994) ..........................................................................46

*Hatch v. Reliance Ins. Co.*,
    758 F.2d 409 (9th Cir. 1985)................................................................22

*Hemi Group LLC v. City of New York*,
    599 U.S. 1 (2010) .............................................................38, 39, 52, 54

Howard v. Am. Online Inc.,
    208 F.3d 741 (9th Cir. 2000)................................................................38

*Hunt v. U.S. Tobacco Co.*,
    538 F.3d 217 (3d Cir. 2008), *as amended* (Nov. 6, 2008)...................58

*In re Brauer v. Bankers Life & Cas. Co.*,
    2016 WL 4083480 (W.D. Mo. Aug. 1, 2016)........................................56

*In re Estate of Boatright*,
    88 S.W.3d 500 (Mo. Ct. App. 2002).....................................................51

*In re Marsh & Mclennan Cos., Inc. Sec. Litig.*,
    501 F. Supp. 2d 452 (S.D.N.Y. 2006)...................................................54

*In re Metro. Sec. Litig.*,
    2009 WL 36776 (E.D. Wash. Jan. 6, 2009)...........................................54

*In re Parmalat Securities Litigation*,
    684 F. Supp. 453 (S.D.N.Y. 2010).......................................................30

*In re Refco Sec. Litig.*,
    759 F. Supp. 2d 301 (S.D.N.Y. 2010)...................................................50

*In re Toyota Motor Corp.*,
    826 F. Supp. 2d 1180 (C.D. Cal. 2011) ................................................38

*In re Toyota Motor Corp.*,
    785 F. Supp. 2d 883 (C.D. Cal. 2011) ..................................................29

*In re Worlds of Wonder Sec. Litig.*,
    35 F.3d 1407 (9th Cir. 1994)................................................................30

*Indoor Billboard/Washington, Inc. v. Integra Telecom of Wash., Inc.*,
162 Wash. 2d 59 (2007) ........................................................58

*Joiner v. USAA Cas. Ins. Co.*,
2013 WL 84935 (M.D. Ala. Jan. 8, 2013) ............................44

*Jones v. Simpson*,
116 U.S. 609 (1886) ..............................................................33

*Kearns v. Ford Motor Co.*,
567 F.3d 1120 (9th Cir. 2009) ........................................25, 27

*King v. Ins. Co. of N. Am.*,
273 N.C. 396 (1968) ..............................................................49

*Kumar v. Entezar*,
2012 WL 2501049 (W.D. Wash. June 27, 2012) ..................40

*Laro, Inc. v. Chase Manhattan Bank*,
866 F. Supp. 132 (S.D.N.Y. 1994) .......................................30

*Lawrence v. O & G Indus., Inc.*,
319 Conn. 641 (2015) ............................................................47

*Lobato v. Acqura Loan Servs.*,
2012 WL 607624 (S.D. Cal. Feb. 23, 2012) .........................27

*Madison River Mgmt. Co. v. Bus. Mgmt. Software Corp.*,
351 F. Supp. 2d 436 (M.D.N.C. 2005) ..................................44

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ..................................................27, 28, 29

*McDonald v. OneWest Bank, FSB*,
929 F. Supp. 2d 1079 (W.D. Wash. 2013) ............................58

*Midwest Grinding Co. v. Spitz*,
976 F.2d 1016 (7th Cir. 1999) ...............................................32

*Miller v. Thane Int' Corp.*,
615 F.3d 1095 (9th Cir. 2010) ...............................................53

*Miller v. U.S. Steel Corp.*,
902 F.2d 573 (7th Cir. 1990) .................................................46

*Moore Equip. Co. v. Callen Constr. Co.*,
299 S.W.3d 678 (Mo. Ct. App. 2009)...................................................51

*New Life Homecare, Inc. v. Blue Cross Blue Shield of Michigan*,
2009 WL 506376 (M.D. Pa. Feb. 27, 2009) ..........................................52

*Oki America, Inc. v. Microtech Int'l, Inc.*,
872 F.2d 312 (9th Cir. 1989)...............................................................47

*Okla. Firefighters Pension & Ret. Sys. v. Ixia*,
2015 WL 1775221 (C.D. Cal. Apr. 14, 2015) .......................................29

*Orlander v. Staples, Inc.*,
802 F.3d 289 (2d Cir. 2015)................................................................56

*Owen v. Gen. Motors Corp.*,
533 F.3d 913 (8th Cir. 2008)...............................................................57

*Portofino Seaport Vill., LLC v. Welch*,
4 So. 3d 1095 (Ala. 2008) ..................................................................45

*Rahemtulla v. Hassam*,
539 F. Supp. 2d 755 (M.D. Pa. 2008) ..................................................49

*RBS Citizens Fin. Grp., Inc. v. Hewitt Assocs., LLC*,
2016 WL 3525325 (D. Conn. June 22, 2016).........................................48

*Regency Comm'cns., Inc. v. Cleartel Comm'cns. Inc.*,
160 F. Supp. 2d 36 (D.D.C. 2001) .......................................................32

*Reliance Ins. Co. v. U.S. Bank of Washington, N.A.*,
143 F.3d 502 (9th Cir. 1998)...............................................................50

*Richter v. CC-Palo Alto, Inc.*,
176 F. Supp. 3d 877 (N.D. Cal. 2016) ............................................36, 37

*Rohrer v. Snyder*,
69 P. 748 (Wash. 1902)......................................................................33

*Ross v. AXA Equitable Life Ins. Co.*,
115 F.Supp.3d 424, 435 (S.D.N.Y. 2015),
*aff'd* 2017 WL 730266 (2d Cir. Feb. 23, 2017)..............................34, 36

*Roundtree v. Chase Bank USA, N.A.*,
2014 WL 794800 (W.D. Wash. Feb. 27, 2014).................................49, 50

*Royce Int'l Broad. Corp. v. Field*,
   2000 WL 236434 (N.D. Cal. Feb. 23, 2000) ........................................32

*Sands v. Ticketmaster-N.Y., Inc.*,
   207 A.D.2d 687 (N.Y. App. Div 1994)..................................................56

*Schnall v. AT & T Wireless Servs., Inc.*,
   171 Wash. 2d 260 (2011) .....................................................................58

*Schwartz v. Rockey*,
   593 Pa. 536 (2007) ...............................................................................58

*Self v. Equilon Enterprises, LLC*,
   2005 WL 3763533 (E.D. Mo. Mar. 30, 2005) ......................................48

*Shuster v. Symmetricon, Inc.*,
   2000 WL 33115909 (N.D. Cal. Aug. 1, 2000) ......................................30

*Simpson v. Specialty Retail Concepts*,
   149 F.R.D. 94 (M.D.N.C. 1993) ..........................................................54

*Singer v. Priceline Grp., Inc.*,
   2016 WL 3976539 (D. Conn. July 22, 2016) ........................................44

*Sitevoice, LLC v. Gyrus Logic, Inc.*,
   2014 WL 4722329 (D. Ariz. Sept. 23, 2014)........................................22

*Smith v. Wells Fargo Bank, N.A.*,
   158 F. Supp. 3d 91 (D. Conn. 2016), *aff'd*, 666 F. App'x 84 (2d Cir. 2016).......55

*Solum v. Certainteed Corp.*,
   147 F. Supp. 3d 404 (E.D.N.C. 2015)...................................................57

*State v. Lombardo Bros. Mason Contractors, Inc.*,
   307 Conn. 412 (Conn. 2012)................................................................47

*Stearns v. Select Comfort Retail Corp.*,
   2009 WL 1635931 (N.D. Cal. June 5, 2009) ........................................53

*Stoeckinger v. Presidential Fin. Corp. of Delaware Valley*,
   948 A.2d 828 (Pa. Super. Ct. 2008) .....................................................46

*Stuart v. Freiberg*,
   316 Conn. 809 (2015) ...........................................................................54

*TFO, Inc. v. Vantiv, Inc.*,
   2017 WL 1196851 (N.D. Ala. Mar. 31, 2017) ......................................47

*Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Cos., Inc.*,
   110 So. 3d 399 (Fla. 2013) ....................................................................48

*Townson v. Koch Farms, LLC*,
   2014 WL 1618376 (N.D. Ala. Apr. 22, 2014) ......................................47

*U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*,
   637 F.3d 1047 (9th Cir. 2011)................................................................25

*U.S. for Use & Benefit of Walton Tech., Inc. v. Weststar Eng'g, Inc.*,
   290 F.3d 1199 (9th Cir. 2002)................................................................44

*United Food & Commercial Workers Cent. Pennsylvania & Reg'l Health &*
   *Welfare Fund v. Amgen, Inc.*,
   400 F. App'x 255 (9th Cir. 2010) ...................................................26, 40

*US Airways, Inc. v. McCutchen*,
   133 S. Ct. 1537 (2013) ..........................................................................43

*Vess v. Ciba-Geigy Corp. USA*,
   317 F.3d 1097 (9th Cir. 2003)...........................................................25, 26

*Vogt v. State Farm Life Ins. Co.*,
   2017 WL 1498073 (W.D. Mo. Apr. 26, 2017) ................................48, 51

*Wake Cty. v. Hotels.com, L.P.*,
   235 N.C. App. 633 (2014)......................................................................51

*Werwinski v. Ford Motor Co.*,
   286 F.3d 661 (3d Cir. 2002)..............................................................49, 57

*Wolf v. Nat'l Council of Young Israel*,
   264 A.D.2d 416 (N.Y. App. Div. 1999).................................................49

*WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*,
   655 F.3d 1039 (9th Cir. 2011)................................................................29

*Young v. Young*,
   191 P.3d 1258 (Wash. 2008)..................................................................45

1

# STATUTES

2

Connecticut General Statutes
3
    Section 42-110a.....................................................................................55

4

Connecticut General Statutes
5
    Section 42-110b.....................................................................................55

6

Missouri Statutes
    Section 407.020.....................................................................................56
7

Pennsylvania Statutes
8
    Title 73, Section 201-1 ..........................................................................57

9

Pennsylvania Statutes
10
    Title 73, Section 201-2 ..........................................................................57

11

United States Code
12
    Title 18, Section 1962 .......................................................................37, 38

13

# OTHER AUTHORITIES

14

14-106 Appleman on Insurance
15
    Section 106.7 (Lexis 2017) .....................................................................59

16

5C Wright & Miller
17
    Section 1380 (3d ed.) .............................................................................22

18

Couch on Insurance
19
    Section 9:1 (West 2017).........................................................................33

20

Couch on Insurance
    Sections 2:1, 2:7-8 (West 2017)..............................................................20
21

22

Fletcher Cyclopedia
    Section 5924 (West 2017).......................................................................37
23

24

Restatement (Second) Torts
    Section 242, cmt. (b) .............................................................................50

25

26

27

28

1

**RULES**

2

Federal Rules of Civil Procedure
   Rule 8 ................................................................................................22

4

Federal Rules of Civil Procedure
   Rule 9 ...............................................................................24, 25, 26, 27

6

Federal Rules of Civil Procedure
   Rule 12 ..............................................................................................22

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **PRELIMINARY STATEMENT**

2       This is fundamentally a contract case.  Plaintiffs hold life insurance policies

3   that expressly allow the insurer, Voya Retirement Insurance & Annuity Company

4   ("VRIAC"), to change certain policy charges under certain circumstances and

5   subject to certain limitations and restraints.  In June 2016, VRIAC increased one of

6   those policy charges, a nonguaranteed element of the policy known as the Cost of

7   Insurance ("COI") charge.  Plaintiffs allege that the increase was a breach of

8   contract.  That alleged breach of contract is the only alleged cause of any concrete,

9   non-speculative harm to Plaintiffs and, absent the purported breach of contract,

10   Plaintiffs can allege no other viable damages.

11       Plaintiffs impermissibly attempt to turn a breach of contract into a fraudulent

12   RICO conspiracy, and make it the foundation of their common law tort and state

13   statutory claims.  Defendants move to dismiss every claim against every defendant

14   except the contract claim (Count 3) as to VRIAC and the unjust enrichment claim

15   (Count 4) as to Lincoln Life & Annuity Company of New York ("Lincoln NY").

16   The remaining Counts should be dismissed in their entirety.  They are RICO claims

17   (Counts 1 and 2), common law claims for conversion and fraud (Counts 5-6), and

18   claims under various state statutes prohibiting certain trade practices (Counts 7-12).

19       Plaintiffs attempt to inflate their breach of contract claim in a needlessly

20   prolix 188-page Complaint that conjures up a vast RICO conspiracy over a roughly

21   16-year period (beginning in approximately early 2000 and culminating in the June

22   2016 COI rate increase).  Plaintiffs allege that Defendants began to conspire and

23   manipulate their statutory financial reports when stricter capital regulations were

24   instituted in early 2000, 16 years before the only action by Defendants as to which

25   Plaintiffs could have any standing to sue.  ¶¶ 4.165-4.166, 4.116-118.[1]

26

27   [1] All citations to paragraphs (¶) and exhibits (Ex.) refer to paragraphs of and

28   exhibits to the Complaint unless otherwise indicated.

Plaintiffs cite ordinary business conduct and routine transactions as purported evidence of wrongdoing to hide bad investments, or excessive dividends, or corporate waste.  Because the alleged conspiracy could not have harmed Plaintiffs at any time before the 2016 COI rate increase, the Complaint alleges, entirely implausibly, that Defendants always planned to recover losses incurred in 2008 or earlier by improperly raising the COI rate many years later.  ¶¶ 1.23-28.

As a matter of law, the non-contract claims should be dismissed for two independent reasons:  *First*, all non-contract claims rely on an illogical and economically irrational theory that is not (and cannot be) adequately pled.  *Second*, even as alleged, the non-contract conduct could not—and did not—cause any concrete, non-speculative harm to Plaintiffs.

As explained in Section I of the Motion to Dismiss, the alleged conspiracy is implausible.  There is no rational explanation for why the Voya and Lincoln Defendants would conspire to file misleading statutory accounting statements and enter into captive reinsurance arrangements, particularly since one company's statutory filings and captive reinsurance arrangements have no bearing on the other's.  Further, Plaintiffs' causation theory is fatally attenuated and speculative. The alleged misconduct is not alleged to have harmed Plaintiffs in any direct, non-speculative way, other than as a result of the COI increase.  Plaintiffs admit, however, that the COI rate is governed by the terms of their policies.  Thus, the only reason Plaintiffs were allegedly harmed is an alleged breach of contract.

While the Court need look no further than the global pleading deficiencies addressed in Section I, the balance of this motion explains why each non-contract claim must also be dismissed under the law governing each theory advanced by Plaintiffs:

- The Complaint impermissibly pleads a breach of contract as a RICO predicate act and does not plead causation of harm attributable to the alleged racketeering activity—rather, the only direct harm alleged is attributable to breach of contract (Counts 1 and 2).

- The unjust enrichment claim (Count 4) against all Defendants other than Lincoln NY must be dismissed given Plaintiffs' admissions on the face of the Complaint that a contract with VRIAC governs the COI rate increase at issue in this lawsuit and only Lincoln NY collected premiums as agent for VRIAC.

- Both tort claims, conversion (Count 5) and fraud (Count 6), are barred by the economic loss rule because an express contract governs the subject matter.

- There can be no conversion (Count 5) because such a claim may only recover "chattels" owned by Plaintiffs, but Plaintiffs cannot allege the conversion of any "specific money" or tangible instrument that can be identified as a chattel—but only contingent contractual obligations to pay money under various circumstances and elections.

- The fraud claim (Count 6) fails because Plaintiffs fail to plead direct, reasonable reliance on the alleged misrepresentations and Plaintiffs have not pled actual or proximate causation.

- Various state consumer protection act claims fail for reasons ranging from an express provision that excludes insurance from the scope of a statute (Missouri) to Plaintiffs' failure to adequately plead materiality and reliance (Counts 7-12).[2]

In addition, only VRIAC is in privity of contract with any Plaintiff, and therefore the breach of contract claim (Count 3) must be dismissed against all other Defendants.

As detailed in the Motion to Strike portion of this brief, the Complaint weighs down its far-fetched story with pages of improper and redundant allegations that should be stricken. Secondary source quotations fill entire pages. The same conclusory assertions appear in slightly different formulations throughout the 188-page Complaint. Remarkably, after pages of hyperbole about Enron and shadowy alchemy it becomes clear late in the Complaint that Plaintiffs admit the alleged accounting misconduct *is legal*. ¶¶ 4.167-68.

While Defendants urge this Court to dismiss or strike most of the Complaint,

---

[2] Defendants simplified the briefing by not including choice-of-law arguments because all non-contract claims rely on implausible facts and are insufficient under any state's law. Defendants do not concede, however, that any of the Complaint's choice-of-law assumptions are correct.

we believe the Court should be informed that we also believe transfer of this entire case is appropriate at the outset.  Plaintiffs' counsel have tried to create the appearance that this case is unique so that it will not be transferred and consolidated with an earlier-filed case on the same policies on behalf of the same plaintiff class. It is for that reason that Plaintiffs' counsel drafted a 188-page Complaint with implausible and wide-ranging claims even though this lawsuit is actually nothing more than a breach of contract action.

As explained in Defendants' motion to transfer, this case is a tag-along to an earlier-filed case in the Southern District of New York, *Hanks v. Lincoln Life & Annuity Co. of New York, et al.*, 1:16-cv-06399-PKC (filed August 11, 2016).  This case duplicates the class alleged in *Hanks* and arises from the same contract dispute.  When this case was filed, proposed lead counsel in *Hanks* notified the *Hanks* Court of this case, arguing that the existence of multiple similar cases warranted appointment of lead counsel.  The next day, the *Hanks* Court granted interim lead counsel status to counsel for Hanks.  *Hanks*, ECF. Nos. 40-41.

These are the reasons why this Complaint was filed in a different district, and why it goes to great lengths to obscure the truth it cannot hide:  This case is, in fact, nothing more than a breach of contract action and essentially identical to *Hanks*. Accordingly, by separate motion, Defendants seek to transfer this lawsuit to the District already overseeing discovery in the earlier-filed case.  It may be appropriate to transfer before this Court undertakes to resolve the motions to dismiss and to strike.  Alternatively, the Court may prefer to resolve the motions to dismiss and to strike before transfer because their resolution will even more plainly expose this as a wasteful and duplicative case.

## SUMMARY OF ALLEGATIONS

Plaintiffs own life insurance policies issued by Aetna Life Insurance and Annuity Company ("ALIAC").  ¶ 1.2, 2.7-12.  The policies are universal life insurance policies.  ¶¶ 2.7-12.  In return for payment of premiums, they provide for

a death benefit and for accumulation of a cash value, a portion of which may be realized if a policyholder exercises a contractual right to "surrender" a policy. *Id.* ¶¶ 4.236-241, 4.266-327; Compl. Ex. 5, at pp.8-9. Defendant Lincoln NY reinsures and administers the ALIAC policies under an indemnity reinsurance agreement and Lincoln National Life Insurance Company ("Lincoln National Life") is also a party to that agreement. ¶ 4.4. Lincoln NY collects premiums, addresses policyholder inquiries, and pays claims on behalf of VRIAC as its administrator and servicing agent. ¶¶ 4.7, 4.14. Defendant VRIAC is the successor to ALIAC. *See* ¶¶ 4.9-12. The only business relationship alleged between VRIAC and any of the Lincoln Defendants is a function of the indemnity reinsurance contract and directly related agreements (such as the administrative servicing agreement). The Lincoln Defendants are separate from and are not corporate affiliates of the Voya Defendants (or their predecessors in interest on the reinsurance contracts). *Id.* ¶¶ 1.1, 2.1-6.

The "Flexible Premium Adjustment Endowment Policy" attached as Exhibit 5 to the Complaint governs COI rates and changes to those rates. It provides for COI rates "based on" "the insured's sex, attained age, and premium class." Ex. 5 at 7. Further, COI rates "may be adjusted" and adjustments will be based on ALIAC's "estimates for future cost factors, such as mortality, investment income, expenses, and the length of time policies stay in force." *Id.* However, the rates will "never exceed" the rates disclosed in the Guaranteed Maximum Insurance Rates table in the policy (*id.* at 4, 7) and there is no allegation that the rates have ever exceeded those maximum amounts.

Effective June 15, 2016, VRIAC increased the monthly COI rates of Plaintiffs' policies after considering a recommendation by Lincoln. ¶ 1.24. The Complaint alleges that the June 2016 COI rate increase was a policy breach. ¶ 1.28. The Complaint further alleges that the 2016 COI rate increase was the result of a conspiracy that began in the early 2000s, continued through the 2007-08 financial

crisis, and survived at least to 2016. According to Plaintiffs, the conspiracy "arguably" traces back to capital regulations implemented in early 2000. ¶¶ 4.117-18. Those regulations allegedly led the Defendants to invest "as much as 20% of their assets" into mortgage-backed securities ("MBS") (¶1.9). Plaintiffs allege that the financial crisis caused losses on that portfolio and Defendants received government support through programs implemented during the crisis. ¶ 4.39.

According to Plaintiffs, the additional government support was not enough to offset Defendants' losses. Because Defendants are for-profit entities, Plaintiffs allege that Defendants were motivated to create the "appearance" of profits and pay "excessive" dividends. ¶¶ 4.183, 4.199-200. Plaintiffs assert that "for profit" companies generally have "every incentive" to engage in accounting practices "a la Enron," and "for profit" companies are under "great pressure" to provide returns to investors. ¶ 1.4. The Complaint alleges *no other reason* why Defendants would engage in a fraudulent conspiracy for over a decade. *See* ¶¶ 1.13-16 (no reason alleged for conspiracy other than to pay dividends and keep up appearances of profitability).

The Complaint alleges that the conspiracy involved almost every form of corporate malfeasance—improper accounting (¶ 4.34), false statements to credit rating agencies or investors (¶ 1.27), and "waste" of corporate funds. ¶ 4.178. According to Plaintiffs, Defendants engaged in "financial alchemy" or "shadow insurance." ¶¶ 1.14, 1.147 & fn.32. The conspiracy supposedly survived and was undetected for more than a decade despite extensive regulatory oversight. ¶¶ 4.9-12, 4.44, 4.118-17; Couch on Insurance §§ 2:1, 2:7-8 (West 2017).

The Complaint connects its Enron-style narrative to the COI increase on the theory that Defendants intended from the outset to raise COI charges on some (not all) consumers many years later in order to recoup hidden losses. ¶ 1.15. The goal of the conspiracy was allegedly to move assets and liabilities from one entity to another to evade regulatory capital rules implemented in early 2000, creating the

appearance of profit for many years.  The success of the conspiracy allegedly depended on VRIAC's ability to eventually raise COI rates many years later on some policyholders.  *E.g.*, ¶ 1.23 ("To keep the scheme going, the Lincoln and Voya Defendants conspired with each other to generate more cash, or even cause policyholders to lapse or surrender their policies so they could erase the liabilities, by hitting policyholders like Plaintiffs and putative Class members with exorbitant charges"); ¶¶ 5.9-10; ECF No. 17 ("RICO Statement"), at 2:16-20.

Plaintiffs allege that, as part of the conspiracy, Defendants committed mail and wire fraud by announcing the COI increase.  ¶ 5.35 (mail and wire fraud for "sending notices of the COI increases . . . communicating the false reasons for those increases.").  As alleged, the only mail and wire fraud affecting Plaintiffs was the rate change announcement that also allegedly violated the policies.  The only conduct allegedly causing damage to Plaintiffs was the COI rate increase, which is controlled by the policy terms.  The Complaint is also notable for what it lacks:

- The Complaint does not allege any financial link between VRIAC and the Lincoln Defendants other than the indemnity reinsurance and administrative servicing agreement.

- The Complaint does not allege that Defendants coordinated their separate captive reinsurance transactions and separate statutory accounting reports.

- The Complaint does not allege that Defendants' dividend payments, investments, captive reinsurance transactions and statutory accounting filings were actually unlawful or caused direct harm to Plaintiffs.

- The Complaint does not allege that any policyholder ever failed to receive insurance benefits as provided under the policies or was denied a cash payment in exchange for exercising the contractual right to surrender the policy for cash.

## **MOTION TO STRIKE**

The Complaint should be stricken.  The great majority of its 188 pages are redundant, irrelevant, immaterial, or conclusory.  Many pages quote irrelevant secondary sources and speculate about corporate wrongdoing in other industries or as a general matter.  *E.g.*, ¶¶ 4.57-4.63, 4.127, 4.496.  The Complaint as written poses unreasonable burdens for Defendants and the Court.

1
2
3
4
5
6
7

  Federal Rule of Civil Procedure 8(a)(2) requires a "short and plain statement of the claim showing that the pleader is entitled to relief."  Overlong complaints, especially those that are "highly repetitious, or confused, or consist[] of incomprehensible rambling" violate that requirement, and may be rejected under Rule 8 just as it is proper under Rule 12(f) to strike "irredundant, immaterial, impertinent, or scandalous matter.  *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1059 (9th Cir. 2011) (Rule 8; quoting Wright & Miller).[3]

8
9
10
11
12
13
14

  The Ninth Circuit has found complaints of even 70 pages excessively long.  *Id.* (summarizing *Hatch v. Reliance Ins. Co.,* 758 F.2d 409, 415 (9th Cir. 1985)).  Excessive complaints should be stricken because they "impose unfair burdens on litigants and judges"—for example, if they will require "half a day in chambers" to understand their allegations.  *Cafasso*, 637 F.3d at 1059.  Such complaints prejudice the defense, including by forcing them to undertake "the onerous task of combing" through hundreds of pages of excess allegations to prepare an answer.  *Id.* at 1058.

15
16
17
18
19

  Striking undisciplined RICO complaints can be especially beneficial.  RICO's stringent requirements may drive plaintiffs to invent massive conspiracies that are unsupportable, so they rely on heft to cover a lack of substance.  For example, a court in this District ordered a 337-page RICO complaint to be stricken and re-pled in no more than 30 pages.  *Cervantes Orchards & Vineyards, LLC v.*

20

21
22
23
24
25
26
27
28

---

[3] A motion under Rule 8 to "dismiss" a complaint in its entirety is appropriate if the complaint will be re-pled to comply with Rule 8(a)(2).  *Sitevoice, LLC v. Gyrus Logic, Inc.*, 2014 WL 4722329, at *8 (D. Ariz. Sept. 23, 2014).  A Rule 8 motion is subject to a lower standard than a motion to "strike" under Rule 12(f), which does not provide for re-pleading, and is therefore appropriate if the objectionable portions of the complaint can be isolated and discarded without re-pleading.  *See id.*; 5C Wright & Miller § 1380 (3d ed.).  Both Rules enforce the short-and-plain requirement, and this motion is made under both.  *See* 5C Wright & Miller § 1380.

1  *Deere & Co.*, 2014 WL 12639127, at *1 (E.D. Wash. Dec. 19, 2014)

2  ("*Cervantes I*") (striking 337-page RICO complaint).  The re-pled complaint made

3  clear that the facts alleged "were surprisingly paltry."  2015 WL 4429054, at *9

4  (July 17, 2015) ("*Cervantes II*") (dismissing with prejudice for this, among other

5  reasons).

6       Here, the 188-page Complaint indiscriminately quotes model rules, statutes,

7  regulations, and general principles asserted by other secondary sources, all with no

8  direct or specific application to the Defendants in this case.  *E.g.*, ¶¶ 1.143 *et seq.*,

9  4.131, 4.18, 4.44, 4.57-4.63, 4.131 *et seq.*, 4.180, 4.196.  Plaintiffs devote pages to

10  allegations describing ordinary commercial activity as presumptively criminal.

11  That lengthy diatribe is the false premise for Plaintiffs' claim that related-entity

12  transactions such as captive reinsurance—which are commonplace for financial

13  institutions and sophisticated companies—are inherently fraudulent.  Plaintiffs'

14  view can survive no pleading standard and is contrary to basic legal tenets, so the

15  Complaint buries it among longwinded screeds about general corporate

16  wrongdoing.  *See, e.g.*, ¶ 4.111 (false assertion that affiliate transactions are "often"

17  bad) and ¶¶ 4.128-29 (alleging that lawful transactions are inherently suspect).

18       The allegations at times become incoherent.  According to the Complaint,

19  certain accounting matters were allegedly fraudulent—but the Complaint also

20  admits they were disclosed fully to investors and regulators (¶¶ 4.191-92), or were

21  legal.  ¶¶ 4.167-68.  The Complaint tries to infer wrongdoing because Defendants

22  did not disclose details that Plaintiffs admit need not have been disclosed at all.

23  ¶ 4.151.  Pages are devoted to speculation about Defendants' incentives to engage

24  in allegedly wrongful transactions—only to admit that Defendants "cannot receive

25  any balance sheet benefit" from them.  ¶¶ 4.179, 4.195.  Other digressions concede

26  they have no point other than to say something was "interesting."  ¶¶ 4.38-40,

27  7.122.  Sections of the Complaint devolve into reciting legal conclusions without

28  any facts at all.  *E.g.*, ¶¶ 5.6-5.8, 5.15, 5.27-31.

1    These features have real consequences, allowing Plaintiffs to recharacterize
2    the Complaint to suit almost any purpose.  Verifying Plaintiffs' representations
3    about the Complaint will demand excessive time to read and re-read the allegations.
4    *See Cafasso*, 637 F.3d at 1059 ("Our district courts are busy enough without having
5    to penetrate a tome approaching the magnitude of *War and Peace* to discern a
6    plaintiff's claims and allegations").  Defendants' Answer must be reciprocally long.

7    The Court may wish to strike the Complaint in full before reaching the
8    motion to dismiss.  If a new Complaint is permitted before this Court, it should be
9    no more than 40 pages—far more than enough, as plaintiffs were able to condense
10    their RICO allegations into a 27-page RICO statement.  *See also Cervantes I*, 2014
11    WL 12639127 (337-page RICO complaint ordered to be no more than 30 pages).

12    **MOTION TO DISMISS**

13    **I.    THE NON-CONTRACT CLAIMS SHOULD BE DISMISSED
14    BECAUSE THEY ARE IMPLAUSIBLE AND FAIL TO ALLEGE ANY
    CONCRETE NON-CONTRACTUAL DAMAGES**

15    The Complaint alleges that various changing entities continuously conspired
16    beginning in January 2000 to avoid regulatory capital rules in order to pay
17    dividends to shareholders all with an end goal of eventually—in June 2016, after 16
18    years—increasing the COI charge for some (not all) life insurance policies.  To
19    accept the plaintiffs' theory, one must infer that defendants were clairvoyant
20    enough to plan almost 16 years in advance to raise COI charges (which are subject
21    to guaranteed maximums) high enough to cover their alleged shortfalls.  That far-
22    fetched theory is implausible and economically irrational.

23    There are four independently sufficient grounds to dismiss all claims except
24    for the breach of contract claim against VRIAC and the unjust enrichment claim
25    against Lincoln NY.  *First*, the Complaint fails to satisfy Rule 9(b), which applies
26    to all such claims.  *Second*, the Complaint fails to allege a plausible and
27    economically rational conspiracy.  *Third*, Plaintiffs attempt to infer the alleged
28    conspiracy from lawful business conduct.  *Fourth*, Plaintiffs fail to allege that they

1  suffered any concrete or non-speculative harm as a result of any of the alleged

2  wrongful conduct other than the alleged breach of contract.

3  **A.    The Non-Contract Claims Fail To Satisfy Rule 9(b)**

4  Every complaint must allege "sufficient factual matter" to state a "plausible"

5  claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The analysis of sufficiency and

6  plausibility must disregard "labels and conclusions," ignore "naked assertions

7  devoid of further enhancement," and reject unreasonable inferences. *Id.* at 681.

8  What remains is the factual matter, which must add up to a plausible claim. *Id.*

9  Plausibility demands more than possibility.  "Where a complaint pleads facts that

10  are merely consistent with a defendant's liability, it stops short of the line between

11  possibility and plausibility." *Id.* at 678 (internal quotations omitted).

12  Rule 9(b) demands specificity for claims that "sound in fraud." *Vess v. Ciba-

13  Geigy Corp. USA*, 317 F.3d 1097, 1103-04 (9th Cir. 2003).  Courts look to the

14  substance of the allegations to determine whether a complaint sounds in fraud. *Id.*

15  There are no "magic words" or other formal requirements. *Id.*  Plaintiffs may

16  scrupulously avoid using "the word 'fraud,'" but the strictures of Rule 9(b) "cannot

17  be evaded" so easily. *Id.*  For instance, a complaint sounds in fraud if the plaintiff

18  alleges "a unified course of fraudulent conduct and rel[ies] entirely on that course

19  of conduct as the basis of a claim." *Id.*, 317 F.3d at 1103-04; *see also Kearns v.

20  Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009).

21  To satisfy Rule 9(b), the pleading must allege *specific facts*—not

22  generalizations or conduct by unspecified actors—and explain why they constitute

23  illegal conduct. *See Kearns*, 567 F.3d at 1125.  The "pleading must identify "the

24  who, what, when, where, and how of the misconduct charged," as well as "what is

25  false or misleading about [the purportedly fraudulent] statement, and why it is

26  false." *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055

27  (9th Cir. 2011) (quoting precedent; internal quotations and modifications omitted).

28  Here, Rule 9(b) applies to all claims other than the breach of contract claim

(Count 3). *Vess*, 317 F.3d at1103 ("It is established law, in this circuit and elsewhere, that Rule 9(b)'s particularity requirement applies to state-law causes of action."); *see also United Food & Commercial Workers Cent. Pennsylvania & Reg'l Health & Welfare Fund v. Amgen, Inc.*, 400 F. App'x 255, 257 (9th Cir. 2010) (affirming order that applied *Vess* to RICO and state consumer protection act claims because the entire complaint sounded in fraud); *Fidelity Mortgage Corp. v. Seattle Times Co.*, 213 F.R.D. 573 (W.D. Wash. 2003) (Rule 9(b) applies to Washington Consumer Protection Act claims that rest on the same conduct as a fraud claim) (Coughenour, J.). Every claim relies on the same unified course of conduct and therefore is subject to Rule 9(b) under *Vess*. All Defendants allegedly engaged in a single conspiracy to defraud. *E.g.*, ¶¶ 1.14-16.

Plaintiffs allege the same type of overarching fraudulent conspiracy described in *Vess*. 317 F.3d at 1105. The *Vess* plaintiffs alleged a conspiracy and asserted a variety of claims, including tort and California unfair business practice and consumer-protection claims, just as Plaintiffs here assert claims under similar state statutes. *Id*. at 1100. In *Vess*, the California statutes did not inherently trigger Rule 9(b), but Rule 9(b) applied to them (and every other claim) because the complaint as a whole was "comprised of allegations of a unified course of conduct," including "misrepresentations and omissions" that were allegedly related to the non-"fraud" state-law claims. *Id.* at 1101, 1106. Here, Plaintiffs allege that a conspiracy drove Defendants' entire course of conduct over a 16-year period and that it included fraudulent misrepresentations. *E.g.*, ¶¶ 5.44-46, 4.207, 4.214.

Claim-by-claim analysis reaches the same conclusion: The RICO claims rely on mail and wire fraud. ¶¶ 5.20, 5.35, 3.57; RICO Statement at 10, 13-14. The three common-law counts turn on the same scheme. The fraud claim summarizes and asserts the entire scheme as part of the fraud. ¶¶ 7.35-7.41. Conversion and unjust enrichment both require conduct beyond a contract breach, but the Complaint alleges no such conduct other than the alleged fraudulent conspiracy.

1  And every count incorporates every fraudulent conspiracy allegation.  ¶¶ 7.1, 7.6,
2  7.11, 7.17, 7.27, 7.34, 7.44, 7.62, 7.80, 7.98, 7.118, 7.137.

3         The Complaint does not satisfy Rule 9(b) because Plaintiffs cannot plead the
4  required "particular circumstances"—the "who, what, when, where, and how"—of
5  the alleged fraudulent conduct and statements.  *Kearns*, 567 F.3d at 1126.  When
6  forced to do so in a RICO Statement, Plaintiffs can only "outline" generalizations.
7  *E.g.*, ECF No. 17, RICO Statement at 11 (responding to requirement to state "Time,
8  place, and contents of the alleged misrepresentations").  For example, the
9  Complaint does not identify a single individual person who had a role in the
10  conspiracy or fraudulent conduct.  At times it does not distinguish the corporate
11  persons either.  *E.g.*, ¶¶ 4.14, 4.232-33; *see Lobato v. Acqura Loan Servs.*, 2012
12  WL 607624, at *8 (S.D. Cal. Feb. 23, 2012) (plaintiffs should plead the "identities
13  of the parties to the misrepresentation" under Rule 9(b); plaintiffs cannot "lump
14  multiple defendants together").  Aside from the announcement of a COI rate
15  increase, Plaintiffs fail to allege how specific captive reinsurance transactions and
16  statutory accounting statements actually defrauded or harmed them.  Instead,
17  Plaintiffs allege only that they have paid policy premiums and speculate that they
18  might be harmed if VRIAC fails to honor its policy obligations in the future.  ¶¶
19  4.258, 4.260-261, 5.2, 5.9, 7.16, 7.39.  As explained in Section I.D, below, such
20  speculative harm is insufficient as a matter of law.

21         In sum, when assessing each argument that follows, it is appropriate to
22  subject the Complaint to the requirements of Rule 9(b).

23     **B.      The Alleged Fraudulent Conspiracy Is Implausible And Irrational
24              And Is Therefore Insufficient As A Matter Of Law**

25         In *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986),
26  the Supreme Court held that, in order to establish a plausible conspiracy claim,
27  plaintiffs must plead and prove that the defendants had a rational economic motive
28  to conspire and engage in the alleged conspiratorial conduct.  To satisfy that

requirement, plaintiffs must demonstrate how and why an alleged conspiracy made practical sense in light of the duration of the conduct and its goals.  In *Matsushita*, the Supreme Court held that an alleged predatory pricing scheme did not meet those fundamental requirements because (1) the goal of the conspiracy—eventually raising prices in the future—was too distant in time from the alleged start of the conspiracy, and (2) the defendants could have not have been certain that they could recoup losses incurred as a result of their low and allegedly predatory pricing over many years.  *Id.* at 596-97.

The allegations in this case present similar logical flaws.  The goal of the alleged conspiracy here—eventually raising COI rates in 2016—was remote in time from the beginning of the conspiracy (allegedly in response to regulatory capital reforms implemented in January 2000).  Defendants in this case could not have predicted years in advance that VRIAC would eventually raise COI rates high enough and quickly enough (while still complying with the policy maximums) to take in enough money to cover the losses allegedly incurred and compounded over a 16-year period.

The Complaint alleges that various changing corporate entities continuously conspired beginning in January 2000 to avoid regulatory capital rules in order to pay dividends to shareholders all with an end goal of eventually—in June 2016, after 16 years—increasing the COI charge for a few (but far from all) of the many universal life insurance policies they had issued.  This is facially implausible because, as alleged, the relationship between Voya and Lincoln is limited to a single indemnity reinsurance arrangement (clearly documented in a series of related agreements) and there is no other alleged financial entanglement between these independent companies.

To accept Plaintiffs' theory, one must further infer that Defendants forecasted many years in advance that they would raise COI charges (which are subject to maximum ceilings) high enough to cover their alleged shortfalls.  One

must further infer that Defendants would plan to do this selectively on a few, but not all, of the many universal life insurance policies that they issued over many years.

The principles articulated in *Matsushita* arose in the context of a summary judgment dismissal of an antitrust conspiracy claim. Those principles apply equally on a motion to dismiss claims that sound in fraud. Fraudulent intent is an essential element of any fraud claim and any RICO claim where the predicate acts are mail or wire fraud. A corporation's fraudulent intent is implausible if the scheme makes no practical or economic sense.

Federal courts have applied these principles consistently in granting motions to dismiss where the alleged fraudulent scheme—as pleaded—was illogical, economically irrational or implausible. *See, e.g., Atl. Gypsum Co. v. Lloyds Intern'l Corp.*, 753 F. Supp. 505, 514 (S.D.N.Y. 1990) (wire and mail fraud predicates insufficient as a matter of law because "economic reason" could not "yield a reasonable inference of fraudulent intent"); *Drexel Burnham Lambert Inc. v. Saxony Heights Realty Assocs.*, 777 F. Supp. 228, 239 (S.D.N.Y. 1991) (dismissing civil RICO claims predicated on mail and wire fraud because the scheme was "economically unreasonable"); *In re Toyota Motor Corp.*, 785 F. Supp. 2d 883, 901 n.11 (C.D. Cal. 2011) ("*Twombly* strongly suggests, if it does not indeed compel, courts take into account basic economic principles, where applicable, in analyzing the plausibility of a claim.") (dismissing RICO and all other claims; citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 556 (2007)); *Okla. Firefighters Pension & Ret. Sys. v. Ixia*, 2015 WL 1775221, at *22 (C.D. Cal. Apr. 14, 2015) (dismissing securities accounting fraud claims because the fraud "defies economic reason, and is therefore implausible"); *see also WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1056 (9th Cir. 2011) (dismissing Rule 10b-5 claim where plaintiff failed "to allege a cogent scienter theory" to explain motive).

Many other courts have come to the same conclusion. *See, e.g., In re Worlds*

*of Wonder Sec. Litig.*, 35 F.3d 1407, 1425 (9th Cir. 1994) (holding that allegations of irrational conduct negate inference of scienter); *California Architectural Bldg. Prod., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1470 (9th Cir. 1987) (affirming summary judgment dismissal of RICO claims because, absent a rational economic incentive, there could be no inference of intent); *Shuster v. Symmetricon, Inc.*, 2000 WL 33115909, at *8 (N.D. Cal. Aug. 1, 2000) (economic irrationality negates inference of scienter); *Laro, Inc. v. Chase Manhattan Bank*, 866 F. Supp. 132, 138 (S.D.N.Y. 1994) (granting summary judgment for defendants where there was no reasonable inference of fraudulent intent because the alleged fraudulent scheme was economically irrational); *In re Parmalat Securities Litigation*, 684 F. Supp. 453, 473 (S.D.N.Y. 2010) (rejecting an economically irrational fraud theory involving a structured finance transaction).

Plaintiffs do not and cannot explain why Defendants would undertake such a highly risky conspiracy over decades. *Twombly* rejected such implausible allegations. 550 U.S. 544. There, the plaintiffs alleged two conspiracy theories from facts consistent with competitive businesses seeking a profit. *Id.* at 566-68. One of those theories alleged facts equally consistent with lawful competition, but asserted that the "incentive to resist [lawful competition] was powerful." *Id.* at 566. The Supreme Court confirmed that assertion of such ordinary business incentives to engage in misconduct was not enough to infer a conspiracy. *Id.* The Court observed that if such ordinary incentives were sufficient, then pleading a violation "against almost any group of competing businesses would be a sure thing." *Id.*

Like *Twombly*, the Complaint in this case provides no plausible reason for Defendants to conspire on so many matters over so many years. The Complaint alleges that Defendants wanted to create the "appearance" of profits and pay "excessive" dividends. ¶¶ 1.13-16.; 4.183, 4.199-200. Plaintiffs assert that companies have "every incentive" to engage in accounting practices "a la Enron," and "for profit" companies are under "great pressure" to provide returns to

investors.  ¶ 1.4.  All companies are under pressure to perform for their investors. Changed regulatory requirements and the 2007-08 financial crisis allegedly heightened that pressure.  ¶¶ 4.117-18, 4.39.  Those events affected the entire industry, and the Complaint's allegations about MBS investments and their subsequent valuations do not distinguish Defendants from anyone else in the industry.  *Cf. Eclectic Props., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 998-99 (9th Cir. 2014) (RICO conspiracy implausible where plaintiffs relied on the impact of the financial crisis on defendant because the crisis affected all firms; taking judicial notice of effects of the crisis).  And the allegations of "financial alchemy" are leveled against insurers generally.  *¶¶* 4.135-39; *see also ¶¶* 4.147-49.

The alleged conspiracy is implausibly high risk.  It involves at least a decade of purported deception and false statements.  Regulators and credit agencies monitored the relevant conduct.  If this Complaint pleads fraud and conspiracy, then pleading <u>any</u> such case against <u>any</u> insurer would be a "sure thing." *Twombly* 550 U.S. at 566.  *Twombly* rejects that outcome.

**C.    No Negative Inference Can Be Drawn From Lawful Business Conduct, Rendering The Non-Contract Claims Implausible**

The Complaint alleges ordinary business conduct and routine transactions, and then asserts or insinuates they are wrongful.  *E.g.*, ¶¶ 1.1, 1.4, 1.8.  For example, the Complaint alleges that Defendants, like many other financial institutions, invested in mortgage-backed securities before 2008 and received government assistance after 2008.  ¶¶ 1.9, 4.39.  The Complaint admits that captive reinsurance transactions are legal in the various jurisdictions governing those transactions (¶¶ 4.167-167, 4-171, 4.186; *see also* ¶ 4.151), concedes that the transactions were disclosed to the public (¶¶ 4.191-92), never denies that the transactions were submitted to regulators (*id.*), and suggests that if a company exercises its First Amendment right to lobby against a regulation then it can be inferred the whole industry violated the regulation (¶¶ 4.116-121).

1    That is insufficient under *Twombly*, which requires "more than a business

2    deal gone bad for economic and non-fraudulent reasons," but a "plausible

3    fraudulent scheme." *Eclectic Props.*, 751 F.3d at 997 (dismissing RICO claim).

4    Plausibility depends on the context and severity of the allegations. *Id.* For

5    example, when a plaintiff challenges facially legitimate conduct and impugns

6    defendants who

> otherwise act as routine participants in American commerce, a
> significant level of factual specificity is required to allow a court to
> infer reasonably that such conduct is plausibly part of a fraudulent
> scheme.

10    *Id.* at 998.

11    It is implausible and unreasonable to infer fraud or a conspiracy from facts

12    that are "merely consistent" with liability (*Iqbal*, 556 U.S. at 678), or that only add

13    up to a contract dispute. *See Gomez v. Guthy-Renker, LLC*, 2015 WL 4270042, at

14    *11 (C.D. Cal. July 13, 2015 (observing the "remarkable uniformity" of courts

15    concluding that "RICO liability must be predicated on a relationship more

16    substantial than a routine contract between a service provider and its client");

17    *Regency Comm'cns., Inc. v. Cleartel Comm'cns. Inc.*, 160 F. Supp. 2d 36, 43

18    (D.D.C. 2001) ("It is illogical to think that a plaintiff, by merely appending a RICO

19    or other such claim to his complaint, may instantly render his fraud claim

20    nonduplicative of the contract claim."); *Facaros v. Qwest Corp.*, 2011 WL

21    2270588, at *6 (D. Or. June 7, 2011) ("What plaintiff really alleges in this case is a

22    voidable contract based on adhesion or some other theory grounded in contract

23    law"; dismissing RICO claim); *Royce Int'l Broad. Corp. v. Field*, 2000 WL 236434,

24    *4 (N.D. Cal. Feb. 23, 2000) (allegations amounting to a contract "gone sour" do

25    not plead a RICO conspiracy (Illston, J.) (quoting *Midwest Grinding Co. v. Spitz*,

26    976 F.2d 1016, 1025 (7th Cir. 1999)).

27    To the contrary—the law presumes honesty and good faith rather than fraud.

28    *Farar v. Churchill*, 135 U.S. 609, 615 (1890) ("fraud is never presumed"); *Jones v.*

*Simpson*, 116 U.S. 609, 615 (1886) ("The law presumes, in the absence of evidence to the contrary, that the business transactions of every man are done in good faith and for an honest purpose [ . . . .]" (quoting with approval)) (Harlan, J.); *Rohrer v. Snyder*, 69 P. 748, 750 (Wash. 1902) ("there is a presumption of honesty and good faith that prevails in favor of all ordinary business transactions"; "fraud is never presumed").

Here, the Complaint alleges facts that are consistent with legitimate conduct. *First*, indemnity reinsurance agreements are common in the industry. They address "complex factual scenarios," use specialized terms, and are part of a business that can "change rapidly." Couch on Insurance § 9:1 (West 2017). *Second*, captive reinsurance transactions are routine and serve legitimate purposes. A "captive" reinsurer is an entity created "for the purpose of insuring the liabilities of its owner." *Clougherty Packing Co. v. C.I.R.*, 811 F.2d 1297 n.1 (9th Cir. 1987) (defining "captive insurance"). The Ninth Circuit recognizes that captive reinsurance agreements are legitimate even where, "as a matter of economic reality every dollar paid out of the captive was a dollar out of the parent's pocket from whence it came in the first place" because that is "little different from a reserve fund held by the parent itself." *See AMERCO, Inc. v. C.I.R.*, 979 F.2d 162, 166 (9th Cir. 1992) (discussing precedents); *Clougherty Packing*, 811 F.2d at 1307 (Anderson, J., concurring). The Complaint constructs an implausible alternative reality where such a self-insurance or reserve fund structure necessarily would be "a sham" akin to "major white-collar" crimes. ¶¶ 4.149-95; *see also* ¶¶ 4.176-79.

Plaintiffs quote a New York Department of Financial Services ("NYDFS") paper (the "DFS Paper") about a 2012 investigation of several life insurers not including any Defendant. ¶¶ 4.138, n.32. The Report expresses concern about possible negative consequences for the insurance industry if certain captive reinsurance transactions are misused. The DFS Paper characterizes them as "shadow transactions" and "financial alchemy." Report at 1. Just like the

1   Complaint, the DFS Paper identifies nothing illegal about the transactions.  Instead,

2   it recognizes that regulators in various states choose to approve the transactions.

3   *See id.* at 3, 15.  Construed most generously to Plaintiffs, the DFS Paper was

4   concerned about a "little-known loophole" that some companies were using legally.

5   *Id.* at 1.  Then as now, there is no illegality, and calling a common transaction

6   structure shadowy alchemy does not alter the facts that the transactions were legal

7   and subject to regulatory approval.[4]

8       The Ninth Circuit in *Eclectic Properties* rejected a fraudulent conspiracy

9   theory where the plaintiffs relied on innuendo about an industry and financial

10  transactions they either mischaracterized or did not understand.  751 F.3d at 998-99.

11  The *Eclectic* plaintiffs sued a real estate venture after the financial crisis.  *Id.* at 994,

12  998.  They identified sale-and-leaseback transactions and drastic changes in

13  valuations after the financial crisis.  *Id.*  The Ninth Circuit refused to be snowed.

14  Whatever role sale-and-leaseback transactions may have played in some firms'

15  wrongdoing, no negative inference could be drawn from *those defendants'* sale-

16  and-leaseback transactions because they were "facially legitimate" and were

17  conduct that had occurred for years.  *Id.* at 997-98.  The Circuit also took notice that

18  the financial crisis affected all firms, so no inference could be drawn from the

19  changes in valuations either.  *Id.* at 998 & n.6.

20      Plaintiffs in this case fare no better than those in *Eclectic Properties.*

21  Plaintiffs seem to admit that most or all the transactions were legal under the laws

22

_____

23  [4] The Second Circuit recently addressed similar allegations by another insurer's

24  policyholders in a case where the complaint quoted the DFS Paper's "alchemy" and

25  other language.  *Ross v. AXA Equitable Life Ins. Co.*, 2017 WL 730266 (2d Cir.

26  Feb. 23, 2017); *see also Ross*, 2d Amend. Compl. ¶ 76, *available at* 2015 WL

27  1875680.  The Second Circuit affirmed dismissal because any injury to plaintiffs

28  was too speculative to constitute legal injury.  *Ross*, 2017 WL 730266, at *1.

of a variety of states.  ¶¶ 4.167-68.  Plaintiffs concede at least some of the transactions they identify "might appear proper" (¶ 4.205)—*i.e.*, they are "facially legitimate." *Eclectic Props.*, 751 F.3d at 998-99.  Plaintiffs just disagree with the policy decisions of sovereign legislatures or the regulators they have entrusted; they admit Arizona, Missouri, South Carolina, and Vermont have all rejected Plaintiffs' central contention about captive insurance.  *E.g.*, ¶¶ 1.140, 4.168.  The Complaint tries to suggest otherwise with lectures about model rules that states have adopted, but it can only say various conduct appears to be inconsistent with a preamble, a statement in a white paper, or something from a draft white paper.  ¶ 4.58, 4.65, 4.135-37.  Similarly, just as in *Eclectic Properties*, Plaintiffs attempt to draw an inference about particular firms from the widespread effects of the financial crisis. 751 F.3d at 998; ¶ 4.205.

### D. The Complaint Fails To Plausibly Allege Concrete, Non-Speculative Harm To Plaintiffs Caused By Anything Other Than The Alleged Breach Of Contract

The Complaint alleges that Defendants' conduct created "the false appearance of strong surplus . . . and overall strength" (¶¶ 4.183, 4.199) and Plaintiffs paid premiums and excess premiums in reliance on those false appearances.  *See*, *e.g.*, ¶¶4.258, 4.260-261, 5.2, 5.9, 7.16, 7.39.  Plaintiffs have suffered no cognizable damages apart from the alleged breach of contract; they cannot and do not allege that any other policy obligation was dishonored.  As a matter of law, the allegations that Plaintiffs (a) paid premiums and in the future may not receive benefits if the insurer becomes insolvent, and (b) would not have purchased their policies or would have shopped for alternative policies (¶¶ 4.258, 4.260-261, 5.2, 5.9, 7.16, 7.39) are too speculative to adequately allege the requisite direct causation.

The Second Circuit recently illustrated this when it affirmed dismissal of a complaint alleging that an insurer's captive reinsurance transactions and statutory financial reporting created a false appearance of financial strength, lulling plaintiffs

1    into paying premiums and excess premiums.  *Ross v. AXA Equitable Life Ins. Co.*,

2    115 F.Supp.3d 424, 435 (S.D.N.Y. 2015), *aff'd* 2017 WL 730266 (2nd Cir. 2017).

3    The Second Circuit affirmed dismissal because the *Ross* complaint did not allege

4    harm that was "actual or imminent, not conjectural and hypothetical."  2017 WL

5    730266.  Here, the Complaint insinuates, but does not allege, that Defendants'

6    purported financial instability *might* render Defendants unable to meet their policy

7    obligations in the future.  That is the type of speculative harm that does not give

8    rise to legal injury.  To quote the *Ross* District Court:  "Plaintiffs received what

9    they bargained for—life insurance—and do not allege, let alone plausibly allege,

10   that they were financially harmed by virtue of their purchases."  *Id.* at 435-36.

11        As reflected in the Second Circuit and District Court opinions in *Ross*, the

12   Supreme Court requires federal courts to undertake a rigorous standing analysis to

13   ensure that any injury is "*certainly impending*" and not accept mere "allegations of

14   *possible* future injury."  *Clapper v. Amnesty Int'l, USA*, 133 S. Ct. 1138, 1147, 264

15   (2013) (quoting precedent; emphases in original).[5]

16        The Northern District of California in *Richter v. CC-Palo Alto, Inc*

17   addressed similar allegations of possible future harm.  176 F. Supp. 3d 877 (N.D.

18   Cal. 2016).  The *Richter* plaintiffs were retirement home residents who asserted tort

19   and other claims against the nursing home operator.  *Id.* at 882-83.  The plaintiffs in

20   that case claimed they were harmed by (1) illegal or inappropriate fees, and (2)

21   "improper management" that could make the retirement home financially unstable.

22   *Id.* at 886, 894.  The plaintiffs in *Richter* alleged that the defendants "concealed

23

24   [5] *Dickman v. Banner Life Ins. Co*., 2016 WL 7383869 (D. Md. 2016) reached a

25   different result than *Ross* because the plaintiffs in that case alleged that they made

26   "payments for which *they received no benefit*." *Id.* at *10 (emphasis added).  By

27   contrast, in this case, plaintiffs allege the same type of speculative, potential future

28   harm alleged in *Ross*.  *See* ¶¶ 4.258, 4.260-261, 5.2, 5.9, 7.16, 7.39.

their intention to [improperly use certain] fees and keep [the nursing home] 'dangerously underfunded.'" *Compare id.* at 897 *with* ¶¶ 4.172, 4.189 (alleging Defendants "substantially underfund[ed]" some reserves) and ¶ 4.171 (alleging some Voya affiliates "are dangerously dependent on one captive in particular"). The *Richter* complaint also alleged various statutory violations and cited a regulator's letter "expressing concerns" about the retirement home's finances.  176 F. Supp. 3d at 894-95, 902-03.  The court held that the plaintiffs' theories of harm were speculative and therefore inadequate.  *Id.* at 887.  Just as in *Richter*, Plaintiffs' theories of harm in this case are implausible and "speculative at best."

The Complaint in this case contains pages of allegations reciting language typical in securities class actions or shareholder derivative lawsuits.  *Cf. Richter*, 176 F. Supp. 3d at 902.  Plaintiffs allege that Defendants' financial statements were misleading and question Defendants' business judgments.  ¶¶ 4.178, 4.192, 7.105.  Plaintiffs' second-guessing of Defendants' business judgments and financial reporting does not confer standing, because the Plaintiffs are policyholders, not shareholders or investors.  As a matter of law, such allegations concern the breach of a duty that runs to the corporation or its shareholders.  *See* Fletcher Cyclopedia § 5924 (West 2017).  If conduct does not breach a legal duty to the plaintiff, it cannot cause the plaintiff cognizable harm.  Here, the policyholder plaintiffs could be harmed only by breach of a contractual policy obligation.  While alleged misrepresentations concerning Defendants' financial stability may mislead and harm investors, a policyholder is only harmed by a breach of the policy.  *See also Richter* 176 F. Supp. 3d at 886, 901 (explaining consumers do not have direct standing to sue for "improper management"; dismissing derivative claim because plaintiffs could not meet the heavy burden of plausibly pleading insolvency).

## II.  THE RICO CLAIMS (COUNTS 1-2) SHOULD BE DISMISSED BECAUSE PLAINTIFFS FAIL TO ALLEGE RICO CAUSATION AND A PATTERN OF RACKETEERING

Plaintiff asserts two RICO claims.  Count 1 asserts a substantive claim under

1    18 U.S.C. § 1962(c).  Count 2 alleges a conspiracy to violate RICO under Section

2    1962(d).  If Count 1 is dismissed, then Count 2 should also be dismissed.  *Howard*

3    *v. Am. Online Inc.*, 208 F.3d 741, 751 (9th Cir. 2000) ("failure to allege substantive

4    violations precludes claim that there was a conspiracy to violate RICO").

5         Section 1962(c) requires that a culpable "person" conduct or participate in an

6    enterprise that affects interstate commerce through a pattern of racketeering activity

7    ("predicate acts").  *Hemi Group LLC v. City of New York*, 599 U.S. 1, 6-7 (2010);

8    *Gomez*, 2015 WL 4270042, at *3.  To satisfy the RICO causation requirement, the

9    predicate acts must cause even more "direct" harm than the common law demands.

10   *See Hemi*, 599 U.S. at 10-14; *Ass'n of Washington Pub. Hosp. Dists. v. Philip*

11   *Morris Inc.*, 241 F.3d 696, 701 (9th Cir. 2001).

12        The RICO claims fail for at least three independently sufficient reasons.

13   *First*, Plaintiffs do not plead the required RICO "direct causation."  *Second*,

14   Plaintiffs fail to allege predicate acts sufficient to satisfy the pattern of racketeering

15   requirement.  In addition, Plaintiffs fail to allege a RICO "enterprise" that is distinct

16   from the "culpable persons" who direct or participate in it.

17        The first two grounds for dismissal of the RICO claims are straightforward

18   and each independently sufficient to warrant dismissal.  Accordingly, we do not

19   argue the enterprise point at length here, but intend to preserve it.  Affiliates within

20   a corporate family cannot conspire with themselves under the circumstances

21   alleged, so the only potential "conspirators" are Lincoln and Voya.  *See Anatian v.*

22   *Coutts Bank (Switzerland) Ltd.*, 193 F.3d 85, 89 (2d Cir. 1999); *In re Toyota Motor*

23   *Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.*, 826

24   F. Supp. 2d 1180, 1202-03 (C.D. Cal. 2011).  The Complaint alleges that the two

25   Lincoln Defendants and VRIAC have an agency relationship, that there is an

26   indemnity insurance agreement, and that Lincoln National Corp. hired some former

27   ALIAC employees in 1998.  *See* ¶ 4.4.  Under Second Circuit law, for example, that

28   is not enough to allege a plausible enterprise.  *Anatian*, 193 F.3d at 89 (plaintiffs

DEFENDANTS' MOTION TO STRIKE AND MOTION TO DISMISS          38

1   cannot plead a conspiracy "merely of a corporate defendant associated . . . with its

2   agents carrying on the regular affairs of the defendant").  The Ninth Circuit would

3   likely be in accord with Second Circuit authority but to date has been less clear.

4   *See Gomez*, 2015 WL 4270042, at *10-11.

5       A.    **The Complaint Does Not Plead RICO Causation**

6       RICO causation requires that "the alleged violation led directly to plaintiff's

7   injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006).  Though

8   RICO causation is sometimes called "proximate causation," tort-style

9   "foreseeability" is *not* sufficient to establish the required "'direct relationship'

10  between the fraud and the harm." *Hemi*, 559 U.S. at 12.  The predicate acts must

11  *directly* harm the Plaintiffs.  *Id.* at 13 ("Our precedent makes clear, moreover, that

12  'the compensable injury flowing from a [RICO] violation . . . "necessarily is the

13  harm caused by [the] predicate acts.") (internal citations omitted).

14      Thus, Plaintiffs cannot attempt to rely on harm to other purported victims of

15  the alleged conspiracy, such as the corporations, investors, or regulators:

16      A plaintiff "cannot escape the proximate cause requirement merely by
        alleging that the fraudulent scheme embraced all those indirectly
17      harmed by the alleged conduct. [ . . . ] Our precedent makes clear,
        moreover, that the compensable injury flowing from a [RICO]
18      violation [ . . . ] necessarily is the harm caused by [the] predicate acts."

19  *Id*.  For example, victims of a Ponzi scheme who pled predicate acts of mail and

20  wire fraud could not state a claim where the complaint showed that their trust in the

21  Ponzi operator—not the statements in the allegedly fraudulent wire and mail

22  communications—was the direct cause of harm.  *De Los Angeles Gomez v. Bank of*

23  *America, N.A.*, 642 F. App'x 670, 674 (9th Cir. 2016).

24      Here, Plaintiffs allege that communications about the COI increase constitute

25  mail and wire fraud.  ¶¶ 5.35, 5.38; ECF No. 17, RICO Statement at 7-8.  But the

26  communications themselves cannot cause any harm.  Instead, the only alleged cause

27  of direct harm is the same conduct that allegedly constitutes breach of contract.

28  ECF No. 17, RICO Statement, at 7:3-11.  Plaintiffs admit this most clearly in their

RICO statement, when they explain that the conspiracy's objective was to increase the COI charge (*i.e.*, allegedly breach the agreement) while concealing the true reasons for that increase. *Id*. at 2:16-20.

This case is therefore similar to *Kumar v. Entezar*, where a Washington federal court dismissed a RICO complaint alleging that the defendants committed wire and mail fraud in the course of "diverting" profits contractually owed to the plaintiff. *Kumar v. Entezar*, 2012 WL 2501049, at *1-2 (W.D. Wash. June 27, 2012). The complaint in that case failed because "the defendants engaged in wire and mail fraud, but the direct victims of that fraud were the lending institutions." *Id*. at *2. The Court aptly observed, "While this conduct may give rise to a breach of contract claim, the alleged harm is too attenuated from the underlying pattern of fraud to satisfy" RICO causation. *Id*.

Further, Plaintiffs cannot adequately allege wire and mail fraud arising from the alleged accounting and corporate misconduct. There are too many steps from that conduct (beginning in the early 2000s) to a COI rate change in 2016: (1) regulatory capital rule changes in early 2000, followed by (2) MBS investments before 2008, (3) the financial crisis in 2008, followed by (4) transactions and other alleged misconduct (5) to allegedly mislead credit agencies, the public, or regulators (6) so that Defendants could continue paying "excessive dividends," instill confidence, or hide "waste," which about a decade later led to (7) COI rate changes for only some universal life policyholders. ¶¶ 1.23, 1.27, 4.117-18, 4.34, 5.9. The Ninth Circuit has summarily affirmed dismissal of less attenuated theories, such as one that required "at least four independent links" to explain how the plaintiffs were harmed by predicate acts of mail and wire fraud. *United Food*, 400 F. App'x at 257 (affirming dismissal of RICO case).

The Ninth Circuit approves considering additional factors where it is not clear whether RICO causation is pled adequately, including "(1) whether there are more direct victims of the alleged wrongful conduct who can be counted on to

1   vindicate the law as private attorneys general [and] (2) whether it will be difficult to

2   ascertain the amount of the plaintiff's damages attributable to defendant's wrongful

3   conduct." *Ass'n of Washington*, 241 F.3d at 701.  These considerations confirm

4   that Plaintiffs fail to adequately allege that the claimed predicate acts were the

5   proximate cause of their alleged damages.

6       *First*, "there are more direct victims of the alleged wrongful conduct who can

7   be counted on to vindicate the law as private attorneys general." *Id.*  As described

8   above, the conduct underlying the RICO predicate acts asserted in this case

9   involves alleged statements to regulators.  The Complaint alleges that state

10  regulators were the direct recipients of those statements.  ¶ 5.38 ("the transmission

11  to the public of false or materially misleading financial information in statements

12  filed with the respective state regulators and the NAIC that disguised the true

13  reason for the massive increase in COI charges.").  The direct victims of any

14  misleading regulatory filings would be the regulators—who would be responsible

15  for prosecuting regulatory violations—and possibly any investors who actually

16  relied on such filings.  Absent any plausible allegation that a universal life insurer

17  has failed or will imminently fail to honor its obligation to pay death benefits or

18  cash surrender amounts, policyholders are not affected by any allegedly misleading

19  statutory accounting statement.  *See* Section I.D, above.

20      *Second*, "it will be difficult to ascertain the amount of the plaintiff's damages

21  attributable to defendant's wrongful conduct."  *See Ass'n of Washington*, 241 F.3d

22  at 701.  The Complaint admits that Defendants are entitled to raise COI rates for

23  various reasons completely unrelated to the alleged RICO scheme.  Plaintiffs must

24  therefore disentangle the component of the COI increase attributable to the RICO

25  scheme.  *See id.* at 700-03 (hospital districts alleged that tobacco companies had

26  increased hospitals' costs for treating tobacco-related illnesses; RICO claim

27  dismissed because calculating "damages would entail considerable speculation

28  regarding how individuals' tobacco usage would have changed in the event that

accurate information and less harmful tobacco products were available").

### B.    Plaintiffs Fail To Adequately Plead Predicate Acts Constituting A Pattern Of Racketeering Activity

The Complaint alleges mail and wire fraud as "predicate acts."  ¶¶ 5.35, 5.38; RICO Statement at 7-8.  Mail and wire fraud predicates are always subject to Rule 9(b) scrutiny, even where other claims in a complaint do not trigger that standard. *Bryant v. Mattel, Inc.*, 573 F. Supp. 2d 1254, 1264 (C.D. Cal. 2007).

"RICO claims premised on mail or wire fraud must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it." *Efron v. Embassy Suites (Puerto Rico), Inc.*, 223 F.3d 12, 20 (1st Cir. 2000).  Significantly,

> courts must always be on the lookout for the putative RICO case that is really nothing more than an ordinary fraud case.  Indeed RICO claims based on fraud receive especially careful scrutiny because virtually every ordinary fraud is carried out in some form by means of mail or wire communication, and thus there is the potential for transforming garden-variety common law actions into federal cases.

*Abbott Laboratories v. Adelphia Supply USA*, 2017 WL 57802, at *2 (Jan. 4 2017, E.D.N.Y.).  Courts in this Circuit agree.  *See Eclectic Props.*, 751 F.3d at 997 ("Plaintiffs' fraud theory requires them to show more than a business deal gone bad for economic and non-fraudulent reasons"); *Gomez*, 2015 WL 4270042, at *3.

The Complaint alleges an extensive range of misconduct over decades.  The predicate acts of wire and mail fraud, however, are necessarily limited to acts that were fraudulent—that is, the specific acts that made misrepresentations.  Such alleged predicate acts fall into two categories:  (1) communications announcing and implementing the 2016 COI rate increase, and (2) the submission of allegedly misleading financial information to state regulators.  The first category is not an act of fraud.  The COI rate increase either was permissible under the policies or it was a breach of contract.  As to the second category, Plaintiffs appear unable to allege specifically that the communications were made using the mails or wires.  ECF No. 17 ("RICO Statement"), at 7:19-20, 9:10-14.  In addition, as Sections I.D and

II.A explain, Plaintiffs are unable to allege that the purportedly misleading regulatory accounting filings caused any concrete, non-speculative injury to Plaintiffs. Aside from the COI rate increase, Plaintiffs are unable to allege a single instance of Defendants purportedly not honoring their contractual obligations to any Plaintiff.

The RICO claims should therefore be dismissed for the independent reason that they fail to adequately allege predicate acts constituting a pattern of racketeering activity and causing direct, concrete harm to Plaintiffs.

## III. THE COMMON LAW CLAIMS (COUNTS 4-6) SHOULD BE DISMISSED UNDER ESTABLISHED PRINCIPLES CONCERNING EXPRESS CONTRACTS

The common law counts (unjust enrichment, conversion, and fraud) are insufficiently pled for all the reasons stated in Section I, above. In addition, they are unsupportable because (1) Plaintiffs admit a contract exists that governs the parties' rights, (2) Plaintiffs do not seek return of specific money that can be identified as a chattel as necessary to support the conversion claim, and (3) Plaintiffs cannot plead reliance or common law proximate cause as necessary to support the fraud claim.

### A. The Existence Of An Express Contract Bars The Unjust Enrichment Claim Against VRIAC (Count 4)

Plaintiffs necessarily admit that they are parties to an insurance policy that governs the dispute at the heart of this case. *E.g.*, ¶¶ 4.270, 4.287. That admission precludes Plaintiffs' attempt to also assert a quasi-contractual unjust enrichment claim against VRIAC, the defendant that is a party to that contract. In *US Airways, Inc. v. McCutchen*, 133 S. Ct. 1537 (2013), the Supreme Court emphasized that unjust enrichment principles "are 'beside the point' when parties demand what they bargained for in a valid agreement" and held that a "valid contract defines the obligations of the parties as to matters within its scope, displacing to that extent any inquiry into unjust enrichment." *Id*. at 1546-47. In *U.S. for Use & Benefit of*

1   *Walton Tech., Inc. v. Weststar Eng'g, Inc.*, 290 F.3d 1199 (9th Cir. 2002), the Ninth

2   Circuit, applying Washington law, held that a "party to an express contract is bound

3   by the provisions of that contract, and may not disregard the same and bring an

4   action on an implied contract relating to the same matter." *Id.* at 1204.

5       Cases in each state where Plaintiffs assume they have standing to assert a

6   claim reach the same result.[6]  For example, in *Goldman v. Metro. Life Ins. Co.*, 5

7   N.Y.3d 561 (2005), the New York Court of Appeals held that there can be no unjust

8   enrichment claim where "the matter is controlled by contract" and noted that the

9   existence of a "contract governing a particular subject matter ordinarily precludes

10  recovery in quasi contract for events arising out of the same subject matter." *Id.* at

11  572.  *See also Joiner v. USAA Cas. Ins. Co.,* 2013 WL 84935, at *1 n.1 (M.D. Ala.

12  Jan. 8, 2013) (under Alabama law, unjust enrichment claim dismissed given

13  existence of insurance contract governing the policyholder's rights); *Singer v.

14  Priceline Grp., Inc.*, 2016 WL 3976539, at *7-8 (D. Conn. July 22, 2016) (applying

15  Connecticut law); *Blair v. City of Hannibal*, 179 F. Supp. 3d 901, 911 (E.D. Mo.

16  2016) (applying Missouri law); *Madison River Mgmt. Co. v. Bus. Mgmt. Software

17  Corp.*, 351 F. Supp. 2d 436, 446 (M.D.N.C. 2005) (applying North Carolina law).

18      **B.    There Can Be No Unjust Enrichment Claim Against Voya
             Financial And The Lincoln Affiliate Defendants Because Plaintiffs
19           Did Not Pay Them (Count 4)**

20      Nor can unjust enrichment stand against Voya Financial, Inc., Lincoln

21  National Life Insurance Company, and Lincoln National Corp. (collectively, the

22  "Affiliate Defendants") because the complaint does not allege that those

23  Defendants received any payments from Plaintiffs (or had any other relationship

24  _____

25  [6] In addition to the states where they reside, Plaintiffs purport to assert claims under

26  the laws of New York and Pennsylvania, for which there is no named Plaintiff.

27  Counts 8 & 11.  Defendants take no position on Plaintiffs' ability to assert claims

28  under those states' law at this time because the claims fail under any state's law.

1    with Plaintiffs that would support an unjust enrichment claim).

2         The Complaint demonstrates that the policies were issued by VRIAC and

3    administered after 1998 by Lincoln NY.  Compl. Ex. 1.  The Complaint does not

4    allege any direct payments to the Affiliate Defendants, and instead attempts to

5    plead unjust enrichment by alleging that "Defendants" used Plaintiffs' payments "to

6    earn investment income and to pay extraordinary dividends to Voya Financial [and]

7    Lincoln National Corp."  ¶ 7.18.

8         Under New York law, Plaintiffs' financial relationships with the Affiliate

9    Defendants are too attenuated to support unjust enrichment claims.  *See Georgia*

10   *Malone & Co., Inc. v. Rieder*, 973 N.E.2d 743, 746 (N.Y. 2012) (holding that "a

11   plaintiff cannot succeed on an unjust enrichment claim unless it has a sufficiently

12   close relationship with the other party" and "there must exist a relationship or

13   connection between the parties that is not 'too attenuated'").  If the rule were

14   anything else, then any contract plaintiff could disrespect the corporate form by

15   bringing affiliates into a case with an allegation that the affiliate somehow

16   benefitted.

17        Similarly, under Alabama law, "[t]he first requirement of unjust enrichment

18   . . . is that one party must have conferred a benefit on another."  *Portofino Seaport*

19   *Vill., LLC v. Welch*, 4 So. 3d 1095, 1098 (Ala. 2008).  Because Plaintiffs only paid

20   VRIAC and Lincoln NY (as administrative agent for VRIAC), they never

21   "conferred a benefit on" the Affiliate Defendants, and their unjust enrichment

22   claims under Alabama law must be dismissed.  Plaintiffs' lack of a direct

23   relationship with the Affiliate Defendants and the absence of any benefit conferred

24   are equally fatal to their unjust enrichment claims under the other states' laws.  *See*

25   *Hargis v. JLB Corp.*, 357 S.W.3d 574, 586 (Mo. 2011) ("Unjust enrichment

26   requires a showing that . . . [the plaintiff] conferred a benefit on the defendant");

27   *Young v. Young*, 191 P.3d 1258, 1262 (Wash. 2008); *Butler v. Butler*, 239 N.C.

28   App. 1, 7, 768 S.E.2d 332, 336 (2015) ("one party must confer a benefit upon the

1  other party"); *Stoeckinger v. Presidential Fin. Corp. of Delaware Valley*, 948 A.2d

2  828, 833 (Pa. Super. Ct. 2008).

3      Plaintiffs' unjust enrichment claims under Connecticut law must be

4  dismissed as well, as Plaintiffs will be able to recover any losses if they succeed in

5  their breach of contract claims against VRIAC.  Under Connecticut law, "Unjust

6  enrichment applies wherever justice requires compensation to be given for property

7  or services rendered under a contract, *and no remedy is available by an action on*

8  *the contract.*"  *Hartford Whalers Hockey Club v. Uniroyal Goodrich Tire Co.*, 649

9  A.2d 518, 521 (1994) (internal quotations omitted; emphasis added).  Here, it is

10  undisputed that the relevant contracts—the policies—are with VRIAC, and that

11  Plaintiffs' breach of contract claim against that Defendant is an available remedy

12  that, if successful, would fully compensate them for the losses alleged in this case.[7]

13  ### C.  The Economic Loss Rule Bars The Conversion Claim (Count 5) And The Fraud Claim (Count 6)

14

15      Fundamental common law principles prevent plaintiffs from re-framing a

16  breach of contract as a tort action.  Often called the "economic loss rule," the

17  common law bars tort damages, including punitive damages, for conduct that

18  breaches a contract.  *Alejandre v. Bull*, 159 Wash. 2d 674, 694–95 (Wash. 2007).

19  The rule encourages transactions by ensuring that the parties can rely on a single set

20  of legal rules—contract law—to resolve their disputes.  *Affiliated FM Ins. Co. v.*

21  *LTK Consulting Servs., Inc.*, 170 Wash. 2d 442, 451-52 (Wash. 2010); *see also*

22  *Miller v. U.S. Steel Corp.*, 902 F.2d 573, 574 (7th Cir. 1990) (Posner, J.) ("tort law

23  is a superfluous and inapt tool for resolving purely commercial disputes" that are

24  the subject of a contract because it permits circumventing contract law's limitations

25  _____

26  [7] At the pleadings stage Defendants do not move to dismiss the unjust enrichment

27  claim as to Lincoln NY, but will demonstrate at summary judgment that

28  indisputable facts render this claim unsustainable.

on damages; quoted with approval in *Affiliated FM*, 170 Wash. 2d at 452); *see also Oki America, Inc. v. Microtech Int'l, Inc.*, 872 F.2d 312, 31 (9th Cir. 1989) (Kozinski, J., concurring) (explaining the importance of stopping the "tortification of contract law—the tendency of contract disputes to metastasize into torts . . .").

Here, the only nonspeculative harm or damages claimed by Plaintiffs arises under their insurance policies.  This is illustrated, for example, by Plaintiffs' allegation that the communications announcing the COI rate change were fraudulent.  *E.g.*, ¶¶ 5.42-45, 7.40.  The alleged "fraud" was a post-contract statement *announcing* the conduct that Plaintiffs contend *was the breach*.

The law of all the Complaint's referenced states reaches the same result:

"Alabama does not recognize a tort-like cause of action for the breach of a duty created by contract."  *Blake v. Bank of Am., N.A.*, 845 F. Supp. 2d 1206, 1210 (M.D. Ala. 2012); *see also TFO, Inc. v. Vantiv, Inc.*, 2017 WL 1196851, at *2 (N.D. Ala. Mar. 31, 2017) (dismissing overlapping fraud and breach of contract claims); *Townson v. Koch Farms, LLC*, 2014 WL 1618376, at *2 (N.D. Ala. Apr. 22, 2014) (fraud claims dismissed where they "overlap with and are not sufficiently independent from . . . breach of contract").

The Connecticut Supreme Court has applied the economic loss doctrine to bar tort recovery where tort and warranty claims were "premised on the same alleged conduct with respect to the same personal property and rely on the same evidence."  *Lawrence v. O & G Indus., Inc.*, 319 Conn. 641, 663 n.15 (2015) (summarizing precedent; internal citations omitted); *see also State v. Lombardo Bros. Mason Contractors, Inc.*, 307 Conn. 412, 469 n.41 (Conn. 2012) (the doctrine is a "rule limiting a contracting party to contractual remedies for the recovery of economic losses unaccompanied by physical injury to persons or other property").

Missouri's economic loss rule bars conversion claims.  *Citimortgage, Inc. v. K. Hovnanian Am. Mortg., L.L.C.*, 2013 WL 5355471, at *3 (E.D. Mo. Sept. 20, 2013) ("Because the substance of [claimant's] tort claim for conversion is for the

recovery of losses arising out of the parties' contractual relationship, the economic

loss doctrine bars the claim.")  And the Eight Circuit has explained that the

economic loss rule bars fraud theories and approved a district court's observation

that "Missouri courts have recognized rare exceptions to the economic loss

doctrine." *Dannix Painting, LLC v. Sherwin-Williams Co.*, 732 F.3d 902, 905 (8th

Cir. 2013) (internal citations omitted); *see also Self v. Equilon Enterprises, LLC*,

2005 WL 3763533, at *11 (E.D. Mo. Mar. 30, 2005) (Missouri would apply

economic loss rule in commercial contract cases); *Arnold v. AT&T, Inc.* 2012 WL

1441417, *11 (E.D. Mo. Apr. 12, 2012) (same in case regarding consumer billing

practices billing case).[8]

_____

[8] Recently a Missouri District Court incorrectly held that the economic loss rule did

not apply in a consumer billing case where the plaintiffs alleged that COI charges

not permitted by their policies were collected under the contract.  *Vogt v. State

Farm Life Ins. Co.*, 2017 WL 1498073 (W.D. Mo. Apr. 26, 2017).  The *Vogt*

opinion does not mention the Eighth Circuit's endorsement of a strong Missouri

economic loss rule in *Dannix*, nor does it mention *Sherwin-Williams* or *Self*, both of

which recognize that the economic loss rule bars conversion and fraud claims in

consumer billing cases. Instead, *Vogt* appears to limit the economic loss rule to its

origins in products liability and other contexts.  *Vogt*, 2017 WL 1498073 at *3.  But

even courts that reserve the "economic loss rule" label for those circumstances

adhere to the basic common-law principle that the conduct constituting a contract

breach and tortious conduct must be separate and independent.  *See RBS Citizens

Fin. Grp., Inc. v. Hewitt Assocs., LLC*, 2016 WL 3525325, at *13 (D. Conn. June

22, 2016); *Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Cos., Inc.*, 110 So. 3d

399, 408 (Fla. 2013) (even if the "economic loss rule" does not apply the tort must

be "independent of any breach of contract claim") (Pariente, J., *et al*, concurring).

The *Vogt* Court also made the mistake of finding a non-contract duty in the

(Footnote continues on next page . . .)

1  New York courts hold that the economic loss rule bars tort liability where the

2  parties' rights are defined in an insurance policy.  *Core-Mark Int'l Corp. v.*

3  *Commonwealth Ins. Co.*, 2005 WL 1676704, at *3–4 (S.D.N.Y. July 19, 2005); *see*

4  *also Wolf v. Nat'l Council of Young Israel*, 264 A.D.2d 416, 417 (N.Y. App. Div.

5  1999) (conversion "cannot be predicated on a mere breach of contract.").

6  North Carolina does not permit insurance plaintiffs to avoid the economic

7  loss rule by adding an allegation of "fraud" or breach of "good faith."  *King v. Ins.*

8  *Co. of N. Am.*, 273 N.C. 396, 398-99 (1968).[9]

9  Pennsylvania would endorse a strong economic loss rule with few or no

10  exceptions for fraud or consumer transactions.  *Werwinski v. Ford Motor Co.*, 286

11  F.3d 661, 680-81 (3d Cir. 2002) (determining the Pennsylvania Supreme Court's

12  most likely holding); *Rahemtulla v. Hassam*, 539 F. Supp. 2d 755, 777 (M.D. Pa.

13  2008) (no conversion where entitlement to funds turns on contract).

14  Washington considers the practice alleged, the parties' relationship, and other

15  factors to determine whether a claim is contractual or tortious.  *Roundtree v. Chase*

16  *Bank USA, N.A.*, 2014 WL 794800, at *3-4 (W.D. Wash. Feb. 27, 2014).  However,

17

18  (Footnote continued from previous page)

19  common law obligation not to engage in fraud or conversion—but that lets any

20  contract claim become a tort by adding allegations of fraud or that funds were taken

21  in bad faith during the contractual relationship.

22  [9] Some cases misread North Carolina to have a bright-line carve-out allowing

23  plaintiffs to escape the economic loss rule by alleging an "intentional" tort, or by

24  styling a claim for funds as "conversion."  However, consistent with other

25  jurisdictions that use the "economic loss rule" label sparingly, North Carolina still

26  follows the common-law rule that any tort claim must be "identifiable and distinct

27  from the primary breach of contract claim."  *Broussard v. Meineke Disc. Muffler*

28  *Shops, Inc.*, 155 F.3d 331, 346 (4th Cir. 1998); *see also* fn.8, above.

1    Washington courts would reject tort liability in consumer transactions or for billing

2    practices governed by contract. *Id.* at *3 (rejecting tort liability).

3          **D.    The Conversion Claim (Count 5) Is Not Viable Because Plaintiffs
       Do Not Allege That Any Chattel Was Taken**

4

5          Conversion recovers "goods" or chattels in which a Plaintiff holds an

6    ownership interest.  The subject of conversion must be "capable of being described

7    or identified in the same manner as a specific chattel." *9310 Third Ave. Assocs., Inc.*

8    *v. Schaffer Food Svc. Co.*, 210 A.D.2d 207, 208 (N.Y.A.D. 1994).  The alleged

9    "chattel" at issue is some portion of account value, not the policies themselves.  ¶¶

10   7.30-31.  The policyholder has a contractual right to benefits pursuant to the

11   contract.  This kind of intangible interest is not property capable of conversion.

12   The seven jurisdictions the Complaint references have three variations of this

13   fundamental rule.  Plaintiffs cannot state a claim for conversion under any of them

14   because (1) Plaintiffs cannot identify a specific tangible instrument that embodies

15   the funds they allege were taken; (2) Plaintiffs seek funds that have been

16   commingled with other funds that they allege became "profit" or "revenue" for the

17   Defendants; and (3) Plaintiffs seek to collect a "debt" on a contract, not specific

18   money.

19         Some cases apply a black-letter rule that there can be no conversion at all for

20   intangibles.  Restatement (Second) Torts § 242, cmt. (b).  Under that rule, Plaintiffs

21   have no claim because they cannot identify a tangible instrument (such as a stock

22   certificate or promissory note) that was taken. *See Reliance Ins. Co. v. U.S. Bank of*

23   *Washington, N.A.*, 143 F.3d 502, 506 (9th Cir. 1998) (discussing Washington law).

24   Other cases hold that certain intangibles can be converted—for example, the

25   proceeds of a specific named bank account—but only if those proceeds have not

26   been commingled with other funds after withdrawal. *See In re Refco Sec. Litig.*,

27   759 F. Supp. 2d 301, 330 at n.26 (S.D.N.Y. 2010) (explaining New York law).

28   Under that approach, Plaintiffs have no conversion claim because they seek funds

---

DEFENDANTS' MOTION TO STRIKE AND MOTION TO DISMISS          50

that Plaintiffs allege became part of Defendants' revenues after they were paid or withdrawn (and Plaintiffs cannot allege that each Plaintiff's funds were segregated). *E.g.*, *Dwyer v. Unit Power, Inc.*, 965 S.W.2d 301, 306 (Mo. Ct. App. 1998) (Missouri: intentionally intercepting and diverting payments cannot give raise to conversion claim after the funds were deposited into other, commingled accounts). *Wake Cty. v. Hotels.com, L.P.*, 235 N.C. App. 633, 653 (2014) (North Carolina: plaintiffs must trace funds with specificity).[10]

And some courts leave open the possibility of modifying the traditional rules in limited ways, but they still adhere to the rule that money taken in breach of contract is no more than an intangible debt incapable of conversion.  *See, e.g.*,

---

[10] The *Vogt* court (fn. 8, above) incorrectly declined to apply the specific-money rule under Missouri law in a COI case.  That opinion recognizes that money must be "identified as a specific chattel" to be converted (2017 WL 1498073, at *4), but then held that COI charges could constitute conversion if the defendant had a bad intent, or because funds were entrusted for a specific "purpose."  *Id.* at *5-6.  But neither trust in another, nor any particular purpose or intent, can transform intangible funds or a debt on a contract into an identifiable chattel.  This flaw in *Vogt*'s logic caused it to depart from established Missouri law.  *See, e.g.*, *Boswell v. Panera Bread Co.*, 91 F. Supp. 3d 1141, 1145 (E.D. Mo. 2015) ("Conversion is not the appropriate action when the claim is solely for the recovery of money."); *In re Estate of Boatright*, 88 S.W.3d 500, 506 (Mo. Ct. App. 2002) ("As a general rule a claim for money may not be in conversion because conversion lies only for a specific chattel which has been wrongfully converted."); *Moore Equip. Co. v. Callen Constr. Co.*, 299 S.W.3d 678, 681 (Mo. Ct. App. 2009) (conversion generally "does not lie for the wrongful taking of money"); *Gen. Electric Cap. Corp. v. Union Planters Bank, N.A* 409 F.3d 1049, 1059 (8th Cir. 2005) (no conversion of intangible funds taken from an account after commingling).

---

1  *Deming v. Nationwide Mut. Ins. Co.*, 279 Conn. 745, 779 (2006) (Connecticut law

2  "does not permit as a subject of conversion an indebtedness which may be

3  discharged by the payment of money generally"; the "mere obligation to pay money

4  may not be enforced by a conversion action," particularly "where the basis of the

5  suit is a contract"); *First Glob. Commc'ns, Inc. v. Bond, No*., 2006 WL 231634, at

6  *4-5 (W.D. Wash. Jan. 27, 2006) (Washington law); *New Life Homecare, Inc. v.*

7  *Blue Cross Blue Shield of Michigan*, 2009 WL 506376, at *5 (M.D. Pa. Feb. 27,

8  2009) (Pennsylvania law); *Campbell v. Naman's Catering, Inc.*, 842 So. 2d 654,

9  659 (Ala. 2002) (money withheld from employee's paycheck was not specifically

10  identifiable, as required to support conversion claim).  At most, Plaintiffs allege an

11  intangible debt under a contract, for which they could trigger payment *if* they

12  exercised a *contractual* right to surrender the policy.  Compl. Ex. 5 at pp.8-9.

13
14  **E.    The Common Law Fraud Claim (Count 6) Fails Because Plaintiffs Do Not Adequately Plead The Elements of Reasonable Reliance And Proximate Causation**

15  Reasonable reliance on an alleged misrepresentation is an indispensable

16  element of common law fraud.  *E.g.*, *BP W. Coast Prod. LLC v. SKR Inc.*, 989 F.

17  Supp. 2d 1109, 1120 (W.D. Wash. 2013).  Further, such reasonable reliance must

18  be the proximate cause of a plaintiff's injury.  *Hemi*, 599 U.S. at 10-13.  The harm

19  must be an objectively foreseeable result of the tortious conduct.  *Id.* at 12.  The

20  Complaint does not plead that the named Plaintiffs actually or reasonably relied on

21  specific alleged misrepresentations.

22  The Complaint does not allege with the requisite specificity that Plaintiffs

23  actually or directly relied on the statutory financial statements that were allegedly

24  improper and misleading.  Plaintiffs instead make conclusory allegations of reliance

25  without any factual support beyond publicly filed statutory accounting statements.

26  For example, Plaintiffs allege:

27
28  > "the Annual Statement is made available to the public so that consumers, agents, ratings agencies and others can develop an assessment of the company's financial strength and ability to pay future claims as they come due."

---

¶ 4.60; *see also* ¶ 5.47 ("Defendants knew Plaintiffs and the Class relied on their misrepresentations and omissions concerning the true financial condition of Voya and Lincoln").  Plaintiffs do not allege that they read any specific financial information, and there is no reason to infer that they scoured Forms 10-K, regulatory accounting balance sheets, and the like.  It is insufficient as a legal matter to allege only public statements about financial soundness or practices or assert that the information "can" inform consumers (¶ 4.63), without specifying how *these* particular Plaintiffs relied on those statements and why that reliance was reasonable.  *See Cafasso*, 637 F.3d at 1055 (Rule 9(b) requires pleading "who, what, when, where, and how"); *City of Roseville Employees' Ret. Sys. V. Sterling Fin. Corp.*, 47 F. Supp. 3d 1205, 1219–20 (E.D. Wash. 2014) (generalized statements of financial soundness insufficient to plead reliance) (Bastian, J.); *see also Stearns v. Select Comfort Retail Corp.*, 2009 WL 1635931, at *10–11 (N.D. Cal. June 5, 2009) (subjective claims or generalized characterizations cannot support reliance; dismissing fraud claim).

The Complaint instead appears to allege that Defendants assured the market of their stability, and that the market transmitted those assurances to the Plaintiffs by means of Defendants' good reputations.  *E.g.*, ¶¶ 4.183, 4.119, 4.60.  Market-reliance theories necessarily rely on a large and deep market where a security is actively traded.  A plaintiff can invoke it only by "demonstrating that a security is actively traded in an 'efficient market,' in which prices immediately reflect all publicly available information."  *Miller v. Thane Int' Corp.*, 615 F.3d 1095, 1103 (9th Cir. 2010) (internal quotations and citation omitted).  It "presume[s]" that the investor necessarily relies on the market price "knowing that they have little hope of outperforming the market in the long-run based solely on their analysis of publicly available information."  *Amgen Inc. v. Conn.Ret.Plans and Trust Funds*, 133 S. Ct. 1184, 1192 (2013).

None of those features exist here.  The products at issue are not publicly

traded; they are individually priced insurance policies.  Nor is it sufficient for Plaintiffs to assert that they relied on the market to transmit reputational information.  There is no "immediate" transmission of information concerning Defendants' corporate finances in this industry.  Insurance companies build their reputations and brands over decades.  For these reasons and others, the law of all seven states where Plaintiffs live either rejects market-based reliance or requires allegations of actual reliance.  *See Aubrey v. Sanders*, 346 F. App'x 847, 849 (3d Cir. 2009) (Pennsylvania law: no fraud-on-the-market for common law fraud); *Cromeans v. Morgan Keegan & Co.*, 303 F.R.D. 543, 555 (W.D. Mo. 2014) (Missouri law; no market-reliance presumption for negligent or fraudulent misrepresentations); *In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 495 (S.D.N.Y. 2006) (New York law: "a plaintiff alleging common law fraud may not rely on the fraud on the market presumption, but must demonstrate actual reliance on the alleged misrepresentations"); *Stuart v. Freiberg*, 316 Conn. 809, 829 (2015) ("Without *actual* reliance, reasonable reliance cannot possibly exist" (emphasis in original)); *Ex parte Household Retail Servs. Inc.*, 744 So. 2d 871, 880 n.3 (Ala. 1999) (no "fraud-on-the-market" or "presumption-of-reliance" for common law fraud); *Simpson v. Specialty Retail Concepts*, 149 F.R.D. 94, 101 (M.D.N.C. 1993) ("Because the fraud on the market theory is not available for those claims, [plaintiff] must allege and prove actual reliance" under North Carolina doctrine); *see Bakhchinyan v. Countrywide Bank, N.A.*, 2014 WL 1273810, at *3 (W.D. Wash. Mar. 27, 2014) (Washington law: common law fraud plaintiff must allege "specific facts showing that they *actually* relied" on statements) (emphasis in original); *In re Metro. Sec. Litig.*, 2009 WL 36776, at *4 (E.D. Wash. Jan. 6, 2009) (Washington law: a presumption of reliance "is available only when a plaintiff alleges that a defendant made material representations or omissions concerning a security that is actively traded in an efficient market").  Proximate causation of harm is an essential element of common law fraud. *Hemi*,

599 U.S. at 10-13.  Plaintiffs compound their failure to allege reasonable reliance by also failing to allege that any such reliance was the direct and proximate cause of their damages. To the contrary, Plaintiffs' damages are attributable to the alleged breach of contract.

## IV.    EVERY STATE STATUTORY CLAIM (COUNTS 7-12) SHOULD BE DISMISSED

The Complaint asserts six state statutory counts but fails to adequately allege the elements required under each state statute.

### A.    Connecticut (Count 7)

The Connecticut Unfair Trade Practices Act (CUTPA) requires allegations that the plaintiff suffered an ascertainable loss of money or property caused by an unfair method of competition or an unfair or deceptive act in the conduct of any trade or commerce.  Conn. Gen. Stat. § 42-110a *et seq.*, Conn. Gen. Stat. § 42-110b(a).  *Smith v. Wells Fargo Bank, N.A.*, 158 F. Supp. 3d 91, 100 (D. Conn. 2016), *aff'd*, 666 F. App'x 84, 88 (2d Cir. 2016).  The CUTPA's causation requirement adopts common law tort causation principles.  *Abrahams v. Young & Rubicam, Inc.,* 240 Conn. 300, 306 (1997).  Plaintiffs cannot state a claim under CUTPA for two primary reasons.  *First*, they have no "ascertainable loss" attributable to anything other than the alleged breach of contract and they cannot adequately plead causation.  *See* Sections I.D & III.E, above.  *Second*, Plaintiffs cannot establish liability using statutory accounting  statements because that information is provided to regulators rather than consumers and statements concerning financial soundness and other general statements are not sufficiently precise to be actionable under CUTPA.  *See Active Ventilation Prod., Inc. v. Prop. & Cas. Ins. Co. of Hartford*, 2009 WL 2506360, at *3 (Conn. Super. Ct. July 15, 2009).

1

### B.   New York (Count 8)

A claim under New York General Business Law Section 349 requires that Plaintiffs plead "(1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." *Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015) (internal quotation marks omitted); *see also City of New York v. Smokes-Spirits.com, Inc.*, 12 N.Y.3d 616, 621 (2009). *First*, any COI increase could not be deceptive, as the insurer's right to adjust rates was fully disclosed in Plaintiffs' policies. ¶ 4.241 (policy stating: "The monthly Cost of Insurance rates may be adjusted by Aetna from time to time"). The controlling policy language explained to policyholders that the insurer could raise rates, and that the only guarantee was that COI rates "may never exceed the rate shown for that year in the Table of Guaranteed Maximum Insurance Rates in this policy." *Id.* There is no actionable deception under these circumstances. *See, e.g.*, *Sands v. Ticketmaster-N.Y., Inc.*, 207 A.D.2d 687, 687 (N.Y. App. Div 1994) (no actionable section 349 claim where "practices are *fully disclosed* prior to" sale). *Second*, statutory accounting filings are not "consumer-oriented" statements (such as statements promoting a defective product) and statements concerning general financial soundness are not materially misleading under New York law because they are generalized and subjective characterizations. *See Bader v. Siegel*, 238 A.D.2d 272, 272 (N.Y. App. Div. 1997).

### C.   Missouri (Count 9)

The Missouri Merchandising Practices Act does not permit private claims against insurance companies that are "subject to chartering, licensing, or regulation by the director of the department of insurance" absent legislative action. Mo. Stat. § 407.020; *In re Brauer v. Bankers Life & Cas. Co.*, 2016 WL 4083480, at *7 (W.D. Mo. Aug. 1, 2016). Those Voya and Lincoln affiliates that sell policies in

Missouri are subject to the department of insurance's authority,[11] and it would be perverse to immunize the corporate affiliates that operate in Missouri while subjecting their foreign-state affiliates to litigation the Legislature never intended. In addition, the MMPA has a causation requirement Plaintiffs cannot satisfy. *Owen v. Gen. Motors Corp.*, 533 F.3d 913, 922–23 (8th Cir. 2008). And the alleged statements regarding Defendants' financial stability or soundness are not actionable under Missouri law because they are insufficiently precise and not quantifiable. *Faltermeier v. FCA US LLC*, 2016 WL 4771100, at *7 (W.D. Mo. Sept. 13, 2016).

### D.    North Carolina (Count 10)

The North Carolina Unfair And Deceptive Trade Practices Act claim is not viable for two primary reasons. *First*, the Complaint does not plead the required proximate causation. *Bumpers v. Cmty. Bank of N. Virginia*, 367 N.C. 81, 88-89 (2013). *Second*, the statute requires a claim of "aggravating or egregious circumstances" and, where Plaintiffs' damages arise from an alleged breach of contract, that threshold is not met. *Davis v. State Farm Life Ins. Co.*, 163 F. Supp. 3d 299, 307-08 (E.D.N.C. 2016). In addition, the technical information allegations are not material to consumers, and alleged statements concerning general financial soundness are not materially misleading under North Carolina law because they are generalized and subjective characterizations. *See Solum v. Certainteed Corp.*, 147 F. Supp. 3d 404, 412 (E.D.N.C. 2015).

### E.    Pennsylvania (Count 11)

Plaintiffs' count under the Pennsylvania Unfair Trade Practices and Consumer Protection Law (UTPCPL) count is barred by the economic loss doctrine for the reasons discussed in Section III.C, above. 73 P.S. § 201-1, *et seq.*, 73 P.S. § 201-2(3). *Werwinski v. Ford Motor Co.,* 286 F.3d 661, 681 (3d Cir. 2002)

---

[11] *See* Mo. Dept. Insurance, Financial Institutions & Prof. Regs., Licensee Lookup, *available at* https://sbs-mo.naic.org/Lion-Web/jsp/sbsreports/AgentLookup.jsp.

1  (economic loss rule bars fraud claims under the UTPCPL).  The UTPCPL also

2  requires that Plaintiffs adequately plead causation and justifiable reliance.  *Hunt v.*

3  *U.S. Tobacco Co.*, 538 F.3d 217, 221-29 (3d Cir. 2008), *as amended* (Nov. 6, 2008)

4  (imposing common law justifiable reliance standard; rejecting market-based

5  reliance argument).  The Act's requirements generally borrow common-law

6  doctrines, including causation.  *See id.*; *see also Schwartz v. Rockey*, 593 Pa. 536,

7  556 (2007)  (noting the Pennsylvania Supreme Court has "borrowed from the

8  common law in fleshing out prevailing liability standards under the UTPCPL";

9  adopting common law damages standard).  The common law's reliance, causation,

10  and materiality standards therefore apply, and the Complaint does not satisfy them

11  for the reasons in stated in Sections I.D & III.E, above.

12       **F.**    **Washington (Count 12)**

13       Count Twelve asserts a claim under the Washington Consumer Protection

14  Act (CPA).  "To prevail on a private CPA claim, a private plaintiff must show (1)

15  an unfair or deceptive act or practice, (2) that occurs in trade or commerce, (3) a

16  public interest, (4) injury to the plaintiff in his or her business or property, and (5) a

17  causal link between the unfair or deceptive act and the injury suffered."  *Indoor*

18  *Billboard/Washington, Inc. v. Integra Telecom of Wash., Inc.*, 162 Wash. 2d 59, 73

19  (2007).  The "causal link" requires but-for causation.  *Schnall v. AT & T Wireless*

20  *Servs., Inc.*, 171 Wash. 2d 260, 278 (2011).  The Complaint does not satisfy the

21  CPA's causation requirements. *See* Sections I.D & III.E, above.  In addition, the

22  technical information alleged is not of material importance to consumers, and

23  alleged statements concerning general financial soundness are not materially

24  misleading under Washington law because they are generalized and subjective

25  characterizations.  *See McDonald v. OneWest Bank, FSB*, 929 F. Supp. 2d 1079,

26  1097 (W.D. Wash. 2013) (CPA requires concealment or misrepresentation of

27  "something of material importance" to consumers).

28

1
2

## V.   PLAINTIFFS CANNOT STATE ANY CONTRACT CLAIM AGAINST THE LINCOLN DEFENDANTS

3
4
5
6
7

Plaintiffs assert Count 3 (breach of contract) against Lincoln National Life and Lincoln NY even though no contract exists between Plaintiffs and the Lincoln Defendants.  Because the Lincoln Defendants are not parties to a contract with Plaintiffs, they cannot be liable for breach of contract.  *E.g.*, *Detweiler Bros. v. John Graham & Co.*, 412 F. Supp. 416, 419 (E.D. Wash. 1976).

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

In an indemnity reinsurance agreement, the ceding company (here, VRIAC) remains directly liable to its policyholders and the reinsurer (Lincoln NY) assumes no direct liability to policyholders.  *British Ins. Co. of Cayman v. Safety Nat. Cas.*, 335 F.3d 205, 211-12 (3d Cir. 2001) (reinsurance agreement confers no rights on the insured).  The Complaint's admissions about the nature of reinsurance confirm that the obligations run between insurance companies, not to policyholders. ¶¶ 4.14-15, 4.100; *see also* Couch on Insurance § 9:1 (West 2017) ("In essence, reinsurance is insurance for insurance companies.").  Lincoln NY's role as administrative agent does not establish the required relationship with policyholders. *E.g.*, *Brand v. AXA Equitable Life Ins. Co.*, 2008 WL 4279863, at *2 (E.D. Pa. Sept. 16, 2008); 14-106 Appleman on Insurance § 106.7 (Lexis 2017).  The effect on Lincoln National Life and Lincoln NY of any breach of contract liability incurred by VRIAC is controlled by the indemnity reinsurance contract.  Plaintiffs have no standing to assert any claim under that contract, which they do not assert has been breached in any event.

23
24
25
26

Accordingly, while Defendants do not seek dismissal of the breach of contract claim against VRIAC because it is a party to the life insurance policies alleged to have been breached by the COI rate increase, the claim should be dismissed as to Lincoln NY and Lincoln National Life because they are not.

27
28

---

1    DATED this 9th day of May, 2017.

2                              By:  */s/Brendan V. Monahan*
                                    BRENDAN V. MONAHAN (WSBA #22315)
3                                   JAIME CUEVAS, JR. (WSBA #51108)
                                    Attorneys for Defendants
4                                   STOKES LAWRENCE
                                    VELIKANJE MOORE & SHORE
5                                   120 N. Naches Avenue
                                    Yakima, Washington 98901-2757
6                                   (509) 853-3000

7
                                    ALAN B. VICKERY (admitted *pro hac vice*)
8                                   JACK G. STERN (admitted *pro hac vice*)
                                    JOHN F. LASALLE (admitted *pro hac vice*)
9                                   BOIES SCHILLER FLEXNER LLP
                                    575 Lexington Avenue, 7th Floor
10                                  New York, New York 10022
                                    (212) 446-2300
11

12                                  MOTTY SHULMAN (admitted *pro hac vice*)
                                    BOIES SCHILLER FLEXNER LLP
13                                  333 Main Street
                                    Armonk, New York 10504
14                                  (914) 749-8200

15
                                    SEAN P. RODRIGUEZ (admitted *pro hac
16                                  vice*)
                                    BOIES SCHILLER FLEXNER LLP
17                                  1999 Harrison Street, Suite 900
                                    Oakland, CA 94612
18                                  (510) 874-1000

19

20

21

22

23

24

25

26

27

28

1

## CERTIFICATE OF SERVICE

2    I hereby certify that on May 9, 2017, I caused the foregoing document to be:

3    ☒    electronically filed with the Clerk of the Court using the CM/ECF system
        which will send notification of such filing to the following:
4

5    Andrew E Brashier            Andrew.Brashier@BeasleyAllen.com,
                                  Ashley.Burgin@BeasleyAllen.com
6

7    Rachel N Boyd               rachel.boyd@beasleyallen.com,
                                 ashley.burgin@beasleyallen.com
8

9    Samuel J Strauss            sam@turkestrauss.com,
                                 litigation@turkestrauss.com
10

11   W Daniel Miles , III        dee.miles@beasleyallen.com,
                                 ashley.pugh@beasleyallen.com
12

13                                      _s/Brendan V. Monahan_____
                                        Brendan V. Monahan, WSBA #22315
14                                      Attorney for Defendants
                                        Stokes Lawrence Velikanje Moore &
15                                      Shore
                                        120 N. Naches Avenue
16                                      Yakima, WA  98901-2757
                                        Telephone:  (509) 853-3000
17                                      Fax:  (509) 895-0060
18

19

20

21

22

23

24

25

26

27

28

---

DEFENDANTS' MOTION TO STRIKE AND MOTION TO DISMISS          61